1   Lynn Lincoln Sarko, Esq., *admitted pro hac vice*
    lsarko@kellerrohrback.com
2   Michael D. Woerner, Esq., *admitted pro hac vice*
    mwoerner@kellerrohrback.com
3   Gretchen Freeman Cappio, Esq., *admitted pro hac vice*
    gcappio@kellerrohrback.com
4   Havila Unrein, Esq., *admitted pro hac vice*
    hunrein@kellerrohrback.com
5   **KELLER ROHRBACK L.L.P.**
    1201 Third Avenue, Suite 3200
6   Seattle, WA 98101
    Telephone: (206) 623-1900 / Fax: (206) 623-3384
7
    Juli E. Farris, Esq. (CA Bar No. 141716)
8   jfarris@kellerrohrback.com
    Sharon Hritz, Esq. (CA Bar No. 265105)
9   shritz@kellerrohrback.com
    **KELLER ROHRBACK L.L.P.**
10  1129 State Street, Suite 8
    Santa Barbara, CA 93101
11  Tel: (805) 456-1496 / Fax: (805) 456-1497

12  Mark D. Samson, Esq., *admitted pro hac vice*
    msamson@kellerrohrback.com
13  **KELLER ROHRBACK P.L.C.**
    3101 N. Central Avenue, Suite 1400
14  Phoenix, AZ 85012
    Tel: (602) 248-0088 / Fax: (602) 248-2822
15

16  ***Additional Counsel for Plaintiffs on following page***

17              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
18

| | |
|---|---|
| JENNIFER L. SAAVEDRA, DR. MELISSA STRAFFORD, CAROL JACQUEZ, and DAVID MATTHEWS, JR., on behalf of themselves and all other persons similarly situated,<br><br>             Plaintiffs,<br><br>    vs.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>             Defendant. | No. 2:12-cv-09366-SVW(MANx)<br><br>**CLASS ACTION**<br><br>**DECLARATION OF MICHAEL D. WOERNER IN SUPPORT OF MOTION PURSUANT TO RULE 56(d)**<br><br>THE HONORABLE STEPHEN V. WILSON |

(lines 19–28)

Samuel S. Deskin, Esq.
sam@deskinlawfirm.com
DESKIN LAW FIRM, PLC
16944 Ventura Blvd
Encino, CA 91316
Tel.:  (800) 709-8978 / Fax: (800) 709-8971

Harris L. Pogust, Esq.
hpogust@pbmattorneys.com
T. Matthew Leckman, Esq.
MLeckman@pbmattorneys.com
POGUST BRASLOW MILLROOD LLC
161 Washington Street, Suite 1520
Conshohocken, PA 19428
Tel.:  (800) 897-8930 / Fax:  (610) 941-4245

*Additional Counsel for Plaintiffs*

Pursuant to 28 U.S.C. § 1746, I, Michael D. Woerner, declare as follows:

1.     I am a partner at the law firm of Keller Rohrback L.L.P. and am counsel of record for the Plaintiffs in this matter.  I make this Declaration based on personal knowledge and am competent to testify to the matters set forth herein.

2.     On March 27, 2013, Defendant Eli Lilly & Company ("Lilly") filed a 249-page motion for summary judgment, including declarations and exhibits. (Dkt. 54 ("MSJ").)

3.     At this early stage of the litigation, Plaintiffs cannot present facts essential to justify their opposition to Lilly's motion for summary judgment because, to date:

    A.     Lilly has not yet answered Plaintiffs' corrected First Amended Complaint, despite the fact that, by my firm's calculations and according Federal Rule of Civil Procedure ("Rule") 12(a)(4), Lilly's answer was due March 12, 2013.

