UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER L. SAAVEDRA, DR. MELISSA STRAFFORD, CAROL JACQUEZ, and DAVID MATTHEWS, JR., on behalf of themselves and all other persons similarly situated,<br><br>                    Plaintiffs,<br><br>vs.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>                    Defendant. | No. 2:12-cv-09366-SVW(MANx)<br>CLASS ACTION<br><br>DECLARATION OF WILLIAM F. KITZES IN SUPPORT OF PLAINTIFFS' MEMORANDA OF LAW IN SUPPORT OF CLASS CERTIFICATION PURSUANT TO RULE 23(c)(4) AND RULE 23(b)(3)<br><br>The Honorable Stephen V. Wilson |

Declaration of Wm. F. Kitzes, J.D., CHCM, CPSM

1

<u>Declaration of Wm. F. Kitzes, J.D., CHCM, CPSM</u>

I, Wm. F. Kitzes, do hereby declare that:

1.      I am a Board Certified Product Safety Manager and Hazard Control Manager.  I am engaged by attorneys, corporations and government organizations to provide safety analysis and product safety management services.  I have assisted in recalls, developed product warnings and have testified in trial in both State and Federal Court in California and 30 other states over the last 30 years.

2.      From 1974 to 1981, I worked at the U.S. Consumer Product Safety Commission (CPSC), part of which time I served as Legal Advisor to the Director, Office of Product Defect Identification, and was responsible for identifying products which contained a defect which could create a substantial product hazard, developing voluntary corrective action plans under Section 15 of the Consumer Product Safety Act including the recall of substantially hazardous consumer products, and notification to the public of the danger through warnings and other media. (See attached Curriculum Vitae).

3.      As CPSC *Program Manager for Sports, Recreation and Power Equipment (1977-1980)*, I supervised a team of engineers, epidemiologists, human factors specialists, and technical communication staff in the evaluation of injury statistics, engineering data, and product use information to achieve a reduction in consumer products injuries. Injury prevention tools combined mandatory and voluntary standards, on-product warnings, and safety education campaigns; resulting in publication of the *Federal Safety Standard for Walk-Behind Power Lawn Mowers 16 CFR 1205 (1979)*. I served as Commission representative to various industry groups and standards development committees, including American National Standards Institute (ANSI), American Society for Testing & Materials (ASTM), the Outdoor Power Equipment Institute and the Sporting Goods Manufacturers Association.

4.      I have been retained as a consultant for a number of major manufacturers, including the *Toro Company* on product safety issues, the *Vendo Company* for developing warning labels and safety bulletins, the *Jensen Corporation* for warnings and safe operation of industrial equipment, *Nobel Chemical Company* for adequacy of warnings, *Corning Glass* for evaluation of recalls, *BernzOmatic*, a division of the Newell Group, for development of point-of purchase recall displays, warnings, and advertising, *Arctic Cat, Inc*. for analysis of all-terrain vehicle off-road safety, including owner's manuals, instructions, warnings and foreseeable use, and *Visioneer*, Inc. in developing a program to upgrade computer scanners.  I have developed a program for *Global Industries* to improve executive chair stability, reviewed warnings on heavy equipment for *Daewoo Heavy Industries America*, investigated safety issues for Carson Industries, Inc. and assisted *CISCO Systems* in recall development.  I have designed a warning label for *Whisper Communications, Inc*., and assisted *Wham-O, Inc*. in recall procedures.  I have provided risk analysis, recall assistance and consumer warnings and instructions to Restoration *Hardware, Inc*., have developed warnings for *Plastics Research Corp*. concerning use of decorative building materials as protective barriers.  I have reviewed advertising and promotional material for *ACH Foods* and assisted *Hilton Hotels* on recall issues.  I have advised *Swimways Corporation* on product safety management and warnings.  I have advised *AsiaEXP* on risk assessment, labeling and product standards and have assisted *Dick's Sporting Goods* in developing safety communications and warnings.  I currently serve as Product Safety Coordinator for compliance with a Department of Justice/CPSC Consent Agreement and Order for *LM Imports*.  I provided research and analysis on ATV safety for the National Association of Attorneys General and served as the Chairman of the *Florida Consumer's Council* (1993-2007).

