Lynn Lincoln Sarko, Esq., *admitted pro hac vice*
lsarko@kellerrohrback.com
Michael D. Woerner, Esq., *admitted pro hac vice*
mwoerner@kellerrohrback.com
Gretchen Freeman Cappio, Esq., *admitted pro hac vice*
gcappio@kellerrohrback.com
Havila Unrein, Esq., *admitted pro hac vice*
hunrein@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900 / Fax: (206) 623-3384

Juli E. Farris, Esq. (CA Bar No. 141716)
jfarris@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
Tel: (805) 456-1496 / Fax: (805) 456-1497

Mark D. Samson, Esq., *admitted pro hac vice*
msamson@kellerrohrback.com
**KELLER ROHRBACK P.L.C.**
3101 N. Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088 / Fax: (602) 248-2822

*Additional Counsel for Plaintiffs on following page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNIFER L. SAAVEDRA, DR. MELISSA STRAFFORD, CAROL JACQUEZ, and DAVID MATTHEWS, JR., on behalf of themselves and all other persons similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>Defendant. | No. 2:12-cv-09366-SVW(MANx)<br>CLASS ACTION<br><br>**DECLARATION OF DR. JOEL W. HAY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>The Honorable Stephen V. Wilson |

Samuel S. Deskin, Esq.
sam@deskinlawfirm.com
DESKIN LAW FIRM, PLC
16944 Ventura Blvd
Encino, CA 91316
Tel.: (800) 709-8978 / Fax: (800) 709-8971

Harris L. Pogust, Esq.
hpogust@pbmattorneys.com
T. Matthew Leckman, Esq.
MLeckman@pbmattorneys.com
POGUST BRASLOW MILLROOD LLC
161 Washington Street, Suite 1520
Conshohocken, PA 19428
Tel.: (800) 897-8930 / Fax: (610) 941-4245

*Additional Counsel for Plaintiffs*

I, Joel Hay, Ph.D., do hereby declare and state:

1. I have personal knowledge of the matters contained herein and, where I do not have direct knowledge, I believe them to be true and correct based upon the information available to me, my education, training, and experience. I would testify, if called, to the matters set forth in this declaration.

2. I am a tenured Full Professor and Founding Chair of Pharmaceutical Economics and Policy in the School of Pharmacy, with joint appointments in the Schaeffer Center for Health Policy and Economics and in the Department of Economics at the University of Southern California ("USC"). I also serve as the USC Project Coordinator for the Rand Evidence-Based Medicine Practice Centers of Southern California, funded by the U.S. Agency for Healthcare Research and Quality. I am a Health Economics Research Scholar at the UCLA Center for Pediatric Vaccine Research. I am a founding Executive Board member of the American Society for Health Economics. I am also an extramural grants reviewer for the U.S. Agency for Healthcare Research and Quality.

3. Our academic department at USC is the largest and most prominent department in the United States focused specifically on pharmaceutical economics and health economics. Since I initiated the graduate programs in Pharmaceutical Economics and Policy in 1994, we have graduated over 100 Ph.D. and Master of Science students in this field. We currently have 32 graduate students in residence.

4. I earned my B.A. *summa cum laude* in economics from Amherst College in 1974, and my M.A., M.Phil., and Ph.D. in economics from Yale University between 1976 and 1980. I have also taught at Yale University, Stanford University, University of California Santa Barbara, and the University of Connecticut, and I have been a tenured faculty member at USC since 1992.

5. From 1978 to 1980, I was an Assistant Research Professor at USC. Then from 1980 to 1984, I was an Assistant Professor in the School of Dental

Medicine and the Department of Economics at the University of Connecticut. After that I was a Senior Policy Analyst with Project Hope from 1983 to 1985. Then from 1985 to 1992, I was a Senior Research Fellow at the Hoover Institution at Stanford University.

