Clara J. Shin, SB #214809
   E-mail:cshin@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-7058
Facsimile: (415) 591-6091

Mark H. Lynch (*admitted pro hac vice*)
   E-mail:mlynch@cov.com
Michael X. Imbroscio (*admitted pro hac vice*)
   E-mail:mimbroscio@cov.com
Phyllis A. Jones (*admitted pro hac vice*)
   E-mail:pajones@cov.com
Colleen A. Kelly (*admitted pro hac vice*)
   E-mail:ckelly@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

Attorneys for Defendant
ELI LILLY AND COMPANY

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER L. SAAVEDRA, et al., on behalf of themselves and all other persons similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>     Defendant. | No. 2:12-cv-09366-SVW-MAN<br><br>DEFENDANT ELI LILLY AND COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO RULE 23(b)(3)<br><br>Date:     September 17, 2013<br>Time:    1:30 p.m.<br>Location: Courtroom 6<br>Judge:   Hon. Stephen V. Wilson |

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

ARGUMENT ................................................................................................4

I.    PLAINTIFFS BEAR A HEAVY BURDEN TO CERTIFY THE
CLASSES ...........................................................................................4

II.    THE PRESCRIPTION PHARMACEUTICAL CONTEXT IS
CRITICAL .........................................................................................5

III.    PLAINTIFFS HAVE NOT SATISFIED RULE 23(a) ...................6

    A.    Plaintiffs have not satisfied the commonality requirement..................7

    B.    Plaintiffs' claims are not typical of the class .........................8

    C.    Plaintiffs are not adequate representatives............................9

IV.    PLAINTIFFS HAVE NOT SATISFIED RULE 23(b)(3)...........................10

    A.    Individual questions of fact predominate............................11

    B.    Plaintiffs' "excess pricing" theory cannot support class
certification.......................................................................13

    C.    The California Plaintiffs are not entitled to a presumption of
reliance ............................................................................18

    D.    A class action is not the superior method of adjudication .................22

V.    PLAINTIFFS' PROPOSED CLASSES ARE NOT
ASCERTAINABLE ..........................................................................22

VI.    THE MOTION CAN BE DENIED BUT NOT GRANTED .......................24

CONCLUSION...........................................................................................25

# TABLE OF AUTHORITIES

Page(s)

Cases

Akkerman v. Mecta Corp.,
  152 Cal. App. 4th 1094, 62 Cal. Rptr. 3d 39 (Cal. Ct. App. 2007)....................23

Amchem Prods., Inc. v. Windsor,
  521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ....................................9

Campbell v. Purdue Pharma, L.P.,
  No. 1:02cv00163 TCM, 2004 WL 5840206
  (E.D. Mo. June 25, 2004). .................................................................7, 8, 10, 22

Caro v. Procter & Gamble Co.,
  18 Cal. App. 4th 644, 22 Cal. Rptr. 2d 419 (Cal. Ct. App. 1993)................20, 25

Comcast Corp. v. Behrend,
  133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013).........................................................17

Conte v. Wyeth, Inc.,
  168 Cal. App. 4th 89, 85 Cal. Rptr. 3d 299 (Cal. Ct. App. 2009)......................18

Cottam v. CVS Pharmacy,
  436 Mass. 316, 764 N.E.2d 814 (2002).................................................................6

Dhamer v. Bristol-Myers Squibb Co.,
  183 F.R.D. 520 (N.D. Ill. 1998).....................................................................10, 13

Diacakis v. Comcast Corp.,
  No. C 11-3002 SBA, 2013 WL 1878921 (N.D. Cal. May 3, 2013)...................24

Dumas v. Albers Med., Inc.,
  No. 03-0640-CV-W-GAF, 2005 WL 2172030
  (W.D. Mo. Sept. 7, 2005) .....................................................................................10

Fairbanks v. Famers New World Life Ins. Co.,
  197 Cal. App. 4th 544, 128 Cal. Rptr. 3d 888 (Cal. Ct. App. 2011)..................19

Fine v. ConAgra Foods, Inc.,
  No. CV 10-01848 SJO, 2010 WL 3632469 (C.D. Cal. Aug. 26, 2010)...........8, 9

*Gonzales v. Comcast Corp.*,
    No. 10-cv-01010-LJO-BAM, 2012 WL 10621
    (E.D. Cal. Jan. 3, 2012) ................................................................23, 24

*Grair v. GlaxoSmithKline*,
    No. BC288536 (Cal. Super. Ct., L.A., Dec. 17, 2009)........................19

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ..............................................................8

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
    MDL No. 09-02067-NMG, 2013 WL 450148
    (D. Mass. Feb. 5, 2013) .................................................10, 12, 18, 19

*In re Paxil Litig.*,
    212 F.R.D. 539 (C.D. Cal. 2003)...............................................9, 10, 24

*In re Paxil Litig.*,
    218 F.R.D. 242 (C.D. Cal. 2003)...............................................9

*In re Rezulin Prods. Liab. Litig.*,
    210 F.R.D. 61 (S.D.N.Y. 2002) .......................................17

*In re St. Jude Med. Inc. Silzone Heart Valve Prods. Liab. Litig.*,
    522 F.3d 836 (8th Cir. 2008) ........................................12

*In re Vioxx Class Cases*,
    180 Cal. App. 4th 116 (Cal. Ct. App. 2009)........................passim

*In re Vioxx Prods. Liab. Litig.*,
    239 F.R.D. 450 (E.D. La. 2006) ...................................10, 22

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices*
    *& Prods. Liab. Litig.*,
    MDL No. 2100, 2012 WL 865041 (S.D. Ill. Mar. 13, 2012)..................passim

*Int'l Union of Operating Eng'rs Local No. 68 Welfare*
    *Fund v. Merck & Co.*,
    192 N.J. 372, 929 A.2d 1076 (2007) ...............................15

*Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*,
    634 F.3d 1352 (11th Cir. 2011) ....................................6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Judy v. Pfizer, Inc.,
    No. 042-01946-02, 2010 WL 3001745
    (Mo. Cir. Ct., St. Louis Cnty. July 27, 2010) .........................................10, 22, 24

Keenan v. Allan,
    889 F. Supp. 1320 (E.D. Wash. 1995)..........................................................4, 20

Krueger v. Wyeth, Inc.,
    No. 03cv2496 JLS (AJB), 2008 WL 481956
    (S.D. Cal. Feb. 19, 2008)................................................................................9, 22

Latiolais v. Merck & Co.,
    No. CV 06-02208 MRP, 2007 WL 5861354
    (C.D. Cal. Feb. 6, 2007)......................................................................................18

Mazur v. eBay Inc.,
    257 F.R.D. 563 (N.D. Cal. 2009) ......................................................................23

Mazza v. Am. Honda Motor Co.,
    666 F.3d 581 (9th Cir. 2012) .............................................................................19

McLaughlin v. Am. Tobacco Co.,
    522 F.3d 215 (2d Cir. 2008) ...............................................................................15

Moheb v. Nutramax Labs. Inc.,
    No. CV 12-3633-JFW, 2012 WL 6951904
    (C.D. Cal. Sept. 4, 2012) .................................................................................8, 24

Motus v. Pfizer Inc.,
    358 F.3d 659 (9th Cir. 2004) ......................................................................1, 6, 18

Owen v. Gen. Motors Corp.,
    533 F.3d 913 (8th Cir. 2008) ..............................................................................13

