Clara J. Shin, SB #214809
E-mail: cshin@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-7058
Facsimile: (415) 591-6091

Mark H. Lynch (*admitted pro hac vice*)
E-mail: mlynch@cov.com
Michael X. Imbroscio (*admitted pro hac vice*)
E-mail: mimbroscio@cov.com
Phyllis A. Jones (*admitted pro hac vice*)
E-mail: pajones@cov.com
Colleen A. Kelly (*admitted pro hac vice*)
E-mail: ckelly@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

Attorneys for Defendant
ELI LILLY AND COMPANY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER L. SAAVEDRA, et al., on behalf of themselves and all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>Defendant. | No. 2:12-cv-09366-SVW-MAN<br><br>DECLARATION OF PATRICK BRUEN<br><br>Date: November 4, 2013<br>Time: 1:30 p.m.<br>Location: Courtroom 6<br>Judge: Hon. Stephen V. Wilson |

1  I, Patrick Bruen, state as follows:

2  1. I am employed by Eli Lilly and Company ("Lilly") as Senior Advisor, U.S. Strategic Pricing. I have worked at Lilly for twenty-eight years. Since January 1998, I have been the person primarily responsible for developing recommendations for Lilly's U.S. Pricing Committee for the initial launch list price of Lilly's drugs in the United States and for subsequent changes in the list price of those drugs. I have personal knowledge of the facts stated herein and could and would testify competently about them.

2. Prior to my position as Senior Advisor, U.S. Strategic Pricing, I held the following positions:

   a. Manager, U.S. Strategic Pricing (January 1998 - June 2001);
   b. National Accounts Manager (July 1993 - December 1997);
   c. District Manager-Atlanta (December 1991 - June 1993);
   d. Regional Personnel Representative, Human Resources (January 1990 - November 1991);
   e. Market Research Analyst (August 1988 - December 1989);
   f. Business Planning Analyst, Corporate Strategy/Business Development (January 1987 - July 1988);
   g. Sales Representative-Chicago (July 1985 - December 1986).

3. I understand that the plaintiffs in this case seek to represent sub-classes of individuals in Massachusetts, Missouri, New York, and California who paid for or purchased Cymbalta.

4. I have been asked to explain the way Cymbalta is priced, distributed, and paid for.

5. Lilly sells Cymbalta to wholesalers and to large pharmacy chains that maintain warehouses and perform the wholesaling function in-house. The price that wholesalers pay to Lilly for Cymbalta is Lilly's "Net Wholesale Price" or "NWP," which changes from time to time. Lilly's NWP, consistent with standard

industry practice, does not include discounts such as, for example, a two percent prompt pay discount that a wholesaler may earn by paying within 30 days. (Many other participants in the pharmaceutical industry refer to the price paid by wholesalers for their products, before discounts, as "Wholesale Acquisition Cost" or "WAC.")

6. Wholesalers then sell Cymbalta to pharmacies. Lilly does not know the price that wholesalers charge to pharmacies, and the price may be different depending upon the particular pharmacy.

7. Approximately 90 percent of all Cymbalta sales are into what we call the "retail pharmacy channel" — *i.e.*, the drug will ultimately be dispensed by a retail pharmacy to a customer who presents a prescription for the drug.

8. Approximately 95 percent of the Cymbalta prescriptions dispensed by retail pharmacies are covered by insurance of one form or another. These insurance types can be grouped into three types: Medicaid, Medicare Part D, and Commercial Managed Care (CMC). CMC health insurance plans are sponsored by employers, unions, or other entities that offer insurance to groups of individuals. Plan sponsors typically enter into contracts with insurance companies — known as third-party payers (TPPs) — to design and/or administer insurance plans. The sponsors may also contract directly with pharmacy benefit managers (PBMs) to administer their pharmacy benefit in the absence of TPPs. In addition some TPPs retain PBMs to administer their pharmacy benefit programs. Cymbalta prescriptions dispensed by retail pharmacies to patients with insurance in 2012 were covered by the following types of insurance: approximately 5 percent Medicaid, 20 percent Medicare Part D, and 75 percent CMC.

9. The price that a pharmacy will charge a patient/plan member covered by an insurance plan is determined by the sponsor of the patient's health benefit plan as well as its TPP and/or PBM.

10. The contracts between the plan sponsors and the TPPs or PBMs specify how much of the amount charged by a pharmacy will be paid by the plan sponsor through reimbursement by the TPP or PBM and how much will be paid by the patient/plan member. There are substantial variations in these contracts, depending on the objectives of the plan sponsor. The amount paid by the patient/plan member to the pharmacy is known as a co-payment. A co-payment may be either a fixed payment, regardless of the price charged by the pharmacy, or it may be a percentage of the price charged by the pharmacy. Percentage co-payments are also known as co-insurance.

11. TPPs and PBMs maintain formularies, which are lists of the drugs that they will cover and under specified terms. Approximately 20 percent of the CMC market maintains what are considered by Lilly to be "open" formularies. This means that essentially all brand-name drugs are covered. Approximately 15 percent of the commercial market maintains "closed" formularies, which means that only certain brand drugs are covered. The remaining share of the commercial market — approximately 65 percent — uses tiered formularies.

12. Typically, a tiered formulary will have three fixed co-payment tiers, although some have as many as five tiers. Drugs in the first tier have the lowest co-payment requirement. The first tier generally covers a generic drug if one is available to treat the patient's condition. The co-payment for second tier drugs is more than the first tier but less than the third tier. Drugs in the second tier are considered to be preferred brand-name products. Drugs that are listed in the third tier, or non-preferred brands, require a higher co-payment from the insured patient than the preferred brand tier. In some tiered plans, drugs in the high tiers will require the patient to pay a percentage of the pharmacy's reimbursement rather than a fixed co-pay. In some of the plans, the patient may be required to be first treated with a generic drug before coverage for a preferred or non-preferred drug is available. In these situations, a prescription for fluoxetine (the generic name for

Prozac), or paroxetine (the generic name for Paxil) must be dispensed before the patient would be eligible for insurance coverage of a prescription for Cymbalta. The most restrictive tiered benefit programs, which begin to merge into the closed benefit design, may not cover some brand-name drugs, effectively requiring the patient to pay 100% of the TPP's or PBM's pharmacy reimbursement for the drug.

13. A TPP's or PBM's ability to determine placement in either a closed formulary or a tiered formulary creates an incentive for Lilly (and other manufacturers) to offer rebates to TPPs or PBMs. This is particularly true in the antidepressant market where there are multiple brand-name patent-protected drugs that doctors can choose to prescribe. Over the nine years that Cymbalta has been on the market, it has faced competition from as many as eight other brand-name antidepressants (Pristiq, approved in February 2008 and still patent-protected; Effexor XR, approved in October 1997 and patent-protected until June 2010; Effexor, approved in December 1993 and patent-protected until August 2006; Zoloft, approved in 1991 and patent-protected until June 2006; Lexapro, approved in August 2002 and patent-protected until March 2012; Paxil CR, approved in February 1999 and patent-protected until June 2007; Celexa, approved in July 1998 and patent-protected until October 2004; and Viibryd, approved in January 2011 and still patent-protected).

14. Cymbalta contracts provide for two forms of rebates. Most contracts between Lilly and TPPs or PBMs provide that Lilly will pay the TPP or PBM a rebate as a percentage of total Cymbalta sales reimbursed by the TPP or PBM during a time period in return for placement of Cymbalta on a closed formulary or a preferred tier of a tiered formulary. Other contracts provide that Lilly will reimburse the TPP or PBM on the basis of the Cymbalta share of prescriptions in the antidepressant therapeutic class that covered members of the TPP or PBM purchase, with the amount of the rebates escalating as the Cymbalta share increases.

15. The extent to which rebates from manufacturers will be used to reduce a patient's co-payment for the drug varies from plan to plan depending on the plan sponsor's benefit design and the formulary placement decision made by its TPP and/or PBM.

16. TPPs and PBMs employ a very wide variety of plan designs, and the terms of their contracts with manufacturers vary substantially, both at any given time and over the nine years that Cymbalta has been on the market. During that period, Lilly has had 129 separate contracts for Cymbalta with 101 different entities in the CMC market.

17. Lilly does not determine a TPP's or PBM's reimbursement to a pharmacy nor the co-payment amount paid by an insured patient for a Cymbalta prescription. Lilly also does not have visibility into the amounts paid by an insured patient. Determining the amount that each individual paid for Cymbalta would require a review of each patient's insurance coverage. In addition, understanding how the amount that each individual paid for Cymbalta was set would require a review of the contracts between the plan sponsors and the TPPs or PBMs, the contracts between the TPPs or PBMs and the pharmacies, and the extent to which the TPP or PBM used the manufacturer rebates to reduce the individual's co-payment.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 7, 2013.

*Patrick Bruen*