Lynn Lincoln Sarko, Esq., *admitted pro hac vice*
lsarko@kellerrohrback.com
Michael D. Woerner, Esq., *admitted pro hac vice*
mwoerner@kellerrohrback.com
Gretchen Freeman Cappio, Esq., *admitted pro hac vice*
gcappio@kellerrohrback.com
Havila Unrein, Esq., *admitted pro hac vice*
hunrein@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900 / Fax: (206) 623-3384

Juli E. Farris, Esq. (CA Bar No. 141716)
jfarris@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
Tel: (805) 456-1496 / Fax: (805) 456-1497

Mark D. Samson, Esq., *admitted pro hac vice*
msamson@kellerrohrback.com
**KELLER ROHRBACK P.L.C.**
3101 N. Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088 / Fax: (602) 248-2822

***Additional Counsel for Plaintiffs on following page***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER L. SAAVEDRA, DR. MELISSA STRAFFORD, CAROL JACQUEZ, and DAVID MATTHEWS, JR., on behalf of themselves and all other persons similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>Defendant. | No. 2:12-CV-09366-SVW(MANx)<br>__CLASS ACTION__<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION**<br><br>**Date:  November 4, 2013**<br>**Time:  1:30 p.m.**<br>**Location:  Courtroom 6**<br>**Judge:  Hon. Stephen V. Wilson** |

Samuel S. Deskin, Esq.
sam@deskinlawfirm.com
DESKIN LAW FIRM, PLC
16944 Ventura Blvd
Encino, CA 91316
Tel.:  (800) 709-8978 / Fax: (800) 709-8971

Harris L. Pogust, Esq.
hpogust@pbmattorneys.com
T. Matthew Leckman, Esq.
MLeckman@pbmattorneys.com
POGUST BRASLOW MILLROOD LLC
161 Washington Street, Suite 1520
Conshohocken, PA 19428
Tel.:  (800) 897-8930 / Fax:  (610) 941-4245

***Additional Counsel for Plaintiffs***

# **Table of Contents**

I.  INTRODUCTION ...................................................................................1

II.  LILLY'S RELIANCE ON INAPPOSITE CASE LAW ...........................2

    A.  Civil RICO has a different causation requirement...........................2

        1.  Courts have repeatedly rejected the application of RICO standards to state law claims ..........................................4

    B.  Lilly misstates the relevant statutory causation standards ................5

III.  LILLY MISSTATES THE FACTS.........................................................10

    A.  First, Lilly offers no evidence that true and complete information about Cymbalta withdrawal reached a single person ...........................................................................................10

    B.  Second, Lilly focuses on Cymbalta as an antidepressant only, even though Lilly aggressively promoted much broader uses ...............................................................................12

    C.  Third, Lilly's expert underestimates the importance of Cymbalta's withdrawal profile...........................................................13

    D.  Fourth, Lilly falsely states that a section of the Cymbalta label alerts prescribers to Cymbalta's withdrawal risk when it does not.............................................................................14

IV.  THE COURT'S QUESTIONS AND CLASSWIDE DAMAGES...........................................................................................14

        1.  Plaintiffs' damages theory focuses on the objective, classwide measurement of value, not price—a distinction Lilly understands and promotes ...............................................................................17

    B.  Lilly has not contested, and can not contest, the established scientific viability of conjoint analysis........................19

        1.  Lilly's expert has offered no criticism of Dr. Hay's proposed conjoint analysis.................................................19

        2.  Lilly utilizes conjoint analysis itself ...............................20

        3.  Conjoint analysis has been used for decades in marketing in general and in health economics and pharmacoeconomics in particular ...........................21

i

**4.**   Conjoint analysis has been widely accepted in litigation ....................................................................22

**V.**   CONCLUSION.....................................................................22

## **Table of Authorities**

### **Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013)....................................................10

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-1846, 2012 WL 2571332 (N.D. Cal. 2012)........................................22

*Aspinall v. Philip Morris Companies, Inc.*,
442 Mass. 381, 813 N.E.2d 476 (Mass. 2004) ...............................................7

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
344 F.3d 211 (2d Cir. 2003) ............................................................................4

*Bridge v. Phx. Bond & Indem. Co.*,
553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) .............................3

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ...........................................................................2

*Casavant v. Norwegian Cruise Line, Ltd.*,
76 Mass. App. Ct. 73, 919 N.E.2d 165 (Mass. App. Ct. 2009).......................7

*Casavant v. Norwegian Cruise Line, Ltd.*,
460 Mass. 500, 952 N.E.2d 908 (Mass. 2011) ...............................................7

*Chapman v. Skype Inc.*,
--- Cal. Rptr. 3d ----, No. B241398, 2013 WL 5502960 (Cal. Ct.
App. Oct. 4, 2013) ...........................................................................................7

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013)..............................................15, 17

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ............................20

*Desiano v. Warner-Lambert Co.*,
326 F.3d 339 (2d Cir. 2003) .......................................................................4, 5

*Dupler v. Costco Wholesale Corp.*,
249 F.R.D. 29 (E.D.N.Y. 2008).......................................................................6

*Ewert v. eBay, Inc.*,
Nos. 07-2198, 07-4487, 2010 WL 4269259 (N.D. Cal. Oct. 25,
2010) ...............................................................................................................8

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010) ...................................3

iii

*Hess v. Chase Manhattan Bank, USA, N.A.*,
220 S.W.3d 758 (Mo. 2007) ....................................................................9

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) ...............................................................9

*Holmes v. Sec. Investor Prot. Corp.*,
503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992) .................3

*Hope v. Nissan N. Am., Inc.*,
353 S.W.3d 68 (Mo. Ct. App. 2011) .....................................................19

*In re Tobacco Cases II*,
No. JCCP 4042, slip op. (Cal. Super. Ct. Sept. 24, 2013) .................20

*In re Tobacco II Cases*,
46 Cal. 4th 298, 93 Cal. Rptr. 3d 559 (Cal. 2009) ................ 7, 8, 9, 13

*In re U.S. Foodservice Inc. Pricing Litig.*,
--- F.3d ----, No. 12-1311, 2013 WL 4609219 (2d Cir. Aug. 30, 2013) ....................................................................................................10

*Jermyn v. Best Buy Stores, L.P.*,
256 F.R.D. 418 (S.D.N.Y. 2009) ............................................................6

*Johnson v. General Mills, Inc.*,
276 F.R.D. 519 (C.D. Cal. 2011) ...........................................................5

*Keegan v. Am. Honda Motor Co.*,
284 F.R.D. 504 (C.D. Cal. 2012) .........................................................19

*Koch v. Acker, Merrall & Condit Co.*,
18 N.Y.3d 940, 967 N.E.2d 675 (N.Y. 2012) ......................................9

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ...............................................................17

*Microsoft Corp. v. Motorola, Inc.*,
904 F. Supp. 2d 1109 (W.D. Wash. 2012) ..........................................22

*Plubell v. Merck & Co.*,
289 S.W.3d 707 (Mo. Ct. App. 2009) ............................................5, 19

*Poulos v. Caesars World, Inc.*,
379 F.3d 654 (9th Cir. 2004) .................................................................7

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ...........................................................8, 9

*Stutman v. Chem. Bank*,
95 N.Y.2d 24, 731 N.E.2d 608 (N.Y. 2000) .........................................6

*TV Interactive Data Corp. v. Sony Corp.*,
929 F. Supp. 2d 1006 (N.D. Cal. 2013) ..............................................22

iv

*Tyler v. Michaels Stores, Inc.*,
  464 Mass. 492, 984 N.E.2d 737 (Mass. 2013) ...............................................6, 9

*UFCW Local 1776 v. Eli Lilly and Co.*,
  620 F.3d 121 (2d Cir. 2010) ...............................................2, 3, 4, 5

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
  793 F.2d 1034 (9th Cir. 1986) ...............................................22

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. &
  Serv. Workers Int'l Union, AFL–CIO, CLC v. ConocoPhillips Co.*,
  593 F.3d 802 (9th Cir. 2010) ...............................................2

*Wolin v. Jaguar Land Rover N. Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ...............................................19

**Statutes**

Cal. Bus. & Prof. Code §§ 17200 ...............................................5

Cal. Bus. & Prof. Code §§ 17203 ...............................................5

Cal. Bus. & Prof. Code §§ 17204 ...............................................5

Cal. Bus. & Prof. Code §§ 17500 ...............................................5

Cal. Civ. Code §§ 1770 ...............................................5

Cal. Civ. Code §§ 1780 ...............................................5

Mass. Gen. Laws Ann. Ch. 93A, § 9 ...............................................5, 7

Mo. Rev. Stat. §§ 407.020 ...............................................5, 6

Mo. Rev. Stat. §§ 407.025 ...............................................5

N.Y. Gen. Bus. Law §§ 349 ...............................................5, 6

N.Y. Gen. Bus. Law §§ 350 ...............................................5

Racketeer Influenced and Corrupt Organizations Act (RICO),
  18 U.S.C.A. §§ 1961-1968 ............................................... passim

**Rules**

Fed. Rule Civ. P. 23(b)(2)...............................................15, 23

Fed. Rule Civ. P. 23(b)(3)...............................................15, 23

Fed. Rule Civ. P. 23(c)(4)...............................................15, 23

**Other Authorities**

David A. Harpman,
*Introduction to Conjoint Analysis for Valuing Ecosystem Amenities*, Bureau of Reclamation Technical Memorandum Number EC-2008-03. U.S. Dept. of the Interior, Bureau of Reclamation (Feb. 2008), *available at* http://www.usbr.gov/pmts/economics/reports/conjoint/TMEC2008 03.pdf. ..................................................................................21

Deloitte Center for Health Solutions,
*Value-based Pricing for Pharmaceuticals: Implications of the shift from volume to value*, Deloitte LLP (2012) http://www.deloitte.com/view/en_US/us/Insights/centers/center-for-health-solutions/f604ae4d278b7310VgnVCM1000001956f00aRCRD.htm ..................................................................................18

Elie Ofek & Ron Laufer,
*Eli Lilly: Developing Cymbalta*, Harvard Business School Case 507-044, November 2006 (Revised July 2008)........................19, 20

http://www.lilly.com/about/key-issues/Pages/key-issues.aspx (last visited Oct. 21, 2013)...................................................17

http://www.lilly.com/about/key-issues/Pages/value-based-pricing.aspx (last visited Oct. 21, 2013)...................................................17

Michael Aristides et al.,
*Patient Preference and Willingness-to-Pay for Humalog Mix25 Relative to Humulin 30/70: A Multicountry Application of a Discrete Choice Experiment*, 7 Value in Health 442, 449 (2004)..................20

Paul E. Green, Abba M. Krieger, and Jerry (Yoram) Wind,
*Thirty Years of Conjoint Analysis: Reflections and Prospects*, Interfaces S56, S67 (May-June 2001), *available at* https://marketing.wharton.upenn.edu/files/?whdmsaction=public:main.file&fileID=507. ..............................................21

Wouter van der Meer and Jan Kerkhofs, Infosys Lodestone,
*The Art of Pricing in the Pharmaceutical Industry*, 7 (2012), *available at* http://www.lodestonemc.com/files/pdf/white%20papers/WP-The_Art_of_Pricing_in_the_Pharmaceutical_Industry-120703.pdf. ..............22

Yoram (Jerry) Wind, Abba M. Krieger, and Paul E. Green,
*Applying Conjoint Analysis to Legal Disputes: A Case Study*, 2 Wharton School, University of Pennsylvania, Working Paper (2006)....................................................................21

## I.   INTRODUCTION

During the September 17, 2013, hearing on Plaintiffs' Motions for Class Certification, the Court raised the following issues:

> (1) What is the distinction between price and value?  (Tr. 18:4-6, Sept. 17, 2013 ("Tr.").)
>
> (2) How does the value of a product's attribute lead to a damages factor?  (*Id*. at 20:3-5.)
>
> (3) Under Plaintiffs' damages theory, do common issues predominate?  (*Id*. at 9:4-7.)

Lilly's supplemental briefing fails to address these issues.  Instead, Lilly recycles its arguments about the labeling of Cymbalta, ignoring the Court's instruction to assume that it is misleading.  (Dkt. 72, at 8.)

Lilly's opposition to class certification boils down to the proposition that Lilly is "too big to sue" under four states' consumer protection statutes.  Lilly posits that because it is impossible to know whether its omissions about withdrawal caused each consumer to purchase or each doctor to prescribe the drug, a class action cannot be certified in a consumer protection case involving a prescription drug.

But if Lilly's worldview were accurate, class certification regarding any consumer product would be impossible.  While every consumer purchase involves some degree of subjective decision-making, consumer protection claims are nonetheless susceptible to objective proof.  (*See* Dkt. 86, at 5-9.)  And there are no exemptions in the consumer protection laws of the four states for prescription drugs.

As Judge Posner observed in another consumer case based on similar state laws, "A class action is the efficient procedure for . . . a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost to any

one of them large enough to justify the expense of an individual suit." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013). The Cymbalta Plaintiffs stand in the same position—unable to meaningfully seek legal redress without the benefit of the class action device.

Plaintiffs' brief addresses Lilly's arguments in turn. First, Lilly's reliance on inapposite case law is examined. Second, the brief reviews Lilly's factual arguments, noting several inaccuracies. Third, the brief answers the Court's questions about damages and explains why Plaintiffs' proposed conjoint analysis can be effectively employed on a classwide basis.

## II.   LILLY'S RELIANCE ON INAPPOSITE CASE LAW

Lilly creates a straw argument—that Plaintiffs' claims are premised on a RICO theory—and then disassembles the hypothetical RICO plaintiffs' class certification argument based on an individual causation theory. (Dkt. 90, 16-21.) Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. §§ 1961-1968. The only problem with this approach is that it has nothing to do with Plaintiffs' actual legal theories. As the Ninth Circuit has made clear, what matters at class certification is the legal theory as pleaded by the plaintiffs. *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010). Thus, the *proper* class certification analysis turns on the consumer protection statutes that actually give rise to the claims here—claims that present objective questions and are susceptible to classwide proof.

## A.   Civil RICO has a different causation requirement

Lilly's leading authority, *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121 (2d Cir. 2010) ("*UFCW Local*"), is inapposite because it is based on RICO, a federal statute with a drastically different causation requirement than those at issue in this case, as the Court recognized at the September 17 hearing. (Tr. 17:23-24.)

2

RICO's causation standard is particular and demanding.  To state a claim under RICO, 18 U.S.C. § 1964(c), plaintiffs must satisfy both "but-for **and** proximate causation.  *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S. Ct. 1311, 1317-18, 117 L. Ed. 2d 532 (1992).  Proximate cause under RICO is not equivalent to "the many shapes this concept took at common law."  *Id*. Instead, "the focus is on the directness of the relationship between the conduct and the harm."  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12, 130 S. Ct. 983, 991, 175 L. Ed. 2d 943 (2010).  To satisfy this causation inquiry, RICO claims predicated on mail fraud generally require a showing of reliance.  *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 658, 128 S. Ct. 2131, 2144, 170 L. Ed. 2d 1012 (2008).

In *UFCW Local*, the plaintiffs were required to prove reliance as part of their RICO claims.  *UFCW Local*, 620 F.3d at 133.  The plaintiffs, third-party payers, sued Lilly over its misleading promotion of the drug Zyprexa, an antipsychotic. The *UFCW Local* plaintiffs alleged that Lilly conducted a racketeering enterprise whereby Lilly promoted Zyprexa for off-label uses.  As part of the alleged enterprise, Lilly engaged in wire and mail fraud by overselling the efficacy of Zyprexa compared to other antipsychotics and minimizing Zyprexa's side effects. *Id*. at 131.  The plaintiffs' "excess price" theory[1] was that Lilly's conduct caused Zyprexa to be overpriced in comparison with other antipsychotics.[2]  Thus, to prove liability under RICO, the plaintiffs had to prove that doctors' reliance on Lilly's misrepresentations was the but-for and proximate cause of the price eventually

---

[1] Relying on *UFCW Local*, Lilly labels Plaintiffs' theory of damages an "excess pricing" theory.  (Dkt. 90, at 6.)  **Yet Lilly cannot cite to any of Plaintiffs' submissions for that assertion, instead citing to its own opposition brief.**  (*Id*., citing Dkt. 84, at 13-15.)  Plaintiffs' theory is not one of excess pricing; it is that Cymbalta's withdrawal characteristics have an economic value, and because Plaintiffs purchased Cymbalta that was not as represented, they suffered economic harm.

[2] The *UFCW Local* plaintiffs also advanced an "excess prescriptions" theory, which assumed that every off-label prescription was the result of Lilly's allegedly unlawful promotion.  *UFCW Local*, 620 F.3d at 131.

3

paid by the third-party payers.

The Second Circuit rejected the *UFCW Local* plaintiffs' theory of causation, concluding that doctors' reliance could not be a but-for cause of Zyprexa's price when the evidence did not show that doctors considered price when prescribing Zyprexa. *Id.* at 133-34. The court also rejected this theory as to proximate causation, because the plaintiffs, as third-party payers, were in a position to negotiate the price paid for Zyprexa, but had not themselves relied on Lilly's misrepresentations. Moreover, because some third-party payers did in fact negotiate Zyprexa's price and limit its usage while others did not, generalized proof could not show proximate causation. *Id.* at 134.

In sum, *UFCW Local* fails to apply here for three reasons. First, the *UFCW Local* plaintiffs pleaded violations of RICO, which contains substantially different causation standards than those here. Second, the *UFCW Local* plaintiffs pleaded an "excess price" theory—which is not what Plaintiffs plead here. *See supra* n.1. Third, the *UFCW Local* plaintiffs were third-party payers, in a position to negotiate prices, but did not rely on the misrepresentations and often did not actually negotiate prices. No such causation complications exist here, rendering Lilly's main authority wholly inapposite.

## 1. Courts have repeatedly rejected the application of RICO standards to state law claims

Because causation under RICO is a unique creature of the federal statute, its corresponding analyis is not applicable to claims brought under consumer protection statutes. In fact, the Second Circuit has explicitly "cautioned against" broadly applying RICO's proximate causation requirement to state consumer protection statutes. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 219 (2d Cir. 2003) (citing *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 348 (2d Cir. 2003)). In *Desiano*, plaintiffs brought claims under New Jersey's consumer protection statute and state common law based on the

prescription drug Rezulin, alleging that the defendant drug manufacturer had misleadingly marketed the drug. The district court dismissed the claims based on lack of causation, relying on RICO authority. *Desiano*, 326 F.3d at 345. The Second Circuit vacated the district court's decision, explaining that RICO's proximate cause standard was not relevant to the plaintiffs' state law claims. *Id*. at 348. Here, as in *Desiano*, Lilly's RICO authorities are likewise not relevant to Plaintiffs' state law claims.

A court in this district has reached the same conclusion. *Johnson v. General Mills, Inc.*, 276 F.R.D. 519 (C.D. Cal. 2011), rejected defendants' attempt to apply RICO case law to claims brought under California consumer protection statutes. Lilly's reliance on *UFCW Local*, a RICO case, is similarly misplaced with respect to this consumer protection case.

**B.    Lilly misstates the relevant statutory causation standards**

Lilly has consistently misstated the causation standard under the four states' consumer laws by attempting to apply tort or RICO causation standards. *See* Mo. Rev. Stat. §§ 407.020 (1), 407.025 (MPA); Cal. Civ. Code §§ 1770, 1780(a) (CLRA); Cal. Bus. & Prof. Code §§ 17200, 17203, 17204, 17500 (UCL and FAL); Mass. Gen. Laws Ann. Ch. 93A, § 9 (Ch. 93A); N.Y. Gen. Bus. Law §§ 349(a)(h), 350 (NYCPA). Lilly makes no meaningful effort to engage with the *actual* causation standard under the state statutes at issue. Plaintiffs address each in turn.

**Missouri:**  Under Missouri law, the causal relationship required is not between the alleged omissions and a plaintiff's purchase, but rather between the omissions and the ascertainable loss. *Plubell v. Merck & Co.*, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009).[3]  Therefore, no inquiry into purchasing decisions is necessary.

---

[3] Despite the legal and factual parallels between *Plubell* and Plaintiff Matthews' claims under the MMPA, Lilly has made no effort to distinguish the decision of the Missouri Court of Appeals and does not cite it in its supplemental briefing.

Plaintiff Matthews' theory of liability under the MPA only requires that Lilly's omissions have a causal relationship with *his loss*, which was that the Cymbalta he purchased was a product with less value than the product as represented by Lilly.  (Matthews Decl., Dkt. 79, ¶¶ 5-8.)  Lilly's omissions have a clear causal relationship with this loss, because Lilly hid facts that would dramatically affect Cymbalta's value to consumers and prescribing physicians.

**New York:**  Under New York law, a plaintiff need only show that the deception caused a loss, not that she would not have otherwise entered into the transaction altogether.  *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 30, 731 N.E.2d 608, 612-13 (N.Y. 2000).  Therefore, Plaintiff Dr. Strafford need only show that Lilly's omissions caused a loss, not that she would not have purchased Cymbalta had the withdrawal information been accurate.

New York courts routinely certify NYCPA claims where universal omissions are the gravamen of plaintiffs' claims and therefore may be proven classwide, as here.  *See, e.g.*, *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 435 (S.D.N.Y. 2009) (certifying a class based on § 349 claims regarding defendant's omissions); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 43-44 (E.D.N.Y. 2008) (certifying class based on Costco's failure to disclose membership renewal policy and emphasizing suitability of class certification with omission claims). Because Dr. Strafford can show that Lilly's omissions caused an economic loss and the same omissions affected the entire New York subclass, class certification is appropriate under NYCPA.  (Strafford Decl., Dkt. 76, ¶¶ 5-8.)

**Massachusetts:**  Under Massachusetts law, Ch. 93A only requires that a consumer's distinct injury or loss is a result of the deceptive practice.  *Tyler v. Michaels Stores, Inc.*, 464 Mass. 492, 503, 984 N.E.2d 737, 745 (Mass. 2013).  As the Massachusetts Supreme Judicial Court has explained, no proof of individual reliance or subjective motivation is required.  *Aspinall v. Philip Morris Companies,*

*Inc.*, 442 Mass. 381, 397, 813 N.E.2d 476, 488-89 (Mass. 2004) (affirming certification of class of consumers who were injured by the purchase of a product when the actual health risks of the product were misrepresented). Furthermore, in the context of a nondisclosure, materiality is a proxy for causation under Ch. 93A. *Casavant v. Norwegian Cruise Line, Ltd.*, 76 Mass. App. Ct. 73, 77-78, 919 N.E.2d 165, 169-70 (Mass. App. Ct. 2009), *aff'd*, 460 Mass. 500, 952 N.E.2d 908 (Mass. 2011).

Thus, Plaintiff Dr. Strafford need not show not that she relied on Lilly's omissions or that Lilly's omissions caused her purchase of Cymbalta, but rather that Lilly's omissions caused her economic loss. (Strafford Decl., Dkt. 76, ¶¶ 5-8.) Because Dr. Strafford's claim arises in the context of a failure to disclose, she can satisfy the causation requirement merely by demonstrating the materiality of Lilly's omissions. (*See* Joseph Glenmullen, M.D. Supplemental Declaration, ¶¶ 4, 11-12, 14-15, 29 ("Glenmullen Supp. Decl.").)

**California:**  Unlike the states above, California's consumer protection statutes require reliance *as to the named plaintiff only* where a plaintiff's claims are based on allegedly fraudulent conduct. *In re Tobacco II Cases*, 46 Cal. 4th 298, 326, 93 Cal. Rptr. 3d 559, 581 (Cal. 2009) ("*Tobacco II*"). Nonetheless, as the California Court of Appeal reiterated in a recent opinion, "actual reliance, or causation, is inferred from the misrepresentation of a material fact." *Chapman v. Skype Inc.*, --- Cal. Rptr. 3d ----, No. B241398, 2013 WL 5502960, at *6 (Cal. Ct. App. Oct. 4, 2013). Thus, reliance under California consumer protection law is not akin to reliance under RICO, where plaintiffs must prove actual reliance without the benefit of a presumption in the face of a misrepresentation. *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665-66 (9th Cir. 2004).

To establish causation under California law, therefore, Plaintiffs Saavedra and Jacquez need only demonstrate that Lilly's omission of Cymbalta's true

withdrawal risk was material.  Materiality is objective, defined as something to which "a reasonable man would attach importance," and misrepresentations or omissions need not be the only reason for a decision but rather "a substantial factor" in influencing the decision.  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011); *Tobacco II*, 46 Cal. 4th at 326-27.  (*See* Saavedra Decl., Dkt. 78, ¶¶ 5-8; Jacquez Decl., Dkt. 77, ¶¶ 5-8; Glenmullen Supp. Decl. ¶¶ 4, 11-12, 14-15, 29.)  Precisely because materiality is determined on an objective, reasonable person standard, it is subject to classwide proof.  *Ewert v. eBay, Inc.*, Nos. 07-2198, 07-4487, 2010 WL 4269259, at *8 (N.D. Cal. Oct. 25, 2010).

The causation standards described above, not the individualized reliance necessary under RICO or the personal medical causation required for tort failure-to-warn claims, are the actual statutory causation standards under Plaintiffs' claims.  By attempting to import causation standards from RICO and tort law, Lilly dodges the state law causation standards that actually apply to Plaintiffs' claims.  While individualized issues of causation may arise under Lilly's version of the law, they do not under the actual law applicable to Plaintiffs' statutory claims and theory of liability.

To simplify the discussion of the relevant consumer protection statutes, Plaintiffs have included below a chart highlighting each statute's causation and injury elements, as well as citations to the record demonstrating that Plaintiffs can present common evidence at trial to address the question of injury and causation (in addition to the common question of whether Lilly's communications were materially misleading, the answer to which the Court ordered the parties to assume for purposes of class certification).

| | Injury and causation requirements | Evidentiary showing for class treatment |
|---|---|---|
| *Missouri* | • An ascertainable loss of money or property<br><br>• As a result of deceptive practice<br><br>• No reliance required<br><br>*Hess v. Chase Manhattan Bank, USA, N.A.,* 220 S.W.3d 758, 773 (Mo. 2007). | Ascertainable loss: Cymbalta actually worth less than as represented by Lilly. Matthews Decl., Dkt. 79 ¶¶ 5, 8; Hay Decl., Dkt. 83, ¶ 25; Hay Suppl. Decl., ¶¶ 17-20, 23.<br><br>Causation: Omissions caused value of Cymbalta to be inflated. Hay Decl., Dkt. 83, ¶ 25; Hay Suppl. Decl., ¶¶ 17-20, 23. |
| *Massachusetts* | • A distinct injury or loss suffered by the consumer<br><br>• As a result of the deceptive practice<br><br>• No reliance required<br><br>*Tyler v. Michaels Stores, Inc.,* 464 Mass. 492, 503, 984 N.E.2d 737, 745 (Mass. 2013). | Distinct injury: See "ascertainable loss" in Missouri, above; Strafford Decl., Dkt. 76, ¶¶ 5, 8.<br><br>Causation: Same evidence as Missouri. |
| *New York* | • Actual harm<br><br>• As a result of the deceptive practice<br><br>• No reliance required<br><br>*Koch v. Acker, Merrall & Condit Co.,* 18 N.Y.3d 940, 941, 967 N.E.2d 675, 676 (N.Y. 2012). | Injury: See "ascertainable loss" in Missouri, above; Strafford Decl., Dkt. 76, ¶¶ 5, 8.<br><br>Causation: Same evidence as Missouri. |
| *California* | • UCL / FAL: Economic injury<br><br>• CLRA: Any damage<br><br>• Actual reliance required, but presumption of classwide reliance where there is (1) classwide exposure to omission and (2) materiality<br><br>*Hinojos v. Kohl's Corp.,* 718 F.3d 1098, 1104-05, 1107-08 (9th Cir. 2013).<br><br>*Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1022 (9th Cir. 2011); *In re Tobacco II Cases,* 46 Cal. 4th 298, 325-27, 93 Cal. Rptr. 3d 559, 580-82 (Cal. 2009). | Economic injury / damage: See "ascertainable loss" in Missouri, above; Saavedra Decl., Dkt. 78, ¶¶ 5, 8; Jacquez Decl., Dkt. 77, ¶¶ 5, 8.<br><br>Causation: Exposure to omission was universal and Cymbalta's withdrawal risk is material. Saavedra Decl., Dkt. 78, ¶ 8; Jacquez Decl., Dkt. 77, ¶ 8; Glenmullen Decl., Dkt. 80, ¶¶ 10, 26; Glenmullen Suppl. Decl., ¶¶ 4, 11-12, 14-15, 29. |

While Rule 23(b)(3) requires that common questions predominate, it does not require "that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191, 185 L. Ed. 2d 308 (2013). Nor is it necessary for Plaintiffs to prove that every element of their claims is susceptible to classwide proof. *Id*. at 1196. Nonetheless, here, under the relevant state statutes rather than Lilly's version of the law, the elements of injury and causation are susceptible to common proof.

## III.   LILLY MISSTATES THE FACTS

While the Court ordered the parties to assume for class certification that the Cymbalta label was misleading, Lilly attempts to make a record that the label was not misleading. In so doing, Lilly presents statements of fact that are themselves misleading in at least four significant respects.

**A.   First, Lilly offers no evidence that true and complete information about Cymbalta withdrawal reached a single person**

During the hearing, Lilly's counsel all but admitted that, considered by itself, the Cymbalta label was misleading, stating that the only way a doctor could be aware of the actual withdrawal risk is from outside sources: "And the label says that it's at least one percent, but I've read an article, and I've heard from my colleagues, and I've actually gotten a letter from Eli that says it's as high as 44 percent[.]" (Tr. 15:6-9.)

Even if the existence of outside sources of information *could* give Lilly the right to mislead consumers, Lilly has not demonstrated that this information reached a single class member or prescribing physician. "[B]ald speculation that some class members might have knowledge" of misrepresentations is insufficient to defeat class certification. *In re U.S. Foodservice Inc. Pricing Litig.*, --- F.3d ----, No. 12-1311, 2013 WL 4609219, at *10 (2d Cir. Aug. 30, 2013).

Lilly has provided no factual showing that any doctors (other than Lilly's

own doctors and paid consultants) have read the Perahia article[4] or rely on colleagues rather than drug labels.  Most tellingly, despite touting its "Medical Information Letters" since March (Helgeson Decl., Dkt. 55, Exs. 1-11.), Lilly has provided *no evidence* that these letters were sent to a single doctor.  Instead of sending these letters as "Dear Doctor" letters to all physicians in the United States, Lilly made the letter available upon an "unsolicited request."  (*Id*. at ¶ 6.)  In other words, assuming doctors somehow magically learn of the existence of Lilly's Medical Information Letters, they are then required to call Lilly or ask Lilly's sales reps for a specific document.  Despite ample opportunity to provide evidence of Lilly's dissemination of these letters, including this most recent additional submission for the explicit purpose of developing a factual record, Lilly has offered no showing that these letters were sent to anyone.  In the data-rich environment that is the pharmaceutical industry, it is implausible that Lilly would have no record of the requests received and letters sent, unless that data reveals that the letters were, in fact, never sent to anyone.

Instead of providing evidence that its letters were sent to medical doctors, Lilly cites to a professor of applied economics at MIT who is not a medical doctor, who appears to lack first-hand knowledge of whether Lilly's Medical Information Letters were sent to anyone, and who simply repeats the assertion that the data on Cymbalta withdrawal "has been available" to physicians through the letters.

---

[4] Lilly published the Perahia article in a journal out of the Netherlands, the Journal of Affective Disorders.  Although Lilly's expert claims that the JAD is a "prominent" journal, "widely read," its website indicates that it has an impact factor of 3.295.  *See* http://www.journals.elsevier.com/journal-of-affective-disorders/ (last visited Oct. 22, 2013).  By comparison, the New England Journal of Medicine has an impact factor of 53.298, the Journal of the American Medical Association has an impact factor of 30, and the American Journal of Psychiatry has an impact factor of 14.721.  The impact factors are reported at the journals' respective websites, available at http://www.nejm.org/page/author-center/frequently-asked-questions; http://jama.jamanetwork.com/public/WhyPublish.aspx; and http://ajp.psychiatryonline.org/journal.aspx?journalid=13 (last visited Oct. 22, 2013).

(Berndt Decl., Dkt. 92, ¶ 15.)

Furthermore, Lilly's references to other sources overlook the fact that so-called "independent" information about Cymbalta stems from Lilly, since Lilly controls the availability of information about Cymbalta.  (*See* Glenmullen Supp. Decl., ¶ 10 (explaining that Lilly's consultants have downplayed or omitted Cymbalta withdrawal from articles and practice guidelines).)[5]

**B.  Second, Lilly focuses on Cymbalta as an antidepressant only, even though Lilly aggressively promoted much broader uses**

Lilly consistently focuses on Cymbalta as an antidepressant (*see, e.g.*, Tr. 14:25-15:15; Jacobs Decl., Dkt. 91, ¶¶ 20-37; Dkt. 90, at 11-14), ignoring the fact that Lilly aggressively promotes Cymbalta for a number of other uses, including chronic musculoskeletal pain.  (*See, e.g.*, Jacquez Decl., Dkt. 77, Ex. A (Cymbalta advertisement asking consumers, "Are you living with chronic osteoarthritis pain or chronic low back pain?").)  The practical effect of Lilly's multi-symptom promotion of Cymbalta is that the drug is prescribed by a very wide range of doctors, including general practitioners, many of whom are undoubtedly unfamiliar with the pharmacologic properties of serotonin-norepinephrine reuptake inhibitors like Cymbalta.  Even when considering Cymbalta as an antidepressant only, the odds are that a family doctor prescribed it.  (*See* Glenmullen Supp. Decl., ¶ 9 (approximately 80% of antidepressant prescriptions written by non-psychiatrists).) Lilly's misleading focus on Cymbalta as an antidepressant only, along with its submission of psychiatry texts and academic articles within the psychiatric specialization, implies that only psychiatrists prescribed Cymbalta, when in fact,

---

[5] For example, Lilly points to online sources such as WebMD in an effort to substantiate its argument that the label was not misleading (Dkt. 90, at 10; Jacobs Decl., Dkt. 91, ¶ 15.), but WebMD simply recycles the misleading information disseminated by Lilly.  (*See, e.g.*, Plaintiffs' Second Notice of Supplemental Material, Dkt. 71 (Lilly sponsors content on WebMD, which has included a quiz that indicated that all respondents were at risk for major depression, regardless of answers given, and featured Cymbalta promotional information and a link to the Cymbalta label).)

the *minority* of phsycians prescribing Cymbalta were psychiatrists.

Frankly, Lilly's focus on Cymbalta as an antidepressant is also an attempt to use the stigma of mental illness to its advantage, by arguing that the Cymbalta consumer's life is "a mess" and "dysfunctional"—and therefore by implication, too messy for class certification. (Tr. 15:2; 15:14.) The reality is that whether Cymbalta is prescribed for depression, fibromyalgia, anxiety, or chronic back pain, its withdrawal risk is something to which "a reasonable man would attach importance" in any instance. *Tobacco II*, 46 Cal. 4th at 327.

## C.   Third, Lilly's expert underestimates the importance of Cymbalta's withdrawal profile

Lilly argues out of both sides of its mouth regarding the significance of withdrawal in a consumer's decision to take a drug. Lilly's expert Dr. Jacobs first acknowledges that a selling point of one drug, Prozac, is that it has a long half-life, and therefore fewer withdrawal symptoms. (Dkt. 91, ¶ 26.) In the same declaration, he later states that "the risk of discontinuation symptoms exists with all antidepressants, and their rates of occurrence are not a clinically differentiating factor in choosing an antidepressant."[6] (*Id*. at ¶ 55.) This statement cannot be reconciled with his earlier observation that Prozac's fewer withdrawal symptoms are a selling point, and in fact, or his observation that Prozac is so different from Cymbalta that it can be used as a *treatment for withdrawal* caused by Cymbalta. (*See also* Glenmullen Supp. Decl. ¶ 3.) The half-lives of commonly prescribed antidepressants range from 5 hours to 4-6 days. (Glenmullen Decl., Dkt. 80, Ex. B.) Only one antidepressant has a half-life shorter than Cymbalta's. (*Id*. at ¶ 29.) This range, along with Lilly's promotion of Prozac as a low-withdrawal-risk therapy, demonstrates that a drug's withdrawal risk is a clinically differentiating

---

[6] Again, Dr. Jacobs neglects to mention Cymbalta's other uses. One presumes that when Cymbalta is being taken for chronic back pain instead of prescription-strength ibuprofen, for example, the fact that Cymbalta might cause dizziness, vomiting, and brain zaps upon ceasing treatment would be a significant differentiating factor for everyone considering taking or prescribing it.

factor which, moreover, has economic value.

**D.    Fourth, Lilly falsely states that a section of the Cymbalta label alerts prescribers to Cymbalta's withdrawal risk when it does not**

Lilly states that the Pharmacokinetics section of the Cymbalta label "provides information to doctors on the risk of discontinuation." (Dkt. 90, at 13.) This is false.  The Pharmacokinetics section, which describes the bodily absorption and metabolism of the drug, provides information on Cymbalta's half-life, but nowhere does it explain the link between a drug's half life and its likelihood of causing withdrawal.  (Jacobs Decl., Dkt. 91, Ex. I, Ex. J.)  Nor is this section cross-referenced with any other section.  *Id*.  Lilly's expert, Dr. Jacobs, states that the Pharmacokinetics section "alerts" prescribers to Cymbalta's withdrawal risk.  (Dkt. 91, ¶ 51.)  This sort of "alert" functions in the same way as Lilly's "available" Medical Information Letters—the information is hidden, and you can only find it if you already know about it.

Ultimately, all of Lilly's misleading factual assertions go to that issue, by addressing whether Lilly's omissions regarding the actual frequency, duration, and severity of Cymbalta withdrawal are materially misleading.  Not only did the Court order the parties to assume that Plaintiffs could prevail on this question (Dkt. 72, at 8.), but the Court already ruled that Plaintiffs would eventually be entitled to discovery on this very issue.  (*Id*. at 6.)  Much of Lilly's submission, therefore, is completely irrelevant to the decision of whether to certify the classes.

**IV.    THE COURT'S QUESTIONS AND CLASSWIDE DAMAGES**

Once Plaintiffs' claims are analyzed under the correct substantive law, the next question is whether Plaintiffs' claims can be proven on a classwide basis.  For the reasons stated in Plaintiffs' prior briefing, Plaintiffs' claims are susceptible to classwide proof.  (*See* Dkt. 86, at 5-9.)  In light of the Court's questions at oral argument, Plaintiffs wish to specifically address their theory of classwide

damages.[7]  As the Supreme Court recently held, damage calculations need not be exact, but any model of damage calculations must be consistent with the plaintiff's liability case, at the class certification stage as well as at trial.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013).  Plaintiffs have satisfied *Comcast* here.

Plaintiffs' theory of damages is consistent with their liability case because their proposed damages methodology measures only the economic injury under Plaintiffs' theory of liability.  As the Court recognized, under Plaintiffs' theory "the intermediary defense concerns are no longer relevant."  (Tr. 6:16.)  Plaintiffs allege that Lilly is liable under the state consumer protection statutes because Lilly's omissions and misrepresentations caused Plaintiffs' economic harm: namely, Plaintiffs purchased a product materially different from the product as represented.  The omitted characteristic—material information about the frequency and severity of Cymbalta withdrawal—has economic value, and Plaintiffs' proposed damages methodology seeks to quantify precisely that economic value.  Plaintiffs' damages theory is thus fully consistent with their theory of liability.

In support of their damages theory, Plaintiffs submitted the opinion of Dr. Joel Hay, an expert in pharmaceutical economics.  (Hay Decl., Dkt. 83.)  Dr. Hay proposed measuring the value of Cymbalta's withdrawal attribute through conjoint analysis.  As Dr. Hay explained, this methodology is scientifically viable and frequently utilized in the field.  In fact, conjoint analysis is employed by Lilly itself when Lilly wants to isolate the value of a drug's attribute.  *See infra* Part III.B.2.

Notably, Lilly admits in its supplemental submission that it has "not offered an opinion on the viability of the 'conjoint analysis' proposed by Dr. Joel W. Hay." (Dkt. 90, at 21 n. 10.)  Thus, even though the Court granted Lilly this opportunity

---

[7] Of course, even if the Court were not to certify Plaintiffs' claims for damages pursuant to Rule 23(b)(3), the Court could still certify Plaintiffs' claims under 23(b)(2) or an issue class under Rule 23(c)(4).

15

to develop the record and submit expert declarations, **the damages methodology proposed by Plaintiffs and Dr. Hay is *unchallenged.***

In his supplemental declaration, Dr. Hay further explains the mechanics of conjoint analysis, a tool market analysts use to ascertain the value of a product's attributes.  (Dr. Joel W. Hay Supplemental Declaration, ¶¶ 17-20 ("Hay Supp. Decl.").)  He explains that he could measure, objectively and classwide, the value created by the withdrawal attribute, and how much a drug's value decreases when the actual withdrawal risk is revealed.  (*Id.* at ¶ 23.)

At oral argument, the Court probed conjoint analysis and how that analysis supports Plaintiffs' damages theory.  (*See* Tr. 20:3-5 (asking what this difference in value leads to).)  As Dr. Hay explains in his supplemental declaration, he is able to use conjoint analysis to measure how much consumers value the withdrawal profile of Cymbalta.  (Hay Supp. Decl., ¶¶ 17-20.)  The difference in value can be expressed in one of two ways: 1) through a refund ratio or percentage, whereby every consumer will be entitled to a certain percent of the amount he or she spent on Cymbalta, or 2) through an absolute value, measuring the dollar amount a reasonable consumer assigns to the particular attribute.  (*Id.* at ¶¶ 19-21.)  Thus, Plaintiffs' and Class members' damages could be determined as a ratio of their out-of-pocket expenses or simply as the absolute dollar value per prescription filled, up to the class member's total out-of-pocket expenses.  For example, using the refund ratio, if the conjoint analysis determined that the relative value of a 1% versus 44% risk of withdrawal is 30% of the total product value, and Plaintiff Saavedra spent $455.00 out of pocket for Cymbalta, her damages could be calculated as 30% of $455.00, or $136.50.  (*Id.* at ¶ 21.)

Ultimately, even if some individual issues remain as part of damage calculations, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510,

514 (9th Cir. 2013). In *Leyva*, the Ninth Circuit reversed the district court's denial class certification on the ground of individualized damages, holding that the plaintiff's theory of damages satisfied *Comcast* because the proposed methodology measured only those damages attributable to the plaintiff's theory of liability. *Id*. Therefore, even if some arithmetic remains to be done to calculate damages, the existence of some individual issues should not defeat class certification here.

### 1. Plaintiffs' damages theory focuses on the objective, classwide measurement of value, not price—a distinction Lilly understands and promotes

Lilly attacks Plaintiffs' theory of damages on several fronts and Plaintiffs address each in turn. First, Lilly argues that the distinction between price and value is "artificial." (Dkt. 90, at 22.) However, the difference between price and value is actually a basic concept in marketing economics, and one that Lilly understands well. (Hay Supp. Decl., ¶¶ 8, 11.)

In fact, Lilly is so familiar with the distinction between value and price that it devotes space on its own website to explain the two concepts. Lilly's website features a prominent discussion of what it calls "VALUE-BASED PRICING." Lilly's website states:

> "**Lilly believes that our medicine prices reflect their value. In pricing our medicines, we consider the value provided to patients, providers, payers and the industry.**[8] . . . **The judgment of a medicine's value need not be reflected only in its ultimate price."**[9]

Lilly's attempts to mischaracterize Plaintiffs' damages theory should therefore be rejected as litigation rhetoric belied by Lilly's own business practices

---

[8] *See* http://www.lilly.com/about/key-issues/Pages/key-issues.aspx (last visited Oct. 21, 2013) (Attached as Decl. of Michael D. Woerner, Ex. 1.).
[9] *See* http://www.lilly.com/about/key-issues/Pages/value-based-pricing.aspx (last visited Oct. 21, 2013) (Attached as Woerner Decl., Ex. 2.).

and website content.[10]

To understand how Plaintiffs' damages theory can apply classwide, regardless of individual differences, the Court's car analogy is apt. (Tr. 18:15-23.) Assume Plaintiffs purchased cars that were marketed as containing high-end batteries. It turns out that the cars did not contain high-end batteries but rather average batteries. It does not matter whether the average battery in a particular car happens, by chance, to last as long as a high-end battery; what matters is the consumer injury that occurred when *every* car was purchased. Every purchaser bought a car that was less valuable than it was represented to be.

The Court's analogy is also helpful in understanding the distinction between price and value. As Dr. Hay explains in his Supplemental Declaration, price is set by the seller, as opposed to value, which is determined by the buyer. (*See* Hay Supp. Decl., ¶ 11.) Even for a car, price and value may diverge. While in a perfectly efficient market, the value of a product would be its price, a car's price might not perfectly reflect the value of its components—if, say, the price is set to be competitive with another car model with a very different value, or if the car's price is set simply to move inventory. (*See id.*, ¶¶ 10-13.)

Regardless of the car's price, however, the purchaser suffers an economic harm at the point of purchase because the product was not as represented at the time of the transaction. Lilly argues that a class could never be certified because it would be too hard to determine the price that each consumer paid for the car. But

---

[10] Moreover, Lilly's recongnition of the well-known distinction between price and value is commonly understood across the pharmaceutical industry globally, as is the concomitant ability to ascertain product values using aggregate methods. *See*, *e.g.*, Deloitte Center for Health Solutions, *Value-based Pricing for Pharmaceuticals: Implications of the shift from volume to value*, Deloitte LLP (2012) (explaining that there are different approaches to the aggregation of overall value, one of which is multiple criteria decision analysis, which encompasses conjoint analysis, and that as part of the larger process of value-based pricing, "[v]alue attributes (e.g., outcome or performance variables of interest) must be collected, measured, valued, aggregated . . ."), *available at* http://www.deloitte.com/view/en_US/us/Insights/centers/center-for-health-solutions/f604ae4d278b7310VgnVCM1000001956f00aRCRD.htm.

this argument ignores that each individual consumer suffered the *same economic injury* as a result of the deceptive practice—no matter the exact price paid.

In fact, this scenario occurs in the automobile context frequently, and class certification is routinely granted. *See, e.g.*, *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) (class certification appropriate under Michigan and Florida consumer protection statutes based on alleged alignment defect); *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504 (C.D. Cal. 2012) (certifying classes under the UCL, CLRA, NYCPA, and Florida consumer protection act based on allegedly defective rear suspensions); *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68 (Mo. Ct. App. 2011) (relying on *Plubell* and finding class certification appropriate under the MPA based on dashboard bubbling defect).  Thus, misrepresentation in the pharmaceutical context should not yield a different result on class certification.

**B.    Lilly has not contested, and can not contest, the established scientific viability of conjoint analysis**

Conjoint analysis has been utilized for decades, in marketing in general and in health economics and pharmacoeconomics in particular, as well as in litigation. *In fact, Lilly utilizes conjoint analysis, and has even used it to measure the value of the attributes of Cymbalta itself.*  (*See* Elie Ofek & Ron Laufer, *Eli Lilly: Developing Cymbalta*, Harvard Business School Case 507-044, November 2006 (Revised July 2008), Decl. of William F. Kitzes, Dkt. 81-3, at 12, 24-25.)  It is thus no wonder that Lilly's own experts take no issue with Plaintiffs' plan to use conjoint analysis.  (*See* Dkt. 90, at 21 n.10.)

**1.    Lilly's expert has offered no criticism of Dr. Hay's proposed conjoint analysis**

Lilly submitted the opinion of a professor of applied economics, Dr. Berndt. But Dr. Berndt offered no opinion on the declaration of Plaintiffs' pharmaceutical economics expert, Dr. Hay, or on Dr. Hay's proposed conjoint analysis.  (Dkt. 92.)

Dr. Berndt stated only that while he had not been asked to address Dr. Hay's proposal, he is "prepared to demonstrate" that the proposed conjoint analysis will not suffice for calculation of class damages, "at the appropriate time." (*Id.* ¶ 33(a) n. 12.)  Given the Court's questions during the September 17 hearing about the sufficiency of Plaintiffs' damages theory, and the order offering Lilly the opportunity to develop the record, that time has now passed.  In point of fact, Lilly offered no meaningful opposition to Plaintiffs' proposed damages theory and methodology because it has none.[11]

### 2.    Lilly utilizes conjoint analysis itself

Perhaps the other reason Lilly has not criticized Dr. Hay's proposed conjoint analysis is that Lilly has used conjoint analysis itself.  In fact, Lilly performed conjoint analysis to measure the relative value of Cymbalta's attributes.  (*See* Ofek & Laufer, *Eli Lilly: Developing Cymbalta*, Dkt. 81-3, at 13, 25-26.)

Another conjoint analysis funded by Lilly directly contradicts Lilly's one half-hearted attempt to challenge Dr. Hay's proposed conjoint analysis.  In a footnote, Lilly cites a state court opinion which concluded that conjoint analysis "is not accepted by the relevant expert community to assign monetary value to a particular product attribute." (Dkt. 90, at 21 n. 10 (citing *In re Tobacco Cases II*, No. JCCP 4042, slip op. at 10 (Cal. Super. Ct. Sept. 24, 2013)).)  Yet Lilly's own published conjoint study explains that conjoint analysis *can* determine the "relative importance of the attributes . . . *in monetary terms*."[12]  In this study, Lilly's researchers used conjoint analysis to measure consumer preferences for attributes of its prescription diabetes treatments, Humalog and Humulin, and translated the

---

[11] Moreover, Lilly fails to challenge Plaintiffs' experts under Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[12] Michael Aristides et al., *Patient Preference and Willingness-to-Pay for Humalog Mix25 Relative to Humulin 30/70: A Multicountry Application of a Discrete Choice Experiment*, 7 Value in Health 442, 449 (2004) (emphasis added). Attached as Hay Supp. Decl., Ex. 3.

relative preferences into monetary amounts (euros).  The authors of the article described conjoint analysis as "a well-accepted methodology for valuing the relative benefit of therapies as an incremental WTP [willingness-to-pay]," and noted that "the technique allows the relative contribution of the individual attributes to total WTP to be quantified."[13]

In other words, Lilly uses conjoint analysis to do exactly what Plaintiffs propose here: to measure the relative value of attributes of a prescription drug product and express that value in monetary terms.

### 3. Conjoint analysis has been used for decades in marketing in general and in health economics and pharmacoeconomics in particular

Lilly uses conjoint analysis because it is scientifically viable.  Conjoint analysis has been in use for almost 40 years in a wide variety of applications.  (*See* Hay Supp. Decl., ¶ 5.)  It has been used by the pharmaceutical industry, the Department of the Interior,[14] the U.S. Navy, car manufacturers, and hotel chains, to name a few.[15]  In the pharmaceutical industry, conjoint analysis has been used by drug manufacturers such as Lilly and AstraZeneca.  (*See id*., Exs. 2-4.)  As one article explains, conjoint analysis and its variations are "the most popular methodology" for estimating consumer preference, and "[v]irtually all national marketing research firms offer conjoint services."[16]  Conjoint analysis is nothing new in the marketing field, and it is now routinely used in the healthcare and

---

[13] *Id*. at 443.

[14] David A. Harpman, *Introduction to Conjoint Analysis for Valuing Ecosystem Amenities*, Bureau of Reclamation Technical Memorandum Number EC-2008-03. U.S. Dept. of the Interior, Bureau of Reclamation (Feb. 2008), *available at* http://www.usbr.gov/pmts/economics/reports/conjoint/TMEC200803.pdf.

[15] Paul E. Green, Abba M. Krieger, and Jerry (Yoram) Wind, *Thirty Years of Conjoint Analysis: Reflections and Prospects*, Interfaces S56, S67 (May-June 2001), *available at* https://marketing.wharton.upenn.edu/files/?whdmsaction=public:main.file&fileID =507.

[16] Yoram (Jerry) Wind, Abba M. Krieger, and Paul E. Green, *Applying Conjoint Analysis to Legal Disputes: A Case Study*, 2 Wharton School, University of Pennsylvania, Working Paper (2006), attached hereto as Woerner Decl., Ex. 3.

21

pharmaceutical fields.

In short, "The power of [conjoint analysis] is that it calibrates the value of a proposition and each of its features in financial terms."[17]

### 4.     Conjoint analysis has been widely accepted in litigation

Conjoint analysis has been utilized in litigation for decades.  One of the early examples of conjoint analysis employed in litigation was a case of false advertising under the Lanham Act; the district court awarded damages based on a conjoint analysis, and the Ninth Circuit affirmed.  *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034 (9th Cir. 1986).[18]  More recently, conjoint analysis has been used in several high-profile intellectual property cases as a way to measure the economic value of product attribute which has allegedly been infringed.  For example, conjoint analysis was used to assign a dollar amount to Sony's patented "autoplay" technology—a "market's willingness to pay" amount of $9.86.  *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020-21 (N.D. Cal. 2013); *see also Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109 (W.D. Wash. 2012) (conjoint analysis used to provide valuation of certain product features admitted as sufficiently relevant and reliable); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-1846, 2012 WL 2571332, at *9-10 (N.D. Cal. 2012) (same).

## V.   CONCLUSION

The Court gave Lilly an opportunity to develop the record to oppose Plaintiffs' motion for class certification.  Squandering that opportunity, Lilly challenges the merits of the Court's instruction to assume that the Cymbalta label was misleading and rehashes old, failed arguments about the applicability of other causation standards to consumer protection claims.  And Lilly's argument that

---

[17] Wouter van der Meer and Jan Kerkhofs, Infosys Lodestone, *The Art of Pricing in the Pharmaceutical Industry*, 7 (2012), *available at* http://www.lodestonemc.com/files/pdf/white%20papers/WP-The_Art_of_Pricing_in_the_Pharmaceutical_Industry-120703.pdf.
[18] *See* Wind, *supra* n. 16 (discussing examples of conjoint analysis in litigation during the 1980s).

marketing, sale, and pricing of prescription drugs are too complicated to be governed by consumer protection laws does not pass muster.

A class action is the best way to fairly and efficiently adjudicate Plaintiffs' claims, because Lilly's omission of Cymbalta's actual withdrawal risk is universal and common to the class; the statutes under which Plaintiffs pleaded their claims present objective questions susceptible to classwide proof; and the realistic alternative to classwide adjudication is no adjudication of the matter at all.  (Dkt. 73; Dkt. 74.)  Without class certification, Cymbalta consumers will be deprived of a meaningful opportunity to seek legal redress.  Because Plaintiffs have satisfied the requirements of Rule 23, they respectfully request that the Court grant class certification under Rule 23(b)(3) and (b)(2), or at the very least under 23(c)(4).

DATED this 22nd day of October, 2013.

KELLER ROHRBACK L.L.P.

*/s/ Michael D. Woerner*

Lynn Lincoln Sarko, Esq., *admitted pro hac vice*
lsarko@kellerrohrback.com
Michael D. Woerner, Esq., *admitted pro hac vice*
mwoerner@kellerrohrback.com
Gretchen Freeman Cappio, Esq., *admitted pro hac vice*
gcappio@kellerrohrback.com
Havila Unrein, Esq., *admitted pro hac vice*
hunrein@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900 / Fax: (206) 623-3384

Juli E. Farris, Esq. (CA Bar No. 141716)
jfarris@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
Tel: (805) 456-1496 / Fax:(805) 456-1497

Mark D. Samson, Esq., *admitted pro hac vice*
msamson@kellerrohrback.com
**KELLER ROHRBACK P.L.C.**
3101 N. Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel.: (602) 248-0088 / Fax: (602) 248-2822

Samuel S. Deskin, Esq.
sam@deskinlawfirm.com
**DESKIN LAW FIRM, PLC**
16944 Ventura Blvd, Office
Encino, CA 91316
Tel.: (800) 709-8978 / Fax: (800) 709-8971

Harris L. Pogust, Esq.
hpogust@pbmattorneys.com
T. Matthew Leckman, Esq.
MLeckman@pbmattorneys.com
**POGUST BRASLOW MILLROOD LLC**
161 Washington Street, Suite 1520
Conshohocken, PA 19428
Tel.: (800) 897-8930 / Fax: (610) 941-4245

***Counsel for Plaintiffs***

<u>**CERTIFICATE OF SERVICE**</u>

I, Cate R. Brewer, hereby certify that on this 22nd day of October, 2013, I caused true and correct copies of the foregoing:

**PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION**;

to be served on the below-listed counsel via the court's CM/ECF system electronically.

Clara J. Shin (CA Bar No. 214809)
cshin@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Tel: (415) 591-7058
Fax: (415) 955-6558

Phyllis A. Jones
pajones@cov.com
Mark H. Lynch
mlynch@cov.com
Colleen Kelly
ckelly@cov.com
Michael X. Imbroscio
mimbroscio@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Tel: 202-662-5868
Fax: 202-778-5868

*Attorneys for Defendant Eli Lilly and Company*


*/s/ Cate R. Brewer*
Cate R. Brewer, Legal Assistant

25