    B.     Plaintiffs have been precluded from taking discovery.

    C.     Lilly has not served Plaintiffs with initial disclosures pursuant to Rule 26(a).

4.     On February 25, 2013, I attended a hearing before the Court on Lilly's motion to dismiss Plaintiffs' First Amended Complaint.  At the hearing, the Court advised Plaintiffs that they would be permitted to file an application under Rule 56(d) upon receiving Lilly's summary judgment motion, if Plaintiffs needed "more time to respond" to the summary judgment "by way of discovery."  (Tr. 6:13-7:4 (Feb. 25, 2013).)

5.     In accordance with this Court's statements at that hearing, as well as Rule 56(d), I respectfully submit this Declaration to request that Lilly's motion for summary judgment be deferred or denied and that Plaintiffs be given the opportunity and sufficient time to discover facts essential to their opposition.

6.      Specifically, Plaintiffs request targeted discovery as to the following topic areas, as Plaintiffs also explain in their Rule 56(d) motion:

**A.      Topic Area 1: Whom does Lilly treat as the consumer?**

7.      In order for Plaintiffs to present facts essential to oppose Lilly's motion, they need the following discovery regarding Lilly's understanding of who is the consumer of its prescription medicine products:

A.      Discovery of the basis for Lilly's assertion in its summary judgment motion that it is the prescribing physician, and not the patient/consumer, who is the consumer of Cymbalta, in light of the following admission that appears in Lilly's SEC filings:

We promote our major pharmaceutical products in the U.S. through sales representatives who call upon physicians and other health care professionals. We advertise in medical journals, distribute literature and samples of certain products to physicians, and exhibit at medical meetings. In addition, we advertise certain products directly to consumers in the U.S., and we maintain websites with information about our major products. We supplement our employee sales force with contract sales organizations as appropriate to leverage our own resources and the strengths of our partners in various markets.

Lilly's Form 10-K filing with the SEC for the fiscal year ended December 31, 2011, at 3 (attached hereto as Exhibit 1).

B.      Such discovery should include, but not be limited to, the deposition of Lilly's former Chairman, President, and CEO, Sidney Taurel, who has said that:

More than ever, we know that patients are actively seeking information about diseases and treatments, asking questions,

2

evaluating information, and making choices. As a company and
an industry responsible for bringing new, innovative medicines
to the marketplace, we understand it is our duty to provide
advertising that is truthful, accurate and balanced surrounding
these products….Moving forward, Lilly will strive for even
higher standards for our consumer advertising campaigns. We
will continue to develop only campaigns that reinforce the
physician/patient relationship, that appropriately educate
patients about our new medicines without encouraging
inappropriate use, and equally inform patients about the risks
and benefits of our products.

Eli Lilly & Co., *Lilly Announces Support of Drug Industry Principles on Consumer Advertising of Prescription Medicines*, LILLY.COM (Aug. 2, 2005), http://newsroom.lilly.com/releasedetail.cfm?releaseid=170208 (attached hereto as Exhibit 2).

C.     Discovery regarding how Lilly defines and uses the term "consumer" outside the litigation context, including in its sales, marketing, and advertising of Cymbalta.

**B.     Topic Area 2: Were Lilly's representations about Cymbalta misleading to a reasonable lay consumer?**

8.     Lilly argues in its motion for summary judgment that "…read in its entirety, the warning is clear to a reasonable *lay* consumer." (MSJ at 11, n.5 (emphasis added).)  In order for the plaintiffs to present facts essential to oppose Lilly's motion, they need the following discovery:

A.     The identity of all witnesses with knowledge, all documents that support, and all research performed that Lilly relies upon to support its assertion in footnote 5 of its summary judgment motion that "read in its

3

entirety, the warning is clear to a reasonable lay consumer." (MSJ at 11 n. 5.)

       B.    Discovery of (1) oral and written communications from Lilly to consumers regarding Cymbalta, including advertisements, labeling, pamphlets, and other materials; (2) oral and written communications from consumers to Lilly regarding Cymbalta, including any complaints, reviews, or requests for additional information; and (3) any actions that Lilly took in response to communications from consumers regarding Cymbalta withdrawal.

       C.    Discovery regarding Lilly's decision-making and strategy with respect to the advertising, marketing, and labeling of Cymbalta.

       D.    Discovery of how and why the Cymbalta label changed from 2004 to the present. (*See* Order, Dkt. 52 at n. 2 (noting "minor variations").) The withdrawal section in 2004 stated:

> PRECAUTIONS…Discontinuation of Treatment with Cymbalta – Discontinuation symptoms have been systematically evaluated in patients taking Cymbalta. Following abrupt discontinuation in placebo-controlled clinical trials of up to 9-weeks duration, the following symptoms occurred at a rate greater than or equal to 2% and at a significantly higher rate in duloxetine-treated patients compared to those discontinuing from placebo: dizziness; nausea; headache; paresthesia; vomiting; irritability; and nightmare.

(Declaration of Sharon Hoog, M.D. ("Hoog Decl."), Dkt. 56, Ex. 1 at 22-23.) The variations to this section include the following:

          i.    Adding "MDD" before "placebo-controlled clinical trials"

ii.     Removing "of up to 9-weeks duration" after "placebo-controlled clinical trials"

iii.     Changing 2% to 1%

iv.     Adding "insomnia, diarrhea, anxiety, hyperhidrosis, and vertigo" to the list of withdrawal symptoms

v.     Adding "or tapered" between "abrupt" and "discontinuation"

vi.     Adding "fatigue" as a withdrawal symptom

vii.     Changing "at a rate greater than or equal to 1%" to "at 1% or greater"

viii.     Altering the sequence of withdrawal symptoms

ix.     Removing "nightmares" as a symptom

E.     Discovery relating to recommendations or studies known by Lilly regarding tapering / gradual discontinuation of Cymbalta.  (*See*, *e.g.*, Declaration of Sarah L. Helgeson ("Helgeson Decl."), Dkt. 55, Ex. 1 at 8 ("A 3-day taper employed in one long-term study appeared insufficient to substantially decrease the incidence of discontinuation-emergent adverse events."); *see also* Helgeson Decl., Dkt. 55, Ex. 11 (citing fourteen studies involving tapering of Cymbalta published between 2006 and 2010).)

F.     Discovery of studies known by Lilly on the co-administration of fluoxetine and duloxetine to minimize discontinuation symptoms or switching from duloxetine to fluoxetine to alleviate discontinuation symptoms.  (*See* Helgeson Decl., Dkt. 55, Ex. 11 at 75 ("Switching to an agent with an extended half-life, such as fluoxetine [Prozac] can help reduce the incidence of antidepressant discontinuation syndrome."))

G.     Discovery of how and why Lilly chose the following tapering instructions on the label:

5

PRECAUTIONS… Patients should be monitored for these symptoms when discontinuing treatment with Cymbalta. A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible. If intolerable symptoms occur following a decrease in the dose or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered. Subsequently, the physician may continue decreasing the dose but at a more gradual rate (see DOSAGE AND ADMINISTRATION).

(Hoog Decl., Dkt. 56, Ex. 1 at 23.)

DOSAGE AND ADMINISTRATION. Discontinuing Cymbalta (duloxetine hydrochloride). Symptoms associated with discontinuation of Cymbalta and other SSRIs and SNRIs, have been reported (see PRECAUTIONS). Patients should be monitored for these symptoms when discontinuing treatment. A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible. If intolerable symptoms occur following a decrease in the dose or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered. Subsequently, the physician may continue decreasing the dose but at a more gradual rate.

(Hoog Decl., Dkt. 56, Ex. 1 at 33.)

H.     Discovery of Lilly's responses to consumer inquiries about tapering off Cymbalta as well as materials showing how Lilly employees should respond to such inquiries.

I.    Discovery relating to consumer inquiries regarding Cymbalta withdrawal or discontinuation via 1-800-LillyRx, including records of both the consumer inquiries, as asked, and the responses from Lilly employees.

J.    The original label for Cymbalta submitted to the FDA prior to approval.

K.    Discovery of communications between Lilly and the FDA concerning the section of the label titled "Discontinuation of Treatment with Cymbalta."

L.    All correspondence from (or on behalf of) Lilly in response to the September 9, 2005 letter from FDA Regulatory Review Officers Michelle Safarik and Jialynn Wang to Lilly U.S. Regulatory Affairs Manager Stacy Holdsworth.  (*See* Plaintiffs' corrected First Amended Complaint ("FAC"), Dkt. 44 at ¶ 37.)

M.    All correspondence from (or on behalf of) Lilly in response to the September 21, 2007 letter from FDA Regulatory Review Officer Michelle Safarik to Lilly U.S. Regulatory Affairs Manager Michele Sharp.  (FAC, Dkt. 44 at ¶ 38.)

N.    All correspondence from (or on behalf of) Lilly in response to the March 26, 2009 letter from FDA Regulatory Review Officer Michael Sauers to Lilly U.S. Regulatory Affairs Director Michele Sharp.  (FAC, Dkt. 44 at ¶ 39.)

O.    All correspondence from (or on behalf of) Lilly in response to the January 7, 2010 letter from FDA Regulatory Review Officers Twyla Thompson and Mathilda Fienkeng to Lilly U.S. Regulatory Affairs Manager Michele Sharp.  (FAC, Dkt. 44 at ¶ 40.)

P.    Any other regulatory communications with Lilly regarding the Cymbalta label.

7

**C.   Topic Area 3: Without conceding that the learned intermediary doctrine applies, did Lilly adequately warn medical professionals of Cymbalta withdrawal?**

9.     It is Plaintiffs' position that the learned intermediary doctrine does not apply to Plaintiffs' consumer protection claims.  However, since Lilly made the adequacy of its warning the focus of its motion, Plaintiffs, in order to present facts essential their opposition, need the following discovery regarding the adequacy and accuracy of the Cymbalta label, the adequacy and accuracy of medical journal articles funded by Lilly, the adequacy and accuracy of Lilly's Medical Information Letters, and the extent of Lilly's knowledge of the frequency, severity, and duration of Cymbalta withdrawal:

**1.     Cymbalta Label**

A.     Deposition of Declarant Sharon Hoog, MD.

B.     Discovery related to the half-life of Cymbalta and the relationship between Cymbalta's pharmacologic properties and DEAEs.

C.     Discovery related to sections 5.6 (Discontinuation Warning) and 12.3 (Pharmokinetics) of the Cymbalta label and the decision to not cross-reference these sections.

D.     Discovery related to whether data describing the frequency, severity, and/or duration of withdrawal should be included in or excluded from the label.[1]

E.     Discovery related to which specific DEAEs should be included in or excluded from the label.

---

[1] For example, only after March 2009 (and then only in the Medical Information Letters that are sent to doctors upon unsolicited requests and not otherwise disseminated) are doctors informed that a majority of DEAEs in acute and long-term studies were unresolved at final study contact, based on Lilly's data published in 2005.  (*See* Helgeson Decl., Dkt. 55, Ex. 6.)

8

F.     Discovery related to how Cymbalta's withdrawal profile compares to other SNRIs and SSRIs or that address the following passage from the label:

> During marketing of other SSRIs and SNRIs (Serotonin and Norepinephrine Reuptake Inhibitors), there have been spontaneous reports of adverse events occurring upon discontinuation of these drugs, particularly when abrupt, including the following: dysphoric mood, irritability, agitation, dizziness, sensory disturbances (e.g., paresthesias such as electric shock sensations), anxiety, confusion, headache, lethargy, emotional lability, insomnia, hypomania, tinnitus, and seizures.  Although these events are generally self-limiting, some have been reported to be severe.

(Hoog Decl., Dkt. 56, Ex. 1 at 23.)  Additionally, in Lilly's summary judgment motion, Lilly claims that "[t]he discontinuation warning speaks to the 'severity' and 'duration' of potential DEAEs within the SNRI class." (MSJ at 15.)

**2.     Medical Information Letters / Sales Representatives**

10.     As stated in Lilly's motion for summary judgment and the Helgeson Declaration, Lilly provides "Medical Information Letters" following a doctor's "unsolicited" request by 4 principal means: 1) 1-800-LillyRx, 2) Lilly medical professionals responding to questions addressed to sales reps, 3) medical conferences and meetings, 4) www.LillyMedical.com. (MSJ at 5; Helgeson Decl., Dkt. 55 at ¶ 7.)  Attached as exhibits to the Helgeson Declaration are eleven versions of the Medical Information Letter regarding Cymbalta withdrawal, prepared between 2004 and 2013.  (Helgeson Decl., Dkt. 55, Exs. 1-11.)  These eleven letters vary slightly over the years.  Curiously, the last version, dated

9

February 2013, is a complete overhaul of the previous document.  (Helgeson Decl., Dkt. 55, Ex. 11.)  Attached hereto as Exhibit 3 is a true and complete version of the February 2013 letter, with the differences from the January 2012 letter shown as follows:  plain text is content that remained the same, gray highlighted text is newly added content, and strikethrough is deleted content.  For example, here are two relevant excerpts, which are supported by studies published five and seven years ago, yet cited in Lilly's letters for the first time in February 2013:

> Patients should be educated about discontinuation syndrome before and during antidepressant treatment, the importance of taking medication consistently, and the need to taper medication at the end of a course of treatment to minimize such symptoms (Schatzberg, 2006).

(Helgeson Decl., Dkt. 55, Ex. 11 at 75.)

> Switching to an agent with an extended half-life, such as fluoxetine [Lilly's product, Prozac] can help reduce the incidence of antidepressant discontinuation syndrome.

(*Id.* (citations omitted).)

11.   In order to justify their opposition, Plaintiffs need the following discovery regarding both the abrupt overhaul of the Medical Information Letter in February 2013 (Helgeson Decl., Dkt. 55, Ex. 11) and the previous versions of the letter:

A.   Discovery regarding the changes to the letter and the decisionmaking process that led to the February 2013 version.

B.   Deposition of Declarant Sarah L. Helgeson, Director of Global Medical Information at Lilly.

C.   Information regarding requests made "via 1-800-LillyRx," including how many requests, from whom (doctors from which geographic

areas, practicing in which fields of medicine), when the requests were made, and what the substance of the requests was.

D.     Information regarding requests made "through Lilly medical professionals who respond to questions addressed to Lilly sales representatives," including how many questions, from whom, and the other Cymbalta-related materials given to requesting doctors along with the Medical Information Letters.

E.     Information regarding requests made to "Lilly medical personnel at professional conferences and meetings," including how many requests, from whom, and other Cymbalta-related materials distributed at the professional conferences and meetings.

F.     Information regarding requests made "via www.LillyMedical.com," including the number of visits to the website, the number of physicians who take the time to register for the site, and the number of times the Medical Information Letters regarding Cymbalta discontinuation have been downloaded.

G.     Discovery pertaining to the extent to which the Medical Information Letters, as well as any other information that Lilly provided in response to requests, differed from other information that Lilly had regarding the frequency, severity, and duration of Cymbalta withdrawal.

H.     Discovery as to why Lilly chose to distribute the information letters in response to unsolicited requests, rather than simply placing the information in the label or other widely distributed communications.

I.     Discovery as to why the Medical Information Letters differ from the information presented on the label regarding withdrawal.

J.     Discovery as to why Lilly revised the Medical Information Letter in February 2013 but did not similarly revise the label.

11

12.     Plaintiffs also require discovery regarding statements made and information provided by Lilly's and its agents' sales representatives, including the following:

A.     The custodial files and call notes for the sales representatives who visited Plaintiffs' prescribing physicians in this case.

B.     All records, entries, or other data from Lilly's sales representative database, or any other electronic database used to track sales calls to physicians, regarding each and every sales call made to Plaintiffs' prescribing physicians in this case.

C.     Discovery of what Quintiles Transnational's representatives said to doctors regarding Cymbalta.[2]

### 3.     Journal Articles and Published Studies

13.     In order to justify their opposition, Plaintiffs require the following discovery regarding journal articles and published studies dealing with Cymbalta withdrawal:

---

[2] *See* DealBook, *Quintiles Expands Stake in Big Pharma*, NY TIMES (Feb. 16, 2010), http://dealbook.nytimes.com/2010/02/16/quintiles-expands-stake-in-big-pharma/ (attached hereto as Exhibit 4), reporting that the relationship between Quintiles and Lilly dates back to 2002, when Quintiles invested $125 million in cash, as well as $400 million on a sales force of more than 550 people, in order to launch Cymbalta, and that Quintiles receives royalties for marketing Cymbalta. *See also* Quintiles Transnational's Form 10-K filing with the SEC for the fiscal year ended December 31, 2002 (attached hereto as Exhibit 5), which states, "In July 2002, the Company entered into an agreement with Eli Lilly and Company ("LLY") to support LLY in its commercialization efforts for Cymbalta™ in the United States. LLY has submitted a NDA for Cymbalta™, which is currently under review by the FDA for the treatment of depression. Under the terms of the agreement, the Company will provide, at its expense, more than 500 sales representatives to supplement the extensive LLY sales force in the promotion of Cymbalta™ for the five years following product launch. The sales force will promote Cymbalta™ in its primary, or P1, position within sales calls. During the first three years LLY will pay for the remainder of the capacity of this sales force, referred to as the P2 and P3 positions, on a fee-for-service basis…. In return for the P1 position for Cymbalta™ and the marketing and milestone payments, LLY will pay to the Company 8.25% of U.S. Cymbalta™ sales for depression and other neuroscience indications over the five year service period followed by a 3% royalty over the subsequent three years."

A.    The deposition of Declarant David Perahia, M.D., and discovery of the following issues pertaining to David G. Perahia, *et al.*, *Symptoms Following Abrupt Discontinuation of Duloxetine Treatment in Patients with Major Depressive Disorder*, 89 J. Affective Disorders 207-12 (2005) ("Perahia article") (Perahia Decl., Dkt. 57, Ex. 1):

i.    Discovery of how the decision was made as to what portions of the Perahia study should be included in the Cymbalta label and marketing thereof.

ii.    The study protocol for each of the nine studies referenced in the Perahia article.

iii.    The adequacy of the study design. (*See* Helgeson Decl., Ex. 1 at 7 ("Discontinuation symptoms (discontinuation-emergent adverse events) were *proactively* studied during Cymbalta depression clinical studies.") (emphasis added).)

iv.    Whether an 8-week or 9-week study can capture realistic DEAE rates.

v.    Why data regarding DEAEs were collected using open-ended inquiries rather than the widely-used Discontinuation-Emergent Signs and Symptoms (DESS) Scale.[3]    (*See* Perahia Decl., Dkt. 57, Ex. 1 at 12 ("The main limitation of this review is that DEAEs were assessed by means of spontaneous reports rather than a symptom

---

[3] *See*, *e.g.*, Maurizio Fava, *Prospective Studies of Adverse Events Related to Antidepressant Discontinuation*, 67 J. CLIN. PSYCHIATRY suppl. 4, 14 (2006) (attached hereto as Exhibit 6) ("Fava Article"), which is cited by Lilly in its Medical Information Letters, (*See* Helgeson Decl., Dkt. 55, Exs. 3-5.)  The Fava Article states, "Given that the systematic inquiry method is superior to the general inquiry approach, it is not surprising that almost all of the prospective studies in the literature have used the same scale, the Discontinuation-Emergent Signs and Symptoms (DESS) scale."  Fava at 15.

checklist.  The latter might be expected to produce higher incidence rates."))

vi.    Lilly's knowledge of the predicted or average duration of antidepressant treatment generally, and the predicted or average duration of Cymbalta treatment. (*See* Hoog Decl., Dkt. 56, Ex. 1 at 32 ("It is generally agreed that acute episodes of major depression require several months or longer of sustained pharmacologic therapy."))

vii.   Lilly's knowledge regarding the likelihood that rates of DEAEs increase as the duration of treatment increases.

viii.  The final study reports for each of the nine studies referenced in the Perahia article.

ix.    The raw data, including but not limited to the case report forms for each of the nine studies referenced in the Perahia article.

x.     All drafts of the manuscript that was ultimately published as the Perahia article.

xi.    Discovery concerning the manuscript or medical journal article that was ultimately published as the Perahia article.

xii.   Discovery reflecting any third party vendor involvement (such as a medical communications company or PR agency) in the manuscript that was ultimately published as the Perahia article.

xiii.  Discovery regarding how Lilly and/or its agents would address inquiries from medical professionals, and/or the FDA, that pertain to the Perahia article.

xiv.   Discovery reflecting any and all compensation Lilly paid to any of the authors of the manuscript that was ultimately published as the Perahia article.

14

xv.    Non-party discovery regarding the readership of the Journal of Affective Disorders at the time of publication of the Perahia article, the proportion of physicians who research medical literature prior to prescribing a particular medication, and the frequency of such research for those physicians who do.

xvi.   Discovery regarding Lilly's knowledge of physician research practices and the extent to which physicians rely on various sources including the prescription label, the Physician's Desk Reference, medical journals, or other information sources.

B.     Discovery of the following issues pertaining to Christer Allgulander *et al.*, *Pharmacotherapy of Generalized Anxiety Disorder: Results of DuloxetineTreatment from a Pooled Analysis of Three Clinical Trials*, 23 CURR. MED. RES. OPIN. 1245 (2007) ("Allgulander article"):[4]

i.     The study protocol for each of the studies referenced in the Allgulander article.

ii.    The final study reports for each of the studies referenced in the Allgulander article.

iii.   The raw data, including but not limited to the case report forms for each of the studies referenced in the Allgulander article.

iv.    Discovery concerning the manuscript or medical journal article that was ultimately published as the Allgulander article.

v.     Discovery reflecting any third party vendor involvement (such as a medical communications company or PR agency) in the manuscript that was ultimately published as the Allgulander article.

---

[4] The Allgulander article is cited in Lilly's Medical Information Letters from September 2007 – January 2012, which are Exhibits 5 - 10 to the Helgeson Declaration, (Dkt. 55, Exs. 5-10.)  The Allgulander article is attached hereto as Exhibit 7.

15

vi.     Discovery reflecting communications between Lilly and any of the authors of the manuscript that was ultimately published as the Allgulander article.

vii.     Discovery reflecting any and all compensation Lilly paid to any of the authors of the manuscript that was ultimately published as the Allgulander article.

C.     Discovery regarding *all* clinical trials that Lilly conducted with respect to the frequency, severity, and duration of Cymbalta withdrawal.

D.     Discovery regarding whether Lilly had actual or constructive knowledge that its Cymbalta warnings and instructions were inadequate.

E.     All documents that Lilly relies upon to support its assertion that, "[f]or decades, the medical literature has reflected the clinical understanding that '[d]iscontinuation symptoms are common following antidepressant treatment.'"  (MSJ at 21.)

**D.     Topic Area 4: Does Lilly's extensive direct-to-consumer advertising render the learned intermediary doctrine inapplicable to Plaintiffs' claims?**

14.     In 2012, Lilly actually led the pack in direct-to-consumer advertising. Tracy Staton, *LillyTtakes theLlead in DTC Ad Spending, Surpassing Pfizer*, FIERCEPHARMA (Aug. 16, 2012), http://www.fiercepharma.com/story/lilly-takes-lead-dtc-ad-spending-surpassing-pfizer/2012-08-16 (attached hereto as Exhibit 8). During the first three months of 2012 alone, Lilly spent $46.7 million marketing Cymbalta directly to consumers.  *Id.*  As early as 2005, medical professionals voiced concerns over the sea change ushered in by the proliferation of direct-to-consumer advertising and its implications for the learned intermediary rule.  *See* Richard L. Kravitz, *et al.*, *Influence of Patients' Requests for Direct-to-Consumer Advertised Antidepressants: A Randomized Controlled Trial*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, at 7 (April 27, 2005),

16

http://jama.jamanetwork.com/article.aspx?articleid=200780 (attached hereto as Exhibit 9).  In addition, the Government Accountability Office (GAO) issued a report in November of 2006, describing the rapid rise in direct-to-consumer advertising by prescription drug manufacturers, the corresponding increase in drug spending and utilization, and the FDA's inability to adequately review all direct-to-consumer advertising. U.S. Government Accountability Office, GAO-07-54, *Prescription Drugs: Improvements Needed in FDA's Oversight of Direct-to-Consumer Advertising* (2006) (attached hereto is as Exhibit 10).  In light of these materials, and other issues of fact Lilly raises in its Motion, Plaintiffs require the following discovery as to whether the learned intermediary doctrine applies, at all, in the context of their consumer claims, in order to respond to Lilly's motion:

A.    All final Cymbalta advertising materials disseminated by, or on behalf of, Lilly, in any form.

B.    All publications for which Lilly has advertised Cymbalta in non-medical trade journals, including date, ad copy, and publication title.

C.    All final and draft prescription drug advertising materials submitted to FDA, by Lilly or on behalf of Lilly, regarding Cymbalta.

D.    All FDA advisory comments, regulatory letters, or any other responses by FDA, to any of Lilly's draft or final advertisements for Cymbalta.

E.    All of Lilly's written responses to all FDA advisory comments, regulatory letters, or other communications from FDA regarding Lilly's advertisement of Cymbalta.

F.    For such advertising materials, Lilly's "true statements" of information, including those which summarize the side effects, contraindications and/or the effectiveness of Cymbalta.

17

G.     With respect to all non-broadcast advertisements for Cymbalta, all risks of withdrawal specified therein by Lilly.

H.     With respect to all broadcast advertisements for Cymbalta, the major side effects and contraindications specified therein by Lilly.

I.     The total dollars spent by Lilly, per year, on direct-to-consumer advertising for Cymbalta.

J.     The total dollars spent by Lilly, per year, on the promotion of Cymbalta to prescribing physicians.

K.     The total dollars spent by Lilly, per year, on the promotion of Cymbalta to non-prescribing medical professionals.

L.     The total dollars spent by Lilly, per year, on free samples of Cymbalta provided to prescribing physicians to be given to consumers.

M.     Any studies or other analyses performed by (or on behalf of) Lilly as to whether direct-to-consumer advertising by Lilly increased the use of Cymbalta.

N.     Any studies or other analyses performed by (or on behalf of) Lilly as to whether direct-to-consumer advertising increased the number of prescriptions written for Cymbalta by prompting consumers to request Cymbalta from their physicians.

O.     Any studies or other analyses performed by (or on behalf of) Lilly as to whether prescribing physicians are responsive to consumers who request that Cymbalta be prescribed to them.

**E.     Expert Witness Declarations**

15.     Plaintiffs anticipate filing one or more expert witness declarations in opposition to Lilly's motion for summary judgment, the content of which is dependent upon the foregoing discovery requests.

18

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

EXECUTED this 3rd day of April, 2013 at Seattle, Washington.

/s/ Michael D. Woerner
By:  Michael D. Woerner

19