5.      I have developed on-product warnings and instructions for a number of manufacturers and distributors.  A few examples include:

- Vendo Company for vending machine warnings
- Arctic Cat, Inc. for ATV's
- Whisper Communications for electrocution hazards
- Plastics Research Corp. for building material warnings
- Daewoo Heavy Industries America for labeling of heavy machinery
- Swimways Corporation for warnings on children's pool products
- Dick's Sporting Goods for fitness equipment

6.      I have lectured at the National Safety Council Annual Congress and Exposition on the following topics:

- When Risk Can't Be Eliminated:  Building Adequate Warnings, Los Angeles, California, 1998
- Injury Prevention Analysis:  Guidelines for Product Safety Managers, Chicago, Illinois, 1997
- Post Sale Corrective Action Plans - Recalls and Consumer Notice, Orlando, Florida, 1996

7.      I have also addressed industry groups on warnings issues for the International Consumer Product Health and Safety Organization and the CPSC.

8.      In 1991, I wrote an article for Professional Safety, the Journal of the American Society of Safety Engineers (ASSE), entitled *Safety Management and the Consumer Product Safety Commission*.  Reviewed and accepted by the ASSE editorial board, the section on warnings reads in part:

> *VI. Warn users of product dangers and motivate them to avoid injury.*
>
> In addition to hazard elimination, product warnings and instructions must help the user avoid dangers, including those that remain after thorough attempts to eliminate or guard.  An explicit warning that includes a signal word, statement of the hazard, appropriate behavior and description of the danger's consequences is required.  A pictogram illustrating consequences often helps communicate the danger, especially to those who cannot read.

9.      I have previously testified in a number of prescription drug warning cases, including Isotretinoin (Accutane), Zomax, Macrobid and Norplant.  I have done extensive research and analysis on Imitrex, Lovenox as well as Calcium, Ephedrine and IV saline solution.

10.      I have also provided testimony and analyses concerning warnings on numerous medical devices, including hypo /hyper thermal blankets, blood infusion equipment, skin dermabrasion, marlex mesh and cold pack therapy systems.

11.      I have testified concerning false and misleading advertising as well as unfair and deceptive practices where products by representation or omission, were materially misleading to consumers and were likely to or did cause injury.  Under the FDA and FTC rules prescription drugs and their sponsors must not disseminate false or deceptive advertising.

12.      I file this declaration in support of Plaintiffs' Motion for Class Certification. I have reviewed Judge Wilson's Order of June 13, 2013 and have assumed for the purposes of this Declaration, "that Plaintiffs will be able to prevail on their contention that the warnings given to physicians were inadequate as alleged in the FAC."

13.     Based on my experience and the documents below, it is my opinion that Eli Lilly's direct to consumer (DTC) advertising of Cymbalta was no different than the advertising of any consumer commodity such as an automobile or a home mortgage. Lilly clearly intended to reach an entire class of depressed patients seeking a remedy. Lilly made no effort nor were they apparently interested in distinguishing between the medical issues of one patient or another.  Rather, Lilly spent billions of dollars to encourage patients to ask their doctors and encourage them to prescribe Cymbalta, as opposed to any other of the substantially similar remedies or treatments available on the market.  Lilly was successful beyond most measures of business success.  In 2008, they increased their advertising budget for Cymbalta by 17 1/2%, and in turn increased U.S. sales by $1.2 billion based on myriad additional prescriptions written.  They can only effectuate this result through their DTC advertising and other promotion persuading doctors to write more and more prescriptions.

14.     The surveys below clearly show that the more the product is advertised, the more requests are made of doctors and the more prescriptions they write.  Lilly was well aware as evidenced by the Kaiser Foundation Report of 2005, authored by the Harvard Medical School, MIT and the Harvard School of Public Health, that the return on investment from direct to consumer advertising was as high as $4.20 for every dollar invested.  By saturating the airwaves with advertisements about Cymbalta, and following up with both print and Internet advertising, they influenced the class of depressed patients without regard for their individual medical histories or needs.  But Lilly failed to adequately inform either doctors or patients of the consequences of withdrawing from Cymbalta use, consequences that clinical trials highlighted to Lilly even before the first prescription was written.

15.     Spending well over a billion dollars in advertising for Cymbalta was Lilly's voluntary act.  They were not required to advertise Cymbalta.  But once they did, they were responsible to make those ads honest, truthful and fair to adequately protect the public from economic injury.

16.     Lilly's deceptive conduct towards consumers did not distinguish among individual patients.  It was based on a long term strategy to influence all consumers who fit their patient profile with the identical inadequate, unfair and deceptive information and to insure the number of prescriptions written and subsequent Lilly's profits.

17.     The DTC ad campaigns are intended to go around the learned intermediary and directly influence patients.  A substantial number would then ask a doctor for that specific drug, whether it was the correct medication or not.  Countless research papers by medical professionals concluded that Lilly succeeded beyond their expectations.

18.     Cymbalta is a consumer product widely advertised to the ultimate consumer.  One must view the data from the perspective of the "reasonable consumer," the class that the hundreds of millions of dollars in false and deceptive ads were aimed at.  If the deception is material and likely to cause injury, the learned intermediary is supplanted by the deceptive acts of Lilly and has little bearing on the health care decisions of consumers in today's modern medical care environment that urges the consumer to "take charge" of their own care.

19.     The documents summarized below reflect those portions of the actual documents that relate directly to the issues in the instant case.  Where possible to convey the original meaning, I have incorporated the actual words from the text or have condensed long passages while maintaining the original intent.  To insure access to the full text, I have attached each document cited as an exhibit.  For lengthy documents, I have identified the pages where the information is contained.

_____

Exhibit A

Business Ethics

www.lilly.com/Responsibility/ethical-business/Papers/ethical-business.aspx

•       We demonstrate our values through responsible business practices that reflect our
        commitments to strong governance principles; transparency; patient, customer, and
        employee privacy; ethical product promotion; and stakeholder engagement.


Exhibit B

Institute for Safe Medication Practices

ISMP Quarterwatch, October 3, 2012 issue

Why Reports of Serious Adverse Drug Events Continue to Grow

pages:  2, 4, 11, 12, 13, 14

•       Institute for Safe Medication Practices (ISMP) is nation's only 501(c)(3) nonprofit
        organization devoted entirely to medication error prevention and safe medication
        use since the 1970's.

•       ISMP has been an independent voice in safe medication practices for 35 years, and
        is certified as a Patient Safety Organization (PSO) by the Agency for Healthcare
        Research and Quality.

•       Michael Cohen, RPh, MS, ScD (hon.), is president of ISMP.  He edited the text
        book Medication Errors published in 2007 by the American Pharmaceutical
        Association.  In 2005, he was recognized as a MacArthur Fellow by the John D.
        and Catherine T. MacArthur Foundation.

•       ISMP focused on four issues, including this analysis of "Signals for Duloxetine
        (CYMBALTA) and Serious Withdrawal Symptoms.

- We investigated a signal for duloxetine (CYMBALTA) and serious withdrawal symptoms.  In the first quarter of 2012, 48 case reports of withdrawal described an array of problems that included neurological effects such as paresthesia and dizziness, psychiatric problems such as crying, suicidal ideation, and anger, and other symptoms including effects on appetite and weight gain.

- Early clinical studies of abrupt discontinuation showed that withdrawal effects occurred in 40 to 50% of patients, that 10% of those were severe, and that approximately half had not resolved when side effects monitoring ended after one or two weeks.

- In the full report we document a serious lapse in the system that ought to be providing complete information and clear warnings for patients and health professionals about the extensive withdrawal effects of the antidepressant duloxetine. The Medication Guide for patients gives no hint that withdrawal symptoms can affect half of those discontinuing duloxetine, and that many cases may be severe, persistent, or both. The prescribing information for physicians and pharmacists does not provide realistic schedules for dose tapering or a clear picture of the likely incidence of these reactions.

- Urging patients to consult their doctor before stopping duloxetine raises the question of the quality and quantity of company information provided to doctors to manage discontinuation. Some information is provided in the prescribing information for doctors and pharmacists.

- A single sentence describes a tapering regimen: "A gradual dose reduction rather than abrupt discontinuation is recommended whenever possible."

- The duloxetine prescribing information also lists 12 topics for physicians to discuss with patients before starting treatment with duloxetine. Withdrawal problems are not on the list.

9

Exhibit C

Harvard Business Review

Harvard Business School

Eli Lilly:  Developing Cymbalta

July 30, 2008

pages:  1, 2, 3, 5, 6, 7, 8, 10, 11, 12

- In April, 2000, New Antidepressant Team (NAT), a Lilly cross-functional team of Lilly research and development (R&D) and marketing formed to find a successor to Prozac.

- Lilly marketing director was hopeful that Cymbalta would be the "Holy Grail" of the quest for Prozac's successor.

- NAT approached product development as a combined R&D and marketing endeavor.

- R&D should be guided by thorough understanding of market forces.

- This philosophy was shared by senior management at Lilly.

- *Relative Importance of Antidepressant Attributes to Physicians*
  The study revealed that tolerability and the avoidance of certain side effects of antidepressants were often perceived as more important to physicians (47% weight in prescribing decisions) than the drug's primary or secondary efficacy in treating depression (18% each).

Exhibit D

Direct-to-Consumer Advertising of Prescription Drugs:  Looking Back, Looking Forward

Kathryn J. Aikin, Ph.D.

Division of Drug Marketing, Advertising and Communications, FDA

Address to the Society for Women's Health Research

October 25, 2005

- Advertising:
    - Must not be false or misleading
    - Must present "fair balance" between benefits and risk information
    - Must disclose "material" facts in light of claims made about the product

Does DTC advertising cause patients to pressure doctors for advertised drugs?
- Brand specific requests are likely to be accommodated.
    - Patients who ask about a brand are more likely to be prescribed that brand than patients who ask in general.

- DTC ads do not convey information about risks and benefits equally well.
    - Physicians believe patients understand benefits much better than risks.
    - Physicians believe DTC ads confuse patients about relative risks and benefits of drugs.

[This paper is an address to a women's health group and not a rule, regulation, or any official pronouncement by the FDA.  It merely presents a survey of knowledge collected about DTC in general.  The article reviews the general research concerning the link between DTC advertising and its effect on doctors and patients as well as the necessity for fair balance in the presentation of risks and benefits that are the foundation of the system. -- WFK]

<u>Exhibit E</u>

<u>Impact of Direct-to-Consumer Advertising on Prescription Drug Spending</u>

<u>The Henry J. Kaiser Family Foundation, June 2003</u>

- An original study, commissioned by the Kaiser Family Foundation and conducted by researchers at the Harvard School of Public Health, the Massachusetts Institute of Technology, and the Harvard Medical School, provides important new information on the question of direct to consumer advertising.

- The study found that increases in DTC advertising were associated with significant growth in sales for the classes of drugs studied:  for every 10% increase in DTC advertising, drug sales within the class increased by an average of 1%.

- The study concludes that changes in DTC advertising from 1999 to the year 2000 accounted for 12% ($2.6 billion) of the total growth in drug spending in 2000. This means that each additional dollar spent on DTC advertising in 2000 yielded $4.20 in additional pharmaceutical sales in that year.

Exhibit F

FiercePharma

Eli Lilly -- Top 13 Advertising Budgets

September 2008

- Eli Lilly 2007 ad spending:  $774 million

- Eli Lilly pumped up its media push on its antidepressant Cymbalta by a decent 17.5% to $184 million.

- Cymbalta sales growth reached a whopping 60% giving Lilly a $2.1 billion infusion to the top line, $1.8 billion of that in the U.S. alone.

[The pharmaceutical industry was fully aware of the incredible returns available to them by investing in DTC --  3 or 4 dollars in increased sales for every dollar spent is beyond the expectation of nearly all investors.  And there was only one way that these sales and profits could be realized.  By increasing the number of prescriptions written by doctors.  The entire premise of DTC is to increase the number of prescriptions written by encouraging patients to request and physician to write brand specific prescriptions.  Eli Lilly was an industry leader and at times the top spender on DTC advertisements.  They knew the purpose and the power of their actions. -- WFK]

Exhibit G

The Journal of the American Medical Association

Influence of Patients' Requests for Direct-to-Consumer Advertised Antidepressants

• Survey included undercover visits to physician offices by trained investigators complaining of major depression and adjustment disorder.

• Conclusions:   "Patients' requests have a profound effect on physician prescribing in major depression and adjustment disorder."

Exhibit H

Direct-to-Consumer Pharmaceutical Advertising

C. Lee Ventola, MS

Pharmacy and Therapeutics -- A Peer-Reviewed Journal for Managed Care and Hospital Formulary Management

October 2011

pages:  8-11

• Consumers have been found to place unwarranted trust in DTC ads.  One survey of consumers found that 50% of respondents thought the ads were approved by the government, 43% thought a medication had to be completely safe for it to be advertised; and 22% thought that a drug known to have serious side effects could not be advertised.

• Physicians also report that most patients who initiated request for a new drug understand the benefits much better than the risks.  Studies have found that when a claim presents a drug as being very efficacious, consumers do not make much effort to process the rest of the information within the message.  Information about risks is also typically presented in often ignored smaller print or as part of a large,

undifferentiated block of text or audio.  In addition, ads often show a mismatch between visual imagery and verbal messages when risk information is presented. For example, a person may be seen enjoying a walk in the park while the narrator lists serious side effects.  Research has shown that when visual and verbal messages are discordant, visual messages tend to predominate, which can result in insufficient processing of verbally presented risk information.

- If a patient's request for an advertised drug is clinically inappropriate and the health care provider is unable or unwilling to correct the patient's perception that it is a good choice, this situation may lead to unnecessary or harmful prescribing. Patients may withhold information to fit a profile they saw in a DTC ad to get the prescription they want.

- These findings also demonstrate that patients who made either in general or brand specific request for a prescription were more likely to receive it compared with those who didn't.

- In a national survey, 39% of physicians and 30% of patients felt that DTC advertising interfered with the physician-patient relationship.

- The negative impact that denying a prescription request can have on the therapeutic relationship has been well-documented.  Denial of the prescription request has been shown to decrease patient satisfaction and increase physician switching.  In one study, nearly half the patients reported feeling disappointed about not receiving a requested medication.  One-quarter of the patients said they would try to change the physician's mind or get the drug elsewhere, and 15% said they were considering switching physicians.

Exhibit I
A Decade of Controversy:  Balancing Policy With Evidence in the Regulation of
Prescription Drug Advertising
Dominick L. Frosch, PhD et al.
American Journal of Public Health, 2010

- The role of patients in medical decision making has changed in recent decades. Patients are no longer viewed as passive recipients of medical care, but instead as active participants who play a key role in making clinical decisions with their health care providers.  The expansion of DTCA stems in part from the shifts in the conceptualization of the patient's role.  Responding to critics, the pharmaceutical industry argues that DTC plays an important role in enabling consumers to play an active role in medical decision making.

- Surveys of physicians and patients suggest that DTCA promotes patients' participation in their medical care.

- In nationally representative surveys, 39% of physicians and 30% of patients felt that DTC advertisements interfere with the physician-patient relationship.

- Physician surveys find that DTCA increase prescription volume and that some of these prescriptions are clinically inappropriate.  81% of physicians believed that DTCA prompts medication requests, and one quarter report resulting changes in their prescribing habits.

- In another survey, physicians judged half of DTCA prompted requests to be clinically inappropriate.  However, 69% of these requests were at least partially fulfilled, with a small but significant percentage of these requests (6%) judged as potentially harmful choices.

Exhibit J

Physicians Report on Patient Encounters Involving Direct-to-Consumer Advertising

Joel Weissman et al.

Physicians thought that direct-to-consumer advertising led patients to seek unnecessary treatments.  Physicians prescribed the advertised drug in 39% of DTCA visits.  Of those visits when the DTCA drug was prescribed, 46% said it was the most effective drug, and 48% said others were equally effective.

Exhibit K

Journal of the American Medical Association Internal Medicine

Direct-to-Consumer Pharmaceutical Advertising Physician and Public Opinion and Potential Effects on the Physician-Patient Relationship, February 2004

Background

Previous studies have shown that direct-to-consumer pharmaceutical advertising can influence consumer behavior and that many physicians have negative views of these advertisements.  Physician and public opinions about these advertisements and how they affect the physician-patient relationship are not well established.

Results

Most physicians tended to view DTC advertisements negatively, indicating that such advertisements rarely provide enough information, specifically on alternative treatments or adverse effects.  Most also believed that DTC advertisements affected interactions with patients by lengthening clinical encounters and leading to patient requests for specific medications, and changing patient expectations of physicians' prescribing practices 55%, 80% and 67% respectively.  Only 29% agreed that DTC advertising is a positive trend.

Federal Trade Commission

> For guidance and Section 12 of the Federal Trade Commission Act, the FTC statement on deception can provide guidance to identify false and misleading advertising, or deceptive and unfair acts.

- 15 USC 52 (Section 12)

  It shall be unlawful for any person, or corporation to disseminate, or cause to distribute any false advertising by any means to induce the purchase of foods, **drugs**, devices. [emphasis added]

FTC Policy Statement on Deception, 103 F.T.C. 110, 174 (1984)
- Elements of Deception
  - Representation, omission or practice likely to mislead consumers
  - From viewpoint of consumer acting reasonably
  - Representation is material in that it is likely to affect conduct and injury is likely.

---

20.    The Harvard Business Review clearly stated that Lilly's survey found that the primary factor in prescribing Cymbalta is tolerability and side effects.  By literally hiding the information about the severity, frequency and duration of withdrawal symptoms, Lilly deprived doctors of the critical information that Lilly knew would negatively impact Cymbalta sales.

21.      According to the Institute for Safe Medication Practices (ISMP), Lilly's own clinical trials showed that withdrawal affected 40% - 50% of patients, 10% were severe, and half had not resolved after 2 weeks.  In fact, Lilly stopped monitoring patients after 2 weeks, so there is no data on how long the withdrawal symptoms persisted.

22.      The ISMP describe a "serious lapse" in Lilly's system that failed to provide complete information and clear warnings to patients and physicians about the extensive withdrawal effects of Cymbalta.  The Institute further states that information for physicians and pharmacists does not provide realistic schedules for dose tapering or a clear picture of the likely incidence of these reactions.

23.      Finally, the study finds that of 12 topics for physicians to discuss with patients before starting treatment, withdrawal is not on the list.

24.      Survey after survey finds that DTC has an impact, and one study published by the Journal of the American Medical Association (JAMA) found a profound impact on physician prescribing behavior.

25.      When it comes to how much money and how many additional prescriptions are written as a direct result of DTC advertising, a study commissioned and funded by the Henry J. Kaiser Foundation and conducted by the Harvard Schools of Medicine and Public Health in partnership with the Massachusetts Institute of Technology, found that for every $1 spent on DTC advertising, the company reaped $4.20 in increased sales.

26.      According to the website Fierce Pharma, Lilly increased DTC spending by 17.5% on Cymbalta in 2008 and reaped an additional $1.8 billion dollars in sales in the U.S.  In February of 2013, DTC ad spending for Cymbalta reached $243 million annually.

27.    In the 1960's before any advertising on prescription drugs to consumers was allowed, the physician was clearly the learned intermediary, making decisions alone. But modern medical practices encourages and in fact, empowers consumers to play a major role in their health decisions.  Pharmaceutical companies spend billions proving that very fact.


Further Declarant sayeth not.


August 19, 2013                          Wm 7 Kitzes

Date                                     Wm. F. Kitzes, J.D., CPSM

# Consumer Safety Associates, LLC

4501 N.W. 25th Way
Boca Raton, Florida  33434

(561) 241-1900

Wm. F. Kitzes, J.D.
Board Certified
Product Safety Manager
_____

Safety Analysis
Warnings
Expert Testimony

Safety Management
www.productsafety .com
kitzes@productsafety.com
_____

FAX:
(561) 241-1903

## CURRICULUM VITAE

## William F. Kitzes

### Education

University of Wisconsin, B.A.; 1972

Washington College of Law, American University, J.D.; 1975

Certificate in Safety Management (1989)
    American Society of Safety Engineers

University of Michigan, College of Engineering,
    Human Factors Engineering, Summer 1990

Executive Program in Safety Management (2007)
    American Society of Safety Engineers

Risk Communication Skills
     Harvard School of Public Health, March 2013

### Professional Safety Associations

National Safety Council • American Society of Safety Engineers
Board of Certified Product Safety Management, Executive Level
Board of Certified Hazard Control Management, Master Level
Human Factors Society • System Safety Society
International Consumer Product Health and Safety Organization
Florida Propane Gas Safety, Education and Research Council
Chairman, Florida Consumers' Council  (1993-2007)

### Work Experience

#### U.S. Consumer Product Safety Commission
#### Washington, D.C.  20207

1975-1981

| 1975 - 1977 | Legal Advisor to the Director, Section 15<br>Office of Product Defect Identification |
|---|---|
| 1977 - 1980 | Program Manager<br>Sports, Recreation & Power Equipment<br>Office of the Executive Director |
| 1980 - 1981 | Regulatory Counsel<br>Office of the General Counsel |

The Institute for Safety Analysis, Inc.
Rockville, Maryland 20850

1981 - 1983
Vice President and General Manager

Consumer Safety Associates

1983 - Present
Safety Analyst, Product Safety Manager

Professional Experience

Mr. Kitzes has extensive experience in safety analysis, regulatory development, and management systems.  His background includes the following activities:

- o   Managed and supervised professional staff of 18 in preparing safety engineering analysis for nationally-known technical consulting firm which specialized in evaluating the safety performance of automotive and consumer products

- o   Developed the Federal Safety Standard for Power Lawn Mowers, 16 CFR 1205; February 1979

- o   Developed programs to identify and analyze safety performance data to evaluate compliance with the reporting requirements of Section 15 of the Consumer Product Safety Act

- o   Negotiated voluntary corrective action programs and consent agreements with major manufacturers to recall defective products

    o     Managed interdisciplinary task force of engineers,
             epidemiologists, attorneys, and investigators in
             developing standards and communications programs
             for <u>sports</u>, <u>recreation</u>, and <u>power equipment</u>

    o     Conducted special studies of nationwide injury
             patterns using the National Electronic Injury
             Surveillance System (NEISS)

    o     CPSC Awards include the
             Silver Medal for Meritorious Service, 1977 and the
             Superior Achievement Award, 1979

<u>Seminars and Workshops</u>

Mr. Kitzes is an active speaker, author, and educator on safety-related issues.  The
following is a partial list of seminars, workshops, and lectures given by Mr. Kitzes
since 1975:

<u>Compliance Issues and The Consumer Product Safety Act</u>, Diebold Research
Group, 245 Park Avenue, New York, 1975

<u>Government Action Under the Consumer Product Safety Act</u> with Professor
Robert Vaughn, Washington college of Law, American Bar Association,
Washington, D.C., 1975

<u>Consumer Safety Officer Training</u> in accident analysis and implementing the
provisions of Section 15 of the Consumer Product Safety Act (CPSA), U.S.
Consumer Product Safety Commission, New York, Chicago, Minneapolis, and San
Francisco, 1975 and 1976

<u>Manufacturers Compliance Seminar</u> on safety analysis and accident investigation
for Sections 15 and 19 of the Consumer Product Safety Act (CPSA), U.S.
Consumer Product Safety Commission, Kansas City, Missouri

<u>Marketing Analysis and Government Action</u>, panel with Dr. Salvatore Davita,
George Washington University, Washington, D.C.  1976

<u>Reporting Requirements and Corrective Action Plans Under Section 15 of the
CPSA</u>, Product Safety Conference, Washington, D.C., 1976

<u>Implementing the New Requirements for Notification and Reporting:
16 CFR 1115</u>, Product Safety Conference, Washington, D.C.  1977

<u>Changes in the Proposed Standard for Power Lawn Mowers</u>, Outdoor Power
Equipment Institute, Washington, D.C.  1978

The Federal Regulatory Process, National Institute for Paralegal Training, Philadelphia, Pennsylvania, 1978 & 1979

The Art of Applying Technology in Personal Injury Lawsuits, Regulatory Data -- A Buried Treasure, National Center for Technology in Law, Hunt Valley, Maryland, 1981

The Human Factor:  a safety/needs analysis of the modern fire fighting environment, with Richard L.P. Custer, Foundation for Fire Safety, Cliffside Manor, Harpers Ferry, West Virginia, 1981

CPSC and ATVs, AIEG, October 1986, and May 1987

ATV Safety, National Association of Attorneys General, October, 1987

Safety Analysis and the CPSA, American Pleasure Boat Safety Association, January, 1988 and 1989

Safety Management and the CPSC, James Tuck Memorial Lecture, Keynote Address, Detroit, Michigan, June 1990

Safety Analysis and Product Safety Management, Texas Trial Lawyers Product Liability Seminar, Houston, Texas, April 1994

Safety Management and the Consumer Product Safety Commission, The Academy of Florida Trial Lawyers, Orlando, Florida, January 1995

Panel on Child Safety, International Consumer Product Health and Safety Organization, Orlando, Florida, March 1995

Recalls, Defects and Public Disclosure:  Panel Discussion, International Consumer Product Health and Safety Organization, Orlando, Florida, March 1996

National Safety Council Congress and Exposition, Session #51 Post Sale Corrective Action Plans - Recalls and Consumer Notice, Educational Resources Division, Orlando, Florida, October 1996

National Safety Council Congress and Exposition, Session #152 Injury Prevention Analysis:  Guidelines for Product Safety Managers, Educational Resources Division, Chicago, Illinois, October 1997

Worldwide Juvenile Product Safety Panel, International Consumer Product Health and Safety Organization, Orlando, Florida, February 1998

The Faces of the Future Seminar, Keenan's Kids Foundation, Atlanta, Georgia, May 1998

The Role of the Safety Analyst,  Kentucky Academy of Trial Attorneys, Louisville, Kentucky, May 1998

<u>National Safety Council Congress and Exposition</u>, Session #69
When Risk Can't Be Eliminated:  Building Adequate Warnings, Educational
Resources Division, Los Angeles, California, October 1998

<u>Freedom of Information</u>, CPSC-ABA Forum, International Consumer Product
Health and Safety Organization, Orlando, Florida, February 1999

<u>Protecting Our Kids</u>, Faces of the Future Seminar, Keenan's Kids Foundation,
Atlanta, Georgia, March 1999

<u>CPSC Compliance Workshop</u>, Preparing, Developing and Implementing a
Successful Recall Program, Los Angeles, California, October 1999

<u>CPSC Compliance Workshop</u>, Conducting a Recall - Fast Track vs. Traditional,
International Consumer Product Health and Safety Organization, Orlando, Florida,
February 2000

<u>CPSC Compliance Workshop</u>, Designing, Producing and Distributing Safer
Consumer Products, International Consumer Product Health and Safety
Organization, Orlando, Florida, February 2001

<u>Ten Principles of Product Safety Management</u>,  Kentucky Academy of Trial
Attorneys, Louisville, Kentucky, May 2001

<u>CPSC Compliance Course</u>, Recall Success Stories, International Consumer
Product Health and Safety Organization, Orlando, Florida, February 2002

<u>Masters in Trial</u>, American Board of Trial Advocates, Chicago, Illinois,
June 2002

<u>CPSC Compliance Course</u>, CPSC and ICPHSO -- 10 Years Later, International
Consumer Product Health and Safety Organization, Orlando, Florida,
February 2003

<u>CPSC Compliance Course</u>, Section 15 Reporting Obligations, Panel, International
Consumer Product Health and Safety Organization, Orlando, Florida,
March 2004

<u>Creating Safe Products--Practical Applications of Hazard Assessment</u>,
International Consumer Product Health and Safety Organization, Orlando, Florida,
February 2005

<u>Warnings and Instructions, Human Factors Symposium</u>, ICPHSO and CPSC,
International Consumer Product Health and Safety Organization, Bethesda,
Maryland, September 2005

<u>Introduction to Product Safety</u>, AIG UK Limited, Human Focus, Web based video
Instruction Programme, Accredited by the Royal Society for the Prevention of
Accidents, London, England, United Kingdom, 2007
<u>Risk Assessment</u>, AIG Consultant, Inc., New York, 2008

<u>Risk Management 101</u>, ICPHSO and CPSC Compliance and Training Seminar, International Consumer Product Health and Safety Organization, Chicago, Illinois, May 2008

<u>Safety Testing:  Beyond the Statutes</u>, International Consumer Product Health and Safety Organization, Orlando, Florida, February 2011


<u>Publications</u>

<u>Standards, Regulations and Safety Guidelines to Protect Children from Injury</u>, Children and Injuries, Joe Frost, ed., Lawyers & Judges Publishing Company, Inc., Tucson, Arizona, 2001

Columnist, <u>Product Safety:  An In-Depth Analysis</u>, Consumer Product Safety Guide, CCH, Chicago, Illinois, 2000 - 2001

<u>Risk Analysis in Product Liability Litigation</u>, 2000 Wiley Expert Witness Update, New Developments in Personal Injury Litigation, Aspen Law & Business, New York, 2000

<u>Protecting Our Kids - Everyone Plays a Part</u>, Forum, Consumer Attorneys of California , Volume 27, No. 10, December 1997

<u>Forensic Safety Analysis:  Investigation and Evaluation</u>, 1996 Wiley Expert Witness Update, New Developments in Personal Injury Litigation, John Wiley & Sons, Inc., New York, 1996

<u>The Role of the Safety Analyst in Product Liability Litigation</u>, Trial Diplomacy Journal, Vol. 18, No. 2, March/April 1995

<u>Safety Management and the Consumer Product Safety Commission</u>, Professional Safety, Vol. 36, No. 4, April 1991

<u>ATVs -- The Hidden Danger</u>, Journal of Law, Medicine and Health Care, Vol. 17, No. 1, Spring, 1989

<u>Private Causes of Action Under the Consumer Product Safety Act</u>, Trial Lawyers Quarterly, Vol. 17, No. 1, 1985

<u>Administrative Civil Penalties Are Here To Stay, But How Should They Be Implemented</u>?  Wm. F. Kitzes and David Schmeltzer, American University Law Review, Vol. 26, No. 4, Washington, D.C., 1977

<u>Substantial Hazards in Consumer Products</u>, (Investigators Manual), Wm. F. Kitzes, U.S. Consumer Product Safety Commission, 1977