6. I have authored or coauthored over 450 scientific reports, articles and abstracts, including 160 peer-reviewed scientific articles in the fields of pharmaceutical economics, health economics, health care markets, outcomes research, disease management, statistics, econometrics, epidemiology and health care in journals including: *American Journal of Cardiology, American Journal of Managed Care, American Journal of Public Health, Archives of Neurology, Haemophilia, Health Care Financing Review, Health Affairs, Health Economics, Health Policy, JAMA, Journal of AIDS, Journal of the American Geriatrics Society, Journal of Business & Economic Statistics, Journal of Clinical Gastroenterology, Journal of Health Economics, Journal of Health Politics, Policy and Law, Journal of Human Resources, Journal of the Royal Statistical Association, Medical Care, Pediatrics, Pharmacoepidemiology & Drug Safety, Psychiatric Services* and *Value in Health.*

7. I have served as a consultant to U.S. Centers for Medicare and Medicaid Services, U.S. Agency for Healthcare Research and Quality, U.S. Centers for Disease Control and Prevention, U.S. Public Health Service, U.S. Food and Drug Administration, U.S. Environmental Protection Agency, Government of Hungary, Hong Kong Centre for Economic Research, Hong Kong Medical Executives Association, World Bank, California AIDS Commission, California Medi-Cal Drug Advisory Board, County of San Diego Medically Indigent Adult Program and County of Sacramento Homeless Program.

8. I have also written numerous health care-related op-eds published in papers such as the Los Angeles Times, New York Times, Wall Street Journal, San

Francisco Chronicle, San Diego Union, Sacramento Bee and Newsday. I have been interviewed numerous times on television and radio regarding health-related and drug-related policy issues, including media networks such as PBS, CBS, ABC, NBC, Fox News, C-SPAN and Air America.

9. I have served as a member of the Expert Advisory Panel on Drug Utilization Review, United States Pharmacopeial Convention, as an Executive Committee member for the federally sponsored Southern California Evidence-Based Medicine Practice Center, and as a member of the JAMA Web Site HIV/AIDS Editorial Review Panel. I am a founding member of the Board of Directors of the International Society for Pharmacoeconomics and Outcomes Research.

10. I served as the Founding Editor-in-Chief of Value in Health, the peer-reviewed scientific journal of the International Society for Pharmacoeconomics and Outcomes Research, from its 1998 inception until 2003. In its first scientific citation impact factor, Value in Health was ranked number one in two categories for the year 2004 by the ISI Journal Citation Reports® (JCR) with an impact factor of 3.657. Value in Health led all other journals listed both in the Health Care Sciences and Services category in the JCR Science Edition and in the Health Policy & Services category in the JCR Social Sciences Edition. These categories include all journals relating to health economics and pharmaceutical economics.

11. I have also provided legal expert reports and testimony in several damage and injury cases relating to pharmaceutical and medical issues.  A more complete listing of my qualifications and publications is outlined on my *curriculum vitae*, which is attached as Exhibit A.

12. I have been retained by counsel for Plaintiffs Jennifer L. Saavedra, Dr. Melissa Strafford, Carol Jacquez, and David Matthews, Jr. as an expert in this matter.  I was asked to explain how one would develop an economic damages

calculation methodology to measure and quantify the economic damage to the putative class as a result of alleged wrongful conduct by Defendant Eli Lilly and Company.

13. I was asked to provide my opinion about how Plaintiffs could quantify the market's increased willingness to pay for a drug based on allegedly omitted characteristics regarding withdrawal risks and, correspondingly, the amount of money consumers in the four relevant states allegedly overpaid for Cymbalta because of the omitted risk information.

**Calculating the Market's Willingness to Pay and the Amount of Money Consumers in California, Missouri, New York, and Massachusetts Spent on Cymbalta Prescriptions Because Information about Cymbalta's Withdrawal Risk Was Omitted from its Label and Marketing**

14. For Plaintiff's theory of damages, I was asked to determine how one could ascertain the amount consumers paid for Cymbalta because the product was allegedly marketed without disclosing its risk of causing physical dependence and withdrawal, or as an alternative, how much additional Cymbalta was sold in the marketplace because this information was allegedly omitted. In essence, Plaintiff would like to know if it is possible, using valid survey and statistical techniques, to ascertain what value consumers and physicians place on the information about Cymbalta's withdrawal risks.

15. It my opinion, it would be possible and scientifically valid to ascertain the value consumers and physicians place on the withdrawal risk information at issue here using conjoint survey analysis.[1]

---

[1] I have substantial experience and expertise in conducting conjoint analysis surveys among prescribing physicians and in evaluating treatment preferences for patients with depression. I have worked on these various publications involving conjoint analysis (I have put my name first to indicate my involvement, although I was not necessarily the first author): Joel W. Hay et al, *Using Conjoint Analysis to Assess Depression Treatment Preferences among Low-Income Latinos*, 55 PSYCHIATRIC SERVICES 8, 934-37 (2004); Joel W. Hay, *Effectiveness of Collaborative Care in Addressing Depression Treatment Preferences Among Low-Income Latinos*, 61 PSYCHIATRIC SERVICES 11, 1112 – 18 (2010); Joel W.

16. Conjoint ("*con*sider *joint*ly") analysis is a type of survey market research that has been used by researchers for over four decades to determine how consumers place value on specific attributes of products, often called the market's willingness to pay ("MWTP"). Since it was first introduced in the early 1970s, conjoint analysis has become the most widely used technique in quantitative marketing research. In the healthcare sector, conjoint analysis uses a systematic approach to efficiently assess treatment preferences and how these preferences are altered by differences in treatment efficacy and adverse effects.

17. Conjoint analysis emerged in response to the failure of prior methodologies to determine accurately the MWTP for particular product attributes. Research has shown that simply asking consumers what they are willing to pay for a particular attribute is inaccurate, due to a variety of psychological factors that weigh into how consumers provide answers to questions about the valuation of a product. Conjoint analysis, however, avoids these pitfalls by tapping into a basic aspect of human psychology, namely, that consumers make relational choices about products based upon the product's features and functionality. Accordingly, conjoint analysis conceptualizes products as bundles of attributes, such as price, to compare how a consumer values particular aspects of a product over others. Using specialized consumer surveys, conjoint analysis forces consumers to make trade-offs over attributes, which allows researchers to see how consumers comparatively value a particular aspect of a product. In other words, it examines how consumers "consider jointly" the various aspects of a product.

18. Conjoint analysis is particularly suited to ascertaining damages in cases involving the value created, or lost, because of a particular feature or

---

Hay et al, *Depression Treatment Preferences of Older White and Mexican American Men*, 35 GEN. HOSPITAL PSYCH. 1, 59-65 (2013); Joel W. Hay, *Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing*, Podium Presentation, Health Care Applications: Sawtooth Software Conference, October, 2013, Dana Point, CA.

attribute in the context of litigation.  Since conjoint analysis uses advanced quantitative statistics to predict and dissect market behavior, it avoids the problem of what individual consumers "would have done" and, instead, uses statistics to evaluate *common* market behavior.  For example, it would be difficult to use conjoint analysis to predict how a specific consumer would value a specific attribute.  Indeed, predictive statistics are typically not designed to predict individual action.  Instead, conjoint analysis predicts how, on average, all consumers value a particular attribute.  This is important in the context of marketing a product because, generally, promotional activities and representations about a product are not made individually, but are directed to the entire consumer base.  Thus, companies are generally concerned with common market behaviors and how specific marketing efforts will, on average, affect sales.  The results of a conjoint analysis, while driven by data collected on an individual level, allow researchers to ascertain how specific product attributes drive the marketplace's valuation of a product, which, in turn, allows researchers to evaluate how that attribute affects sales.

19.   In the context of prescription medication, conjoint analysis can be used to ascertain how consumers and physicians value particular aspects of a drug. *See, e.g.*, Joel W. Hay, Conjoint Analysis in Pharmaceutical Research, 8 J. MANAGED CARE PHARMACY 3, 206-08 (2002) ("There are a number of important pharmacy and pharmaceutical research questions that naturally suggest conjoint analysis as a valuable research methodology. These include new drug development, drug benefit program design, drug treatment willingness-to-pay assessment, and medication cost effectiveness research."); Joel W. Hay et al, *Development and validation of a grading system for the quality of cost-effectiveness studies*,  41 MED. CARE 1, 32044 (Jan. 2003); Gang Xu & Yilian Tuan, *Conjoint analysis in pharmaceutical marketing research*, QUIRK'S

MARKETING RESEARCH R. (2001) ("Conjoint analysis is a technique that evaluates the importance of a product's attributes to consumers. For a pharmaceutical product such as a drug, its attributes may include price, dosing, efficacy, and side effects, among others. Conjoint analysis is used to examine how consumers' perceptions of these attributes influence their preference of the products."). Indeed, conjoint analysis is best suited for markets where there are a variety of competitors in the marketplace. In the context of Cymbalta and other serotonin-norepinephrine reuptake inhibitors (SNRIs) and selective serotonin reuptake inhibitors (SSRIs), there is a robust marketplace of competing antidepressants, including, *inter alia*, Prozac, Paxil, Celexa, Lexapro, Zoloft, Effexor, and Pristiq. Because Cymbalta is also approved to treat chronic pain and fibromyalgia, other marketplace competitors are non-steroidal anti-inflammatory drugs such as ibuprofen and Celebrex, as well as pain medications such as Percocet, Vicodin, Savella, and Lyrica. In determining how consumers and physicians valuate which products they purchase or prescribe, conjoint analysis is particularly suited.

20. Using conjoint analysis to ascertain how much consumers and physicians, as a marketplace, value withdrawal risk information will require several phases. The first phase will entail generating an appropriate list of attributes that will be the subject of the analysis. The goal, here, will be to isolate the most important characteristics of antidepressants and pain relievers that consumers and physicians consider before deciding whether to purchase or prescribe a drug. The generation of a list of attributes will require interviewing physicians and patients, examining those attributes that are already marketed by pharmaceutical companies, and characterizing those attributes in ways that are conducive to a conjoint analysis. Indeed, it may prove valuable to convene a focus group of experts in the field to see what common attributes of antidepressants are important. Such qualitative methods in generating attribute lists for conjoint

analysis is common.  Some of the important considerations will include:  (1) avoiding attributes that are nearly universally present in all drugs, since such attributes are unlikely to be a basis for customer choice; (2) avoiding attributes that are nearly universally absent, since such attributes are unlikely to be a basis for customer choice; (3) avoiding attributes that have substantial variation such that there are numerous potential values, since a phenomenon known as "number of levels effect" in conjoint analysis can overstate a particular attribute's significance; (4) avoiding attributes that involve other types of products, like antipsychotics or other non-SSRI based drugs; and (5) avoiding attributes that are too complicated for the survey population.  It will also be important to determine how the attribute levels will be characterized to allow for conjoint surveying.

21.  Since the process of determining which antidepressant a consumer will purchase is influenced by the physician's decision-making process—in fact, the consumer cannot purchase a prescription medication without a doctor's authorization—in order to sufficiently establish the MWTP, it is important to survey both consumers and physicians and to tailor the conjoint analysis for both groups.  Thus, it is possible that the list of attributes for consumers may be different than the list of attributes created for the physicians.  This is particularly true since the list of attributes for physicians may be substantially more sophisticated in light of their advanced training.  It may also be worthwhile to consider the responses of third-party payors and formulary committee members, since consumers' choices are influenced by which drugs are covered by their insurance policies.  However, patients are ultimately the ones who decide to purchase or refill their prescriptions.  Although prescription drug choice represents a complex decision-making process, discrete choice analysis is very flexible and can be tailored accordingly.

22. By generating a list of material attributes that consumers and physicians consider before purchasing or prescribing an antidepressant or pain reliever, I will be able to craft surveys designed to isolate how the market values a drug's likelihood to cause withdrawal. For instance, by holding all attributes constant, I could isolate what the MWTP is for an antidepressant with a withdrawal risk of 1% versus an antidepressant with a withdrawal risk of 44%. I could, similarly, ascertain the MWTP for a drug that causes moderate to severe withdrawal in 63% of users versus a drug that causes moderate to severe withdrawal in 18% of users. These, however, are simply hypothetical approaches to the conjoint analysis. Any and all questions or approaches will be governed by the results of the first phase.

23. After generating the appropriate attribute list, I would need to design a proper questionnaire and select a type of conjoint analysis that best suits the issue of a drug's withdrawal risk. There are various approaches I would consider in developing my conjoint survey and data collection. The first option I would consider would involve using a full-profile technique. Full-profile techniques have each survey respondent, here consumers and physicians, place a value on every attribute. This is done using a variety of sampling methods, for instance, using: (1) a rating scale: where respondents rate the importance of each attribute on a specified gradation scale; (2) a constant sum scale: where respondents are asked to allocated 100 points among specific attributes, giving more points to those attributes they feel are most important; or (3) a maximum difference scale: where respondents pick the most important and least important attribute. In addition, I could employ a self-explicated preference-data collection, such as Adaptive Self-Explication of Multi-Attribute Preferences, where respondents use a combination of ranking methods followed by comparative value assessments between comparable attributes. I would similarly consider hybrid techniques, such as

adaptive conjoint analysis, where each respondent performs a self-explicated task which, in turn, automatically generates specific product choice questions designed to ascertain how, based upon the respondent's stated preferences, those preferences manifest in a decision-making context. Since conjoint surveys are implemented as web-based surveys, implementing a conjoint survey is relatively simple and allows for a variety of data-structure options.

24. After I had developed a conjoint survey that could accurately evaluate how consumers and physicians value the probability that a drug will cause withdrawal, the next step would require conducting the survey itself. This step requires ensuring there is no sampling bias in the subjects to be surveyed (i.e., that the characteristics of the sample reflect the characteristics of the relevant population) and that there is a sufficient number of respondents to give the conjoint analysis statistical power and precision.

25. The final phase would be to untangle and evaluate the data collected through the conjoint survey. Specifically, I would need to evaluate how the "withdrawal risk" attribute played into the decision-making process of consumers and physicians. This result could yield two possible, analytically independent, metrics that could be used to ascertain the damages at issue here. First, using conjoint analysis I could determine how much the "withdrawal risk" was valued by consumers and physicians. This value would be determined using a pricing attribute as part of the conjoint analysis that would allow me to calculate, on average, what the "withdrawal risk" value was for each purchase, either in absolute or percentage terms. Second, and in the alternative, I could use the conjoint survey to evaluate the consumer's and physician's willingness to pay / prescribe a drug with the "withdrawal risk" attribute applicable to Cymbalta, to determine how much additional Cymbalta was sold as a result of suppressing the "withdrawal risk" attribute from the market. Each of these metrics would independently allow

me to calculate an amount of damages that were sustained by the marketplace as a result of the consumer protection violations alleged by Plaintiffs.

26. In sum, it is my opinion that, should this matter be certified as a class, I would be able to ascertain through a conjoint analysis survey how much money consumers within California, Missouri, New York, and Massachusetts spent out-of-pocket on Cymbalta between 2004 and the present as a direct result of Lilly allegedly withholding the withdrawal risk information at issue.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 16, 2013.

*/s/ Joel Hay*

_____
Dr. Joel W. Hay