Perez v. Wyeth Labs. Inc.,
    161 N.J. 1, 734 A.2d 1245 (1999) ........................................................................4

Pfizer Inc. v. Super. Ct.,
    182 Cal. App. 4th 622, 105 Cal. Rptr. 3d 795
    (Cal. Ct. App. 2010)............................................................................................19

Plenger v. Alza Corp.,
    11 Cal. App. 4th 349, 13 Cal. Rptr. 2d 811 (1992) ......................................1, 2, 3

Plubell v. Merck & Co.,
    289 S.W.3d 707 (Mo. Ct. App. 2009) ............................................................ 13

Plummer v. Lederle Labs., Div. of Am. Cyanamid Co.,
    819 F.2d 349 (2d Cir. 1987) ...................................................................... 5

Prohias v. Pfizer, Inc.,
    485 F. Supp. 2d 1329 (S.D. Fla. 2007) ....................................................... 15

Rivera v. Wyeth-Ayerst Labs.,
    283 F.3d 315 (5th Cir. 2002) ..................................................................... 23

Sanders v. Apple Inc.,
    672 F. Supp. 2d 978 (N.D. Cal. 2009) ........................................................ 24

Sergeants Benevolent Ass'n Health & Welfare Fund v.
    Sanofi-Aventis U.S. LLP,
    No. 08-CV-0179 (SLT) (RER), 2011 WL 1326365
    (E.D.N.Y. Mar. 30, 2011) ................................................................. 15, 20

Sweet v. Pfizer,
    232 F.R.D. 360 (C.D. Cal. 2005) ............................................................. 9, 10

UFCW Local 1776 v. Eli Lilly & Co.,
    620 F.3d 121 (2d Cir. 2010) ............................................................... passim

Wal-Mart Stores, Inc. v. Dukes,
    131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)..................................................... 4, 7

Williams v. Purdue Pharma Co.,
    297 F. Supp. 2d 171 (D.D.C. 2003)......................................................... 15, 23

Zinser v. Accufix Research Inst., Inc.,
    253 F.3d 1180 (9th Cir. 2001) ............................................................... 4, 22

Statutes

21 U.S.C. § 353(b)(1) ................................................................................... 11

Other Authorities

Fed. R. Civ. P. 9(b) ..................................................................................... 20

Fed. R. Civ. P. 23(a) ............................................................................ 4, 6, 7, 10

Fed. R. Civ. P. 23(a)(2)................................................................7

Fed. R. Civ. P. 23(a)(3)................................................................8

Fed. R. Civ. P. 23(a)(4)................................................................9

Fed. R. Civ. P. 23(b)....................................................................4

Fed. R. Civ. P. 23(b)(3)..............................................................10

David G. Perahia et al., <u>Symptoms following abrupt
      discontinuation of duloxetine treatment in patients with
      major depressive disorder</u>, 89 J. of Affective Disorders 207 (2005) .................12

## INTRODUCTION

Plaintiffs assert claims for monetary relief under the consumer protection laws of California, Massachusetts, Missouri, and New York.[1]  The crux of each claim is that Eli Lilly and Company ("Lilly"), the maker of the antidepressant Cymbalta, failed to warn sufficiently of symptoms that can occur upon the discontinuation of Cymbalta.  Plaintiffs claim that if the Cymbalta package insert (also known as the "label") had contained a more detailed warning, they would not have purchased Cymbalta.  (First Am. Compl. ¶ 42.)  Plaintiffs move to certify four state classes, each comprised of consumers who purchased Cymbalta since August 2004.[2]

In its June 13 Order, (Dkt. #72), the Court set the framework governing Plaintiffs' claims.  Following a thorough review of the relevant case law (id. at 4-5), the Court "concur[red] with the great weight of authority and conclud[ed] that the learned intermediary doctrine applies to the consumer protection claims at issue."  (Id. at 6.)  Under that doctrine, a pharmaceutical manufacturer "is obligated to warn doctors, not patients, of potential side-effects associated with its pharmaceutical products."  Motus v. Pfizer Inc., 358 F.3d 659, 661 (9th Cir. 2004).  The doctor, in turn, is "an intervening party in the full sense of the word," making prescription decisions based upon individualized, independent medical judgments.  Plenger v. Alza Corp., 11 Cal. App. 4th 349, 361 n.6, 13 Cal. Rptr. 2d 811, 818-19 n.6 (1992).

The Court also noted that each Plaintiff is required to prove causation.  (Dkt. #72, at 6 n.7.)  Even if Plaintiffs prove that the discontinuation warning in

---

[1] In its February 26, 2013 order, the Court dismissed Plaintiffs' claims for declaratory and injunctive relief due to lack of standing.  (Dkt. #52.)

[2] Plaintiff Jennifer Saavedra also asserts personal injury claims against Lilly.

1

the Cymbalta package insert was inadequate, "Plaintiffs would still be required to prove that the 'inadequacies or absence of the warning caused the Plaintiff's injury.'"  (Id. at 6.)  This requires the factfinder to determine, inter alia, (1) "if the individual plaintiff's physician had known about the relevant side-effects, would the physician still have recommended and prescribed Cymbalta," and (2) "did the individual Plaintiff's physician know of the side effects from a source other than the warning label, and prescribe Cymbalta even with this knowledge."  (Id. at 7.)  As the Court found, "[i]n the context of prescription drugs, each of these determinations will necessarily be different."  (Id.)  Thus, the Court reasoned that "[a]lthough the question of whether or not the warnings given to doctors . . . were inadequate or misleading may be capable of resolution on a class-wide basis, the question of whether or not, had the warnings been adequate, each plaintiff would not have taken Cymbalta are not."  (Id.)

The Court then directed the parties to brief class certification.  (Id. at 8.)  For purposes of the motion, the parties were to assume that Plaintiffs could prove that the discontinuation warning given to physicians was inadequate.  (Id.)[3]

Plaintiffs' brief ignores the framework carefully and clearly set out by the Court.  Instead, they try to end run the Court's decision in two ways.  First,

---

[3] Lilly of course accepts this instruction as an effective case management technique, but is confident that the three-paragraph warning in Cymbalta's package insert alerting physicians to the potential risk of discontinuation symptoms is fully adequate to satisfy its duty to warn physicians, especially in light of the long-held understanding in the medical community of the risk of antidepressant discontinuation symptoms.  Lilly also notes that, in addition to the detailed discontinuation warning, the Cymbalta package insert alerts prescribing doctors to Cymbalta's half-life.  (Dkt. #56, Ex. 1, at 17.)  According to Plaintiffs' expert, Dr. Joseph Glenmullen, the length of the half-life correlates with the frequency of discontinuation symptoms.  (Dkt. # 80, ¶ 5.)  That information has been available to doctors since Cymbalta's launch.

although they concede that they must show causation to recover on their claims, Plaintiffs summarily dismiss the individualized questions identified by the Court as "not necessary or relevant." (Dkt. #73, at 8-9.) Plaintiffs offer instead an "excess pricing" theory to prove class-wide causation. Under that theory, each class member "paid for a drug whose value was inflated by the omission of material information." (Id. at 6.) Second, in a dramatic turnabout, Plaintiffs have largely abandoned the central allegation in the First Amended Complaint — that the Cymbalta package insert's "1%" reference is misleading. (First Am. Compl. ¶ 45.) Plaintiffs now seek to "hold Lilly accountable for omitting important information in its marketing and advertising of Cymbalta." (Dkt. #73, at 1.)

Neither strategy supports class certification. Courts have repeatedly rejected the "excess pricing" theory of generalized proof to show class-wide causation. Those cases track this Court's June 13 Order: due to the "[t]he nature of prescriptions," the causal chain would be "interrupted by the independent actions of prescribing physicians." UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 135 (2d Cir. 2010). Plaintiffs' methodology for showing class-wide causation reinforces this point. Their expert  proposes to perform a "conjoint analysis" involving a lengthy period of interviews with prescribing doctors, consumers, third-party payers, and formulary committee members (and, later, surveys of these groups) to assess what factors they consider before prescribing or purchasing an antidepressant. (Dkt. #83 ¶¶ 20-21.) The method, by its own terms, aims to identify the prescribing behavior of individual doctors and is premised on the recognition that "prescription drug choice represents a complex decision-making process." (Id. ¶ 21.) It thus bears out this Court's prediction: showing causation in the prescription medicine setting demands individualized evaluations.

The proposal to make this tremendous investment of time and resources (of the parties and the Court) is all the more remarkable in light of Plaintiffs' studious refusal to present any evidence from their own prescribing doctors among the

3

eight fact and expert declarations they have submitted in support of their class certification motion. Plaintiffs have maintained this reticence even faced with the Court's June 13 Order, which confirms the centrality of their prescribers' decisionmaking. Unless Plaintiffs' doctors were misled, Plaintiffs have no claim and cannot be class representatives. If their doctors were misled, Plaintiffs should provide that evidence before this case is allowed to proceed further and Plaintiffs are permitted to embark on the expansive project proposed by Dr. Hay.

The Court should likewise reject Plaintiffs' effort to convert this case into one based on advertising to consumers. Plaintiffs may not "amend their complaint through briefing." <u>Keenan v. Allan</u>, 889 F. Supp. 1320, 1359 n.26 (E.D. Wash. 1995), <u>aff'd</u>, 91 F.3d 1275 (9th Cir. 1996). Having elaborately pled and aggressively pursued the theory that the Cymbalta label is deficient, they may not adopt a new theory to avoid the implications of the Court's Order. In any event, Plaintiffs' attempted shift to an advertising case is futile because every court but one — <u>Perez v. Wyeth Labs. Inc.</u>, 161 N.J. 1, 21, 734 A.2d 1245, 1257 (1999) — has rejected the relevance of direct-to-consumer advertising to evaluating whether the learned intermediary doctrine applies to failure-to-warn suits. (<u>See</u> Dkt. #68, at 8-10.) The parties have extensively briefed whether <u>Perez</u> should apply here. In its learned intermediary doctrine ruling, the Court implicitly declined to follow <u>Perez</u> and, by extension, Plaintiffs' new theory.

ARGUMENT

I.   <u>PLAINTIFFS BEAR A HEAVY BURDEN TO CERTIFY THE CLASSES.</u>

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011). Plaintiffs must meet the four requirements of Rule 23(a) and one of the requirements of Rule 23(b). <u>Zinser v. Accufix Research Inst., Inc.</u>, 253 F.3d 1180, 1186 (9th Cir. 2001). A trial court "must conduct a 'rigorous analysis' to determine whether the

4

1  party seeking certification has met the prerequisites of Rule 23." Id.

2  II.     THE PRESCRIPTION PHARMACEUTICAL CONTEXT IS CRITICAL.

3     Plaintiffs' consumer protection claims arise in the unique context of

4  prescription pharmaceuticals.  Unlike other purchases for personal use, "[a]n

5  individual patient does not choose what drug to take; she is prescribed a drug by

6  her physician."  UFCW Local 1776, 620 F.3d at 126.  A range of individualized

7  issues pervades both a physician's decision to prescribe a drug and a patient's

8  experience with the drug.  "This is particularly true in the treatment of mental

9  disorders, which is an extremely individual process." Id. at 127.

10     A physician must exercise his or her independent medical judgment to

11  prescribe a drug for a patient, after considering specific patient characteristics and

12  the benefits and risks of the medication.[4]  For example, physicians consider the

13  patient's medical history, including drug reactions and allergies; the nature and

14  severity of the patient's current condition; the patient's current medications; and

15  the likelihood of patient compliance with treatment.[5]  Physicians also consider the

16  characteristics of the particular drug, such as its benefits and risks.  There are

17  many sources of medical information about prescription medicines, such as

18  medical journal articles, medical treatment guidelines, the label in the Physicians'

19

20  _____

21  [4] (See June 13 Order, Dkt. #72, at 3 (quoting Plummer v. Lederle Labs., Div. of
Am. Cyanamid Co., 819 F.2d 349, 356 (2d Cir. 1987)).)

22  [5] See Weiss v. AstraZeneca Pharms., No. B215901, 2010 WL 3387220, at *3 (Cal.
23  Ct. App. Aug. 30, 2010) ("[P]hysicians' prescribing decisions are patient-based
and vary depending on each patient's medical history, symptoms, prescription
24  drug coverage, and prior experience with other medications."); In re Vioxx Class
25  Cases, 180 Cal. App. 4th 116, 134 (Cal. Ct. App. 2009) ("[P]hysicians consider
many patient-specific factors in determining which drug to prescribe, including
26  the patient's history and drug allergies, the condition being treated, and the
27  potential for adverse reactions with the patient's other medications.").

28

Desk Reference, presentations at medical conferences, a physician's discussions with colleagues, a physician's personal experience with the drug, and medical information letters from drug manufacturers.[6]   Some physicians rely on information from drug manufacturers, while others do not.  See In re Vioxx Class Cases, 180 Cal. App. 4th 116, 126, 103 Cal. Rptr. 3d 83, 92-93 (Cal. Ct. App. 2009).   Moreover, not all physicians read or rely on the label when making prescribing decisions.  See, e.g., Motus, 358 F.3d at 661 (noting that "the doctor testified that he did not read the warning label that accompanied Zoloft . . . before prescribing the drug to [plaintiff]").

Furthermore, the information that a physician chooses to share with a patient regarding potential side effects varies from patient to patient after the doctor considers "the history and needs of their patients and the qualities of the drug."  Cottam v. CVS Pharmacy, 436 Mass. 316, 321, 764 N.E.2d 814, 820 (2002).  The rationale for a patient's treatment, as well as its dose and duration, varies, as do the adverse events patients might experience.

The learned intermediary doctrine recognizes these distinct elements of the prescription pharmaceutical environment, and the Court in its June 13 Order held that the doctrine applies to Plaintiffs' claims.  (Dkt. # 72, at 6.)

III.   PLAINTIFFS HAVE NOT SATISFIED RULE 23(a).

The Court has held that under each of the asserted statutes Plaintiffs must prove a causal link between the allegedly misleading Cymbalta label and their alleged injuries.  (Dkt. #72, at 6 n.7.)  Under the learned intermediary doctrine, Plaintiffs must show that none of the physicians had independent knowledge of

---

[6] See, e.g., Ironworkers Local Union 68 v. AstraZeneca Pharms., LP, 634 F.3d 1352, 1362-63 (11th Cir. 2011) ("[P]hysicians typically obtain additional information about a drug's putative uses from journals, meetings, and conventions.").

the risk of discontinuation symptoms; and that an adequate warning in the Cymbalta label would have changed their physicians' decisions to prescribe. (Id. at 6-7.) Even if the warning is deficient, Plaintiffs would have to show that their physicians read the label and that it influenced their prescribing decision. These individualized inquiries doom Plaintiffs' commonality, typicality, and adequacy showings under Rule 23(a).[7]

> A.   Plaintiffs have not satisfied the commonality requirement.

Under Rule 23(a)(2), Plaintiffs must identify common "questions of law or fact." Any common claim must rely on "a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551. The key "is not the raising of common questions — even in droves — but, . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." Id. (emphasis in original).

Plaintiffs claim that determining whether the Cymbalta label is misleading is a common question. Their argument is misplaced. Even if the label is misleading, that issue will not drive the resolution of this litigation. The one question that could potentially resolve Plaintiffs' claims in one stroke is causation, but that issue is not subject to common proof because of the individualized nature of the prescribing decision. See Campbell v. Purdue Pharma, L.P., No. 1:02cv00163 TCM, 2004 WL 5840206, at **5-7 (E.D. Mo. June 25, 2004) (commonality not satisfied when causation is not uniform and citing cases so holding). For example, some physicians will not have read or relied on the Cymbalta label. For these doctors, the Cymbalta label played *no* role in their

_____

[7] Lilly does not challenge numerosity.

7

prescribing decisions.  See Moheb v. Nutramax Labs. Inc., No. CV 12-3633-JFW (JCx), 2012 WL 6951904, at *4 (C.D. Cal. Sept. 4, 2012) (commonality not satisfied where many putative class members "never saw or relied upon Defendant's representation").  Also, without doubt, some class members' physicians understood the risks of discontinuation, a recognized clinical phenomenon. (Dkt. #57 ¶ 11.) The label could not deceive these physicians.  For some physicians, an "improved" warning would not have changed their prescribing decisions.

### B.   Plaintiffs' claims are not typical of the class.

Plaintiffs must show that their claims or defenses "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The test for typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).  Here, Plaintiffs' claims are not typical because of the "individual nature of any inquiry into the essential element of causation." Campbell, 2004 WL 5840206, at *9.  All of the reasons that defeat commonality also defeat typicality.  Many courts have found typicality to be lacking in consumer protection actions where the class includes members who did not read, were not deceived by, or did not attach importance to the allegedly misleading statements.[8] That reasoning applies equally here.

---

[8] See, e.g., In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., ("In re Yasmin"), MDL No. 2100, 2012 WL 865041, at **16-17 (S.D. Ill. Mar. 13, 2012) (applying California law) (no typicality where the proposed class "necessarily includes women who took [Yaz] knowing it was not approved for the treatment of PMS" and women who did not take Yaz for PMS); Fine v. ConAgra Foods, Inc., No. CV 10-01848 SJO (CFOx), 2010 WL 3632469, at *3 (C.D. Cal. Aug. 26, 2010) (no typicality where "the vast majority of putative (continued...)

C.   <u>Plaintiffs are not adequate representatives.</u>

Plaintiffs must demonstrate that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Because Plaintiffs' claims are not typical of the class members' claims, the adequacy requirement is not met.[9] In addition, the interests of the named Plaintiffs will conflict with the interests of class members. Each of the named Plaintiffs allege that they suffered discontinuation symptoms. (First. Am. Compl. ¶¶ 8-10, 12-13.) Yet they seek to represent individuals who took Cymbalta and may have suffered no such injury. The interests of these two groups will inevitably conflict. <u>See Krueger v. Wyeth, Inc.</u>, No. 03cv2496 JLS (AJB), 2008 WL 481956, at *2 (S.D. Cal. Feb. 19, 2008) (denying plaintiff's motion for class certification because the proposed class "include[s] <i>both</i> uninjured plaintiffs . . . as well as injured plaintiffs"). Even among those class members who did suffer discontinuation symptoms, the differences in severity will create conflicting interests. As one court stated, the determination of actual causation "is by necessity a process that requires a focus on the individual plaintiff and no class representative can possibly represent such individual plaintiffs without encountering a conflict of interest somewhere along the line." <u>In re Paxil Litig.</u>, 212 F.R.D. 539, 550 (C.D. Cal. 2003); <u>see also</u> <u>Sweet v. Pfizer</u>, 232 F.R.D. 360, 370 (C.D. Cal. 2005) (adequacy

---

class members here never read" the diacetyl statement and "do not base their popcorn purchases on diacetyl-related issues"); <u>In re Paxil Litig.</u>, 218 F.R.D. 242, 245 (C.D. Cal. 2003) (no typicality where "some Plaintiffs may never have seen or heard the statements sought to be enjoined or may have received medical advice from their physicians that would have counteracted" the statements).

[9] <u>See</u> <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 626 n.20, 117 S. Ct. 2231, 2251 n.20, 138 L. Ed. 2d 689 (1997) (noting that the adequacy requirement tends to merge with the typicality requirement); <u>Fine</u>, 2010 WL 3632469, at *4 (adequacy not satisfied because plaintiff was not a typical representative).

requirement not met where there were "too many divergent individual issues among plaintiffs").[10]

## IV.    PLAINTIFFS HAVE NOT SATISFIED RULE 23(b)(3).

Even if plaintiffs can satisfy the requirements of Rule 23(a), a class may be certified under Rule 23(b)(3) only if common issues predominate and a class action is the superior method of adjudication.  "[C]ourts have almost invariably found that common questions of fact do not predominate in pharmaceutical drug cases." In re Vioxx Prods. Liab. Litig., 239 F.R.D. 450, 461 (E.D. La. 2006).[11]

Recognizing the impact of the Court's June 13 Order, Plaintiffs attempt to shift the inquiry away from the role that doctors play in prescribing Cymbalta. (See Dkt. #73, at 8-9 (asserting that the questions regarding physicians identified in the June 13 Order "are not necessary or relevant").)  Instead, they assert that each class member's injury is "the economic loss incurred by consumers who overpaid for a product that was represented as having characteristics it did not." (Id. at 9.)  But the bedrock reality in this case is that no consumer could purchase Cymbalta without the independent decision of a doctor to prescribe it.  See 21

---

[10] Lilly does not challenge the adequacy of Plaintiffs' counsel.

[11] See, e.g., In re Celexa & Lexapro Mktg. & Sales Practices Litig., MDL No. 09-02067-NMG, 2013 WL 450148 (D. Mass. Feb. 5, 2013); In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., MDL No. 2100, 2012 WL 865041 (S.D. Ill. Mar. 13, 2012); Dumas v. Albers Med., Inc., No. 03-0640-CV-W-GAF, 2005 WL 2172030 (W.D. Mo. Sept. 7, 2005); Sweet v. Pfizer, 232 F.R.D. 360 (C.D. Cal. 2005); Campbell v. Purdue Pharma, L.P., No. 1:02cv00163 TCM, 2004 WL 5840206 (E.D. Mo. June 25, 2004); In re Paxil Litig., 212 F.R.D. 539 (C.D. Cal. 2003); Dhamer v. Bristol-Myers Squibb Co., 183 F.R.D. 520 (N.D. Ill. 1998); Judy v. Pfizer, Inc., No. 042-01946-02, 2010 WL 3001745 (Mo. Cir. Ct., St. Louis Cnty. July 27, 2010); Weiss v. AstraZeneca Pharms., No. B215901, 2010 WL 3387220, at *3 (Cal. Ct. App. Aug. 30, 2010); In re Vioxx Class Cases, 180 Cal. App. 4th 116 (Cal. Ct. App. 2009).

U.S.C. § 353(b)(1) (permitting administration of prescription medicines "only upon a written prescription of a practitioner licensed by law"). On the essential, unavoidable issue of a doctor's prescribing decision, individual issues predominate. Furthermore, the "excess price" theory Plaintiffs propose to prove causation adds more individualized issues that predominate over common ones, and it is not capable of proving damages on a class-wide basis.

A.   Individual questions of fact predominate.

Each relevant statute requires a plaintiff to prove a deceptive act, causation, and injury. (June 13 Order, Dkt. #72, at 6 n.7.) Thus, even if the Cymbalta warning is deficient, Plaintiffs must still prove causation and injury, a point which Plaintiffs concede. (Dkt. #73, at 10.) ("[A] plaintiff must show that the defendant's deceptive conduct caused a loss.") As both of these elements are subject to individualized proof, Plaintiffs cannot show predominance.

A physician's decision to prescribe depends on many factors, including patient-specific factors, a physician's prescribing practices, and a physician's knowledge about the risks and benefits of a drug. (See supra pages 5-6.) In the instant case, the following individualized assessments would need to be made regarding each class member's physician's prescribing decision:

- What patient-specific factors did the physician consider in deciding to prescribe Cymbalta (e.g., diagnosis, medical history, prior antidepressant use, etc.)?

- Did the treating physician read the discontinuation warning in the Cymbalta label prior to prescribing the drug?

- Was the treating physician misled by the discontinuation warning?

- Did the statement in the label that Cymbalta has a 12-hour half-life alert

11

the physician to the risk of discontinuation symptoms?[12]

- Did the warning influence the physician's decision to prescribe?
- Did the treating physician understand the risks of discontinuation symptoms from other sources of medical information?[13]
- If given a discontinuation warning that Plaintiffs deem "adequate," would the treating physician have decided not to prescribe Cymbalta?
- What information did the treating physician tell his or her patient about the risk of discontinuation symptoms?

These individualized issues of causation overwhelm any common issues and prevent a finding of predominance. Indeed, many courts have concluded that the predominance requirement was not satisfied where a plaintiff's consumer protection claims required individualized inquiries into each class member's physician's prescribing decision.[14] Such inquiries are inevitable here.[15]

---

[12] Plaintiffs' expert states that the frequency of discontinuation symptoms "directly correlates with . . . a drug's half-life." (See Dkt. # 80 ¶ 5.)

[13] Indeed, in 2005, Lilly published data regarding Cymbalta discontinuation symptoms in a widely-disseminated, peer-reviewed journal. See David G. Perahia et al., Symptoms following abrupt discontinuation of duloxetine treatment in patients with major depressive disorder, 89 J. of Affective Disorders 207 (2005) (Dkt. # 57, ¶ 9, Ex. 1.) This journal article contains the information and data that Plaintiffs insist should be in the Cymbalta label. (First Am. Compl. ¶¶ 30-31.) Thus, if class members' physicians read this article, which has been in the public domain since 2005, then these physicians would have had adequate knowledge about the risk of discontinuation symptoms.

[14] See In re St. Jude Med. Inc. Silzone Heart Valve Prods. Liab. Litig., 522 F.3d 836, 839 (8th Cir. 2008) (no predominance where "[w]hether the information on which physicians based their actions ultimately can be traced to a representation by [heart valve device manufacturer] will vary by individual physician"); In re Celexa & Lexapro Mktg. & Sales Practices Litig., 2013 WL 450148, at *7 (no predominance where individualized inquiries would be necessary regarding whether each class member's physician "relied on those misrepresentations when

(continued...)

B.   <u>Plaintiffs' "excess pricing" theory cannot support class certification.</u>

Having conceded their duty to prove causation, Plaintiffs try to avoid the individualized proof requirement by invoking an "excess pricing" theory. Under this rubric, Lilly's alleged misrepresentations resulted in the market overvaluing Cymbalta, causing the price to increase. As a result, Plaintiffs claim that they spent more on Cymbalta than they would have if the market had been fully aware of the risk. (Dkt. #73, at 11.)   They seek class-wide recovery of the difference between what was paid for Cymbalta and what it supposedly was really worth.

Courts have repeatedly rejected excessive pricing theories as alternatives to proving class-wide causation. The Second Circuit's decision in <u>UFCW Local 1776</u> is the leading case in this regard. There, a group of third-party payors brought a putative class action against Lilly, arguing that the company had misrepresented the efficacy and safety of Zyprexa, a second generation

---

deciding to prescribe Celexa"); <u>In re Yasmin</u>, 2012 WL 865041, at *21 (no predominance where individual proof would be required regarding the "information conveyed by each prescribing physician to putative class members"); <u>Dhamer</u>, 183 F.R.D. at 532 (no predominance where individualized issues regarding "what oral or written statements were provided to the physician, what warnings or instructions the physician passed on to the patient, and whether the physician relied on statements or his or her own knowledge, independent of the product literature"); <u>Weiss</u>, 2010 WL 3387220, at *13 (no predominance where "an examination of the factors that influence physician prescribing decisions" was necessary).

[15] Plaintiffs rely on <u>Plubell v. Merck & Co.</u>, 289 S.W.3d 707 (Mo. Ct. App. 2009), for the proposition that common issues predominate because "the central issue in plaintiffs' suit is whether [Lilly] violated the MMPA by failing to disclose and concealing [Cymbalta's] safety risks." (Dkt. #73, at 12.)   Plaintiffs are incorrect. The MMPA requires a causal connection between the deceptive act and the ascertainable loss. <u>Owen v. Gen. Motors Corp.</u>, 533 F.3d 913, 922 (8th Cir. 2008) ("[T]he plain language of the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice.").

antipsychotic. 620 F.3d at 123. They alleged, as Plaintiffs do here, that they paid a higher price for Zyprexa than would have been charged absent the alleged misrepresentation and brought claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Id. On appeal from the district court's certification decision, the Second Circuit reversed and decertified the class. Id.

The court's analysis began with a discussion of the inelasticity of pricing for prescription pharmaceuticals. Id. at 125. "Even if negative information is released about a medication, the demand for the drug may go down, but the price generally remains the same." Id. In addition, the market for prescription drugs differs from typical consumer products in two critical respects. See id. at 126. First, consumers do not choose what drug to take; drugs are prescribed by physicians. Second, insurers — known as third-party payers ("TPPs") — pay some or all of a drug's cost. Id. Here, each plaintiff had insurance and made co-payments for Cymbalta. (Dkt. ## 76-79.)

Further adding to the complexity of the prescription pharmaceutical market, pharmacy benefit managers ("PBMs") often manage the pharmacy benefits that TPPs offer. Id. Negotiations over price occur between retail pharmacies, wholesalers, manufacturers, and TPPs (often through PBMs). These negotiations "do not intersect" with the doctor's choice of a drug for a patient. Id. Instead, "[p]hysicians generally do not take the price of a drug into account [or] even know the price of the drugs they prescribe." Id. at 126-27.

Against this backdrop, the Second Circuit held that plaintiffs could not prove either but-for or proximate causation on a class-wide basis. First, because "doctors do not generally consider the price of a medication when deciding what to prescribe for an individual patient[,] [a]ny reliance by doctors on misrepresentations as to the efficacy and side effects of a drug, therefore, was not a but-for cause of the price . . . ultimately paid for each prescription." Id. at 133-34. Turning to proximate causation, the Court traced the attenuated chain of

14

causation implicit in the TPPs' theory of causation: Lilly communicates information to physicians who prescribe; TPPs, relying on the advice of PBMs, place the medicine on their formularies as approved drugs; TPPs fail to negotiate the price of the medicine; and TPPs overpay. Id. at 134. In this case, of course, there is an additional step — the individual plaintiffs' co-payment for Cymbalta, as determined by the individual insurance policies. Any theory of causation and damages that depends on these many steps between the alleged misinformation to doctors and the amounts plaintiffs pay will involve individual issues that far outweigh common issues.[16]

---

[16] Other courts have adopted the reasoning of UFCW Local 1776 in rejecting excess price theories in the prescription pharmaceutical area. See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP, No. 08-CV-0179 (SLT) (RER), 2011 WL 1326365, at **4-5 (E.D.N.Y. Mar. 30, 2011) (denying class certification where plaintiffs sought to establish causation through aggregate proof); Prohias v. Pfizer, Inc., 485 F. Supp. 2d 1329, 1337 (S.D. Fla. 2007) (granting motion to dismiss where plaintiffs proposed to establish causation through "excess price" theory that relied on "faulty premise that the price of Lipitor fluctuates based on the public's knowledge of Lipitor's benefits, even though drug prices . . . are fixed by the product's manufacturer").

In addition, to the extent that plaintiffs seek to rely on the so-called "fraud on the market" theory, it has been overwhelmingly rejected outside of the securities context. See, e.g., Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., 192 N.J. 372, 392, 929 A.2d 1076, 1088 (2007) (decertifying class and ruling that "[t]o the extent that plaintiff intends to rely on a single expert to establish a price effect in place of a demonstration of an ascertainable loss or in place of proof of a causal nexus between defendant's acts and the claimed damages . . . plaintiff's proofs would fail."); see also McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 223-24 (2d Cir. 2008) (reversing class certification in case based on "fraud on the market" theory); Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171, 177 (D.D.C. 2003) (rejecting "fraud on the market" theory in suit under District of Columbia consumer protection act).

The methodology Plaintiffs invoke to prove that Lilly's alleged misrepresentations caused class-wide injury fares no better than the ones rejected in the foregoing cases. Plaintiffs offer the expert declaration of Dr. Joel W. Hay, a pharmaceutical economist, who proposes to show how Lilly's alleged conduct inflated Cymbalta's value. (Dkt. #83.) Dr. Hay offers to conduct a "conjoint analysis," as a means of "determin[ing] how consumers place value on specific attributes of products," or "the market's willingness to pay." (Id. ¶ 16.) Dr. Hay's workplan is vast in scope, requiring "several phases." (Id. ¶ 20.) In the first, he will interview physicians and patients to generate a list of "attributes," the "most important characteristics of antidepressants and pain relievers" that are considered before prescription and purchase of a drug. (Id.) He also envisions convening a "focus group of experts" to comment on these "attributes." (Id.) In the second phase, Dr. Hay will develop and administer a survey to "evaluate how consumers and physicians value the probability that a drug will cause" discontinuation symptoms. (Id. ¶ 24.) In the third phase, Dr. Hay will evaluate the data to learn how much the risk of discontinuation "played into the decision-making process of consumers and physicians." (Id. ¶ 25.)

Although Plaintiffs offer Dr. Hay's analysis in place of the individualized proof of causation necessary for their claims, his methods effectively concede that class-wide proof of causation is unsuitable in this context. Dr. Hay acknowledges that "prescription drug choice represents a complex decision-making process." (Id. ¶ 21.) His interview and survey protocol is based entirely on an inquiry into individualized clinical views. Such a complex effort to "average" prescribing practices across such a diverse set of "attributes" is a tacit recognition that individual decisionmaking is critical and unavoidable in assessing causation in this setting. In sum, rather than facilitating class-wide treatment of this case, Plaintiff's strategy injects even more complexity. Plaintiffs should not be permitted to skirt the limitations of Rule 23 by imposing on the Court the

oversight of a process that is no less burdensome than the process of assessing causation on an individualized basis.

Dr. Hay's methodology also fails to satisfy Plaintiffs' obligation to prove that "damages are capable of measurement on a classwide basis." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013). Plaintiffs allege that because the discontinuation warning was inadequate, they paid more for Cymbalta than it was worth. Dr. Hay proposes to establish a single price that represents Cymbalta's worth. But even accepting the premise that Cymbalta was overpriced, the proper measure of relief would be the "difference between what the plaintiff paid and the value of what the plaintiff received." In re Vioxx Class Cases, 180 Cal. App. 4th at 131.[17]   Individualized assessments would be necessary to determine the value of Cymbalta for each class member. See In re Rezulin Prods. Liab. Litig., 210 F.R.D. 61, 69 (S.D.N.Y. 2002) ("[W]hether an individual class member got his or her money's worth is inherently individual."). Class members who received relief from depression or pain with no discontinuation symptoms received the full value for what they paid. For other class members, the risk of discontinuation may have been worth relief from debilitating depression or pain. Thus, each class member's medical history would need to be analyzed to determine whether the individual received the benefit of his or her bargain.[18] Therefore, individualized damages issues predominate.

---

[17] See also In re Yasmin, 2012 WL 865041, at *23.

[18] See In re Vioxx Class Cases, 180 Cal. App. 4th at 136 (noting that determining restitution in prescription drug case "depends on issues specific to that individual plaintiff," such as the "patient's medical history [and] treatment needs"); see also In re Yasmin, 2012 WL 865041, at *24 (noting in prescription drug case that "establishing the existence of a measurable amount of restitution will turn on a number of patient-specific factors").

C.     The California Plaintiffs are not entitled to a presumption of reliance.

The California Plaintiffs claim entitlement to a presumption of reliance.  To benefit from that presumption, Plaintiffs must demonstrate that common evidence can show that: (1) the class members' physicians were exposed to and read the Cymbalta discontinuation warning; and (2) the alleged misrepresentations in the Cymbalta warning were material to the class members' physicians.  See In re Vioxx Class Cases, 180 Cal. App. 4th at 129 ("If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class."); see also In re Yasmin, 2012 WL 865041, at **19-21, 25-26 (noting that reliance can be presumed under the UCL, FAL, and CLRA where material misrepresentations are actually made to each class member).  Plaintiffs can make neither showing on a class-wide basis.

First, Plaintiffs cannot use common proof to demonstrate that the class members' physicians read the discontinuation warning in the Cymbalta label.  As many courts have noted, some physicians do not read a prescription drug's label prior to making a prescription decision.[19]   Individualized assessments are necessary to answer this question.  The court's decision in In re Celexa & Lexapro Mktg. & Sales Practices Litig. is instructive.   2013 WL 450148.   There, the

---

[19] See Motus, 358 F.3d at 661 ("Because the doctor testified that he did not read the warning label . . . before prescribing the drug to [plaintiff], the adequacy of Pfizer's warnings is irrelevant to the disposition of this case."); Latiolais v. Merck & Co., No. CV 06-02208 MRP (JTLx), 2007 WL 5861354, at *3 (C.D. Cal. Feb. 6, 2007) (noting that there was no genuine issue of material fact regarding causation where the physician "stated under oath that the [package] inserts played no role in his decision to prescribe Zocor to Decedent"); Conte v. Wyeth, Inc., 168 Cal. App. 4th 89, 112, 85 Cal. Rptr. 3d 299, 319 (Cal. Ct. App. 2009) ("There can be no proximate cause where, as in this case, the prescribing physician did not read or rely upon the allegedly inadequate warnings promulgated by a defendant about a product.").

plaintiff sought certification of a California class of Celexa purchasers relating to allegedly misleading statements about Celexa. Id. at *6. The court ruled that "individual, plaintiff-specific inquiries" are necessary to determine whether physicians were actually exposed to the allegedly false statements. Id. at *7 ("It is not sufficient simply to presume all doctors who prescribed Celexa were recipients of those misrepresentations."). Here, the lack of common proof on physicians' exposure to the warning is an independent reason for denying class certification.[20]

To avoid this conclusion, Plaintiffs cite Grair v. GlaxoSmithKline, No. BC288536 (Cal. Super. Ct., L.A., Dec. 17, 2009). The Court there based class certification on "uniform misrepresentations" to the public and doctors in Paxil marketing. Id. at 8. However, the Grair court did not fully address what this Court recognized in its June 13 Order (Dkt. #72, at 6-7) — that individualized determinations about plaintiffs' physicians would still be required to prove that the defendant's representations caused plaintiffs' injuries. Grair, therefore, does not measure up to the more complete analysis this Court has already performed.

Plaintiffs' desire to seek refuge in the Grair decision and avoid the centrality of individualized physician decisionmaking that this Court has recognized explains their hard pivot to a previously-ignored advertising theory. But the Court should reject Plaintiffs' attempt to amend their complaint through

---

[20] See Mazza v. Am. Honda Motor Co., 666 F.3d 581, 595 (9th Cir. 2012) (rejecting a presumption of reliance where "many class members were never exposed to the allegedly misleading advertisements"); Fairbanks v. Famers New World Life Ins. Co., 197 Cal. App. 4th 544, 562, 128 Cal. Rptr. 3d 888, 904 (Cal. Ct. App. 2011) ("[A] class certification denial will be upheld when individual evidence will be required to determine whether the representations at issue were actually made to each member of the class."); Pfizer Inc. v. Super. Ct., 182 Cal. App. 4th 622, 631, 105 Cal. Rptr. 3d 795, 803 (Cal. Ct. App. 2010) ("[O]ne who was not exposed to the alleged misrepresentations . . . is not entitled to restitution.").

briefing.  Keenan, 889 F. Supp. at 1359 n.26.  There are no allegations in the complaint concerning allegedly fraudulent advertising that would satisfy the heightened pleading standard imposed under Fed. R. Civ. P. 9(b).  Indeed, Plaintiffs acknowledged at the April 29 hearing that their allegations relate to the physician package insert, not Cymbalta's advertising and marketing.  (See Dkt. #64, Apr. 29, 2013 Tr. 20:17-22:12.)  Plaintiffs' shift to an advertising theory — advanced in the declaration of William Kitzes (Dkt. #81) — is also an unabashed effort to re-litigate the Court's June 13 Order.  As demonstrated in prior briefing, courts have overwhelmingly held that advertising to consumers does not trump the learned intermediary doctrine.  (Dkt. #68, at 8-10.)

Second, Plaintiffs cannot use common proof to show materiality.  A misrepresentation is material "if it induced the plaintiff to alter his position to his detriment."  Caro v. Procter & Gamble Co., 18 Cal. App. 4th 644, 668, 22 Cal. Rptr. 2d 419, 433 (Cal. Ct. App. 1993) (citation and internal quotation marks omitted).  Many factors influence a physician's prescribing decision, and "different physicians rely on different sources of information in deciding which drug to prescribe."  In re Vioxx Class Cases, 180 Cal. App. 4th at 126. Determining whether the discontinuation warning was material requires an individualized inquiry into each physician's prescribing decision.[21]

---

[21]  See Weiss, 2010 WL 3387220, at **13-14 (materiality of AstraZeneca's statements regarding Nexium must be determined by individualized assessments, thus precluding class certification); see also In re Yasmin, 2012 WL 865041, at *25 (materiality of Bayer's statements regarding Yaz was not subject to common proof because "a  number of patient-specific factors influence the decision to select and take an oral contraceptive"); Sergeants Benevolent Ass'n Health & Welfare Fund, 2011 WL 824607, at *14 ("Plaintiffs cannot use generalized proof when individual physicians prescribing Zyprexa may have relied on Lilly's alleged misrepresentations to different degrees, or not at all . . . .") (emphasis, citation, and internal quotation marks omitted).

1   The court's analysis in <u>In re Vioxx Class Cases</u> is on point.  There, the court

2   ruled that individualized assessments were needed to determine whether

3   statements regarding Vioxx's cardiovascular risks were material.  180 Cal. App.

4   4th at 134.  The court concluded that Merck's statements were not material for all

5   physicians, as some "physicians would still prescribe [Vioxx] regardless of risks."

6   <u>Id.</u>   The court further observed that "physicians are different and obtain their

7   information about prescriptions from myriad sources" and "consider many patient-

8   specific factors in determining which drug to prescribe."  <u>Id.</u>   Due to the many

9   variables implicated in the prescribing decision, the materiality of any statements

10   made by Merck to any prescribing decision could not be presumed.  <u>Id.</u>

11   Plaintiffs insist that they "can use common proof to demonstrate at trial the

12   materiality of Cymbalta's significant withdrawal risk."  (Dkt. #73, at 20.)  They

13   offer no methodology for doing so, however.  Instead, they submit the declaration

14   of Dr. Joseph Glenmullen, a psychiatrist who offers only the bare assertion that

15   the Cymbalta label includes "material misstatements" on discontinuation risks.

16   (Dkt. #80 ¶ 26.)  The solitary perspective of a single psychiatrist — who does not

17   even profess to know anything about the prescribing decisions for these Plaintiffs

18   — cannot prove materiality on a class-wide basis.  Indeed, Dr. Glenmullen's

19   declaration reinforces the reasoning articulated in <u>In re Vioxx Class Cases</u>.  He

20   confirms the range of sources from which a doctor might gather information on a

21   medicine's risks.  (<u>Id.</u> ¶ 11 (citing "recommendations by fellow physicians and

22   medical journal publications").)  Ironically, Dr. Glenmullen's declaration also

23   provides an example of the individualized risk-benefit judgments that doctors

24   must make in deciding whether to prescribe a medicine in the face of known risks.

25   He himself prescribes Cymbalta for appropriate patients despite his knowledge of

26   the risk of discontinuation symptoms.  (<u>Id.</u> ¶ 3.)

27   Plaintiffs' reliance on <u>Krueger v. Wyeth, Inc.</u> is also unavailing.  There, the

28   manufacturer allegedly conducted a "broadly disseminated" campaign claiming

21

1    that hormone replacement therapy reduces the risk of heart disease, dementia, and

2    Alzheimer's.  Civil No. 03CV2496 JAH, 2011 WL 8971449, at *8 (S.D. Cal. Mar.

3    30, 2011).  In fact, plaintiffs alleged, the product had the "opposite effects."  Id.

4    Here, it is undisputed that the Cymbalta label has included since launch a three-

5    paragraph warning on the risk of potential discontinuation symptoms.  Plaintiffs'

6    claim of materiality rests entirely, then, on the claim that a doctor might deem

7    material a single statistic in an otherwise comprehensive warning.  This is a far cry

8    from Krueger, where plaintiffs alleged that the defendant "failed to disclose that

9    [its product] had the opposite effects of those advertised."  Id.

10          D.     A class action is not the superior method of adjudication.

11          Due to the individualized assessments required to resolve Plaintiffs' claims,

12   a class action is not the superior method of adjudication.  See Zinser, 253 F.3d at

13   1192 ("If each class member has to litigate numerous and substantial separate

14   issues to establish his or her right to recover individually, a class action is not

15   'superior.'").  Individualized assessments of causation and injury would render

16   class treatment unmanageable, and the action would "degenerate into multiple

17   lawsuits that had to be separately tried."  Campbell, 2004 WL 5840206, at *11.[22]

18   V.     PLAINTIFFS' PROPOSED CLASSES ARE NOT ASCERTAINABLE.

19          A proposed class "must be sufficiently definite, . . . precise, objective, and

20   presently ascertainable."  Mazur v. eBay Inc., 257 F.R.D. 563, 567 (N.D. Cal.

21   2009).  A class is overbroad when the "proposed definition includes individuals

22   who were never injured by the defendant's conduct."  Gonzales v. Comcast Corp.,

23   No. 10-cv-01010-LJO-BAM, 2012 WL 10621, at *20 (E.D. Cal. Jan. 3, 2012); see

---

25   [22] See In re Vioxx Prods. Liab. Litig., 239 F.R.D. at 463 (superiority requirement
26   not met because of the "predominance of individual issues"); Judy, 2010 WL
27   3001745 (superiority requirement not met because "individualized determinations
     would be necessary to properly adjudicate this action").

1    Mazur, 257 F.R.D. at 567.

2    Because Plaintiffs' four statewide classes include all individuals who

3    purchased Cymbalta, the classes will include individuals who suffered no ill-

4    effects from taking Cymbalta. Such individuals paid for a medication to relieve

5    depression or pain, received that benefit, and, accordingly, have no claim.[23]

6    Even limited to those who suffered discontinuation symptoms, the classes

7    necessarily include (1) class members whose physicians did not read and rely on

8    the Cymbalta label in making a prescribing decision, and (2) class members whose

9    physicians were not deceived by the warning, as they understood the risk of

10   discontinuation symptoms from other medical sources. These class members

11   could not have been harmed by Lilly's conduct, because their doctors' prescribing

12   decision was independent of the contents of the Cymbalta label. See In re

13   Yasmin, 2012 WL 865041, at *26 (proposed class was overly broad because it

14   included women "who did not rely on and were not deceived by the alleged

15   omission" in the advertisements). Because Plaintiffs' classes necessarily include

16   many uninjured class members, including many satisfied Cymbalta users,[24] the

17

18   [23] See Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315, 320 (5th Cir. 2002) (plaintiff

19   who suffered no injury "paid for an effective pain killer, and she received just
     that—the benefit of her bargain. . . . Had [defendant] provided additional

20   warnings . . . the plaintiffs would be in the same position they occupy now.");

21   Williams, 297 F. Supp. 2d at 176 ("Without alleging that a product failed to
     perform as advertised, a plaintiff has received the benefit of his bargain and has no

22   basis to recover purchase costs."); Akkerman v. Mecta Corp., 152 Cal. App. 4th

23   1094, 1101, 62 Cal. Rptr. 3d 39, 45 (Cal. Ct. App. 2007) (plaintiff cannot receive
     "a windfall award of restitution" under the UCL where the medical procedure was

24   "successful and beneficial").

25   [24] See Moheb v. Nutramax Labs. Inc., No. CV 12-3633-JFW (JCx), 2012 WL

26   6951904, at *3 (C.D. Cal. Sept. 4, 2012) (class was not ascertainable because it
     included unharmed members "who derived benefit from Cosamin and are satisfied

27   users of the product").

28

1  classes are overbroad and cannot be certified.[25]

2      If Plaintiffs were to revise the definitions of the proposed classes, they

3  would not be ascertainable because individualized inquiries would be required to

4  determine class membership.  For instance, were Plaintiffs to redefine the classes

5  to include only those Cymbalta purchasers whose physicians read and were

6  deceived by the Cymbalta warning prior to making prescribing decisions, such

7  classes would not be ascertainable because "the proposed definition would require

8  the Court to determine whether a person is a member of the class by evaluating the

9  merits of the individual claims."  Gonzales, 2012 WL 10621, at *20.[26]  As the

10  proposed classes are overbroad, and revisions would render the classes

11  unascertainable, this Court should deny Plaintiffs' motion for class certification.

12  VI.    <u>THE MOTION CAN BE DENIED BUT NOT GRANTED.</u>

13      As demonstrated above, there are ample grounds, based on persuasive

14  caselaw, to deny Plaintiffs' motion for class certification.  If the Court is not

15  inclined to deny the motion, Lilly should be permitted to develop the record in

16  support of its opposition, including by leave to:

17

18

---

19  [25] See, e.g., Diacakis v. Comcast Corp., No. C 11-3002 SBA, 2013 WL 1878921,
20  at *4 (N.D. Cal. May 3, 2013) (proposed class was overbroad because "the class
   includes *anyone* who purchased any bundled package, irrespective of whether he
21  or she was deceived by Comcast's alleged failure to disclose the existence of
   additional modem charges") (emphasis in original); Sanders v. Apple Inc., 672 F.
22  Supp. 2d 978, 991 (N.D. Cal. 2009) (proposed class was overbroad because it
23  included "individuals who either did not see or were not deceived by
   advertisements, and individuals who suffered no damages").

24  [26] See In re Paxil Litig., 212 F.R.D. at 545 (concluding that the class definitions
25  improperly made "the actual composition [of the class] only determinable at the
   conclusion of all proceedings"); Judy, 2010 WL 3001745 ("[M]odifying the
26  definition to remove the uninjured individuals would rely on impermissible
27  individual merit determinations.").

28

- Depose Plaintiffs' prescribing doctors to determine if they read the discontinuation warning, relied on it, or were in any way misled by it.[27]
- Obtain Plaintiffs' medical records and records of their payments for Cymbalta and take Plaintiffs' depositions.
- Depose Dr. Hay to probe his proposed method for proving class-wide injury and damages, his qualifications as an expert, and the admissibility of any exhibits submitted in support of his declaration.
- Depose Dr. Glenmullen to probe the basis for his opinions, including the circumstances under which he prescribes Cymbalta, his qualifications as an expert, and the admissibility of any exhibits submitted in support of his declaration.
- Depose Mr. Kitzes to probe the basis for his opinions, his qualifications as an expert, and the admissibility of any exhibits submitted in support of his declaration.
- Submit expert declarations in opposition to Plaintiffs' experts.

This work is necessary before the Court should consider granting Plaintiffs' motion.  See Caro, 18 Cal. App. 4th at 667 n.20 (allowing defendants to "introduce evidence to rebut any inference or presumption of reliance"). However, the present record and legal authority are fully adequate to deny Plaintiffs' motion for class certification now and, consistent with the Court's June 13 Order, serve "the interests of judicial economy."  (Dkt. #72, at 8.)

CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be denied.

---

[27] If not, Plaintiffs are not suitable class representatives.

1

DATED: August 26, 2013

2

Respectfully submitted,
COVINGTON & BURLING LLP

3

By:   /s/ Clara J. Shin

4

Clara J. Shin

5

Mark H. Lynch
Michael X. Imbroscio

6

Phyllis A. Jones
Colleen A. Kelly

7

Attorneys for Defendant

8

ELI LILLY AND COMPANY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28