1  Lynn Lincoln Sarko, Esq., *admitted pro hac vice*
   lsarko@kellerrohrback.com
2  Michael D. Woerner, Esq., *admitted pro hac vice*
   mwoerner@kellerrohrback.com
3  Gretchen Freeman Cappio, Esq., *admitted pro hac vice*
   gcappio@kellerrohrback.com
4  Havila Unrein, Esq., *admitted pro hac vice*
   hunrein@kellerrohrback.com
5  **KELLER ROHRBACK L.L.P.**
   1201 Third Avenue, Suite 3200
6  Seattle, WA 98101
   Telephone: (206) 623-1900 / Fax: (206) 623-3384
7
8  Juli E. Farris, Esq. (CA Bar No. 141716)
   jfarris@kellerrohrback.com
   **KELLER ROHRBACK L.L.P.**
9  1129 State Street, Suite 8
   Santa Barbara, CA 93101
10 Tel: (805) 456-1496 / Fax: (805) 456-1497

11 Mark D. Samson, Esq., *admitted pro hac vice*
   msamson@kellerrohrback.com
12 **KELLER ROHRBACK P.L.C.**
   3101 N. Central Avenue, Suite 1400
13 Phoenix, AZ 85012
   Tel: (602) 248-0088 / Fax: (602) 248-2822
14

15 *Additional Counsel for Plaintiffs on following page*

16                    **UNITED STATES DISTRICT COURT**
                     **CENTRAL DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| JENNIFER L. SAAVEDRA, DR. MELISSA STRAFFORD, CAROL JACQUEZ, and DAVID MATTHEWS, JR., on behalf of themselves and all other persons similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>Defendant. | No. 2:12-cv-09366-SVW(MANx)<br>**CLASS ACTION**<br><br>**DECLARATION OF DR. JOEL W. HAY IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION**<br><br>Date: November 4, 2013<br>Time: 1:30 p.m.<br>Location: Courtroom 6<br>Judge: Hon. Stephen V. Wilson |

1  Samuel S. Deskin, Esq.
   sam@deskinlawfirm.com
2  DESKIN LAW FIRM, PLC
   16944 Ventura Blvd
3  Encino, CA 91316
   Tel.: (800) 709-8978 / Fax: (800) 709-8971
4
   Harris L. Pogust, Esq.
5  hpogust@pbmattorneys.com
   T. Matthew Leckman, Esq.
6  MLeckman@pbmattorneys.com
   POGUST BRASLOW MILLROOD LLC
7  161 Washington Street, Suite 1520
   Conshohocken, PA 19428
8  Tel.: (800) 897-8930 / Fax: (610) 941-4245

9  *Additional Counsel for Plaintiffs

1.	I have personal knowledge of the matters contained herein and, where I do not have direct knowledge, I believe them to be true and correct based upon the information available to me, my education, training, and experience. I would testify in person if the Court has any questions regarding the matters set forth in this declaration.

2.	I make this Supplemental Declaration in Support of Plaintiffs' Motion for Class Certification. Prior to writing this declaration, I reviewed the transcript of oral argument on September 17, 2013, the Declaration of Ernst R. Berndt, Ph.D. (Dkt. 92), and the Declaration of Patrick Bruen (Dkt. 93).

3.	In my previous declaration, I provided an opinion about whether it would be possible, using valid statistical techniques, to create a damages model to ascertain the amount by which consumers were injured by purchasing Cymbalta which was not as represented. I stated that I would be able to ascertain a damages calculation using conjoint analysis.

4.	As I explained in my previous declaration, conjoint analysis is a statistical technique used in market research to objectively ascertain how much consumers value specific attributes of a product. Using the power of sampling and statistics as a whole, conjoint analysis allows researchers to examine what drives consumer behavior and determine, on a market-wide (i.e., class-wide) level, how consumers value specific attributes of a product.

5.	This method of research and analysis has been widely used since the 1970s and has been specifically used in the pharmaceutical context since the 1990s.[1] Indeed, Defendant Eli Lilly & Co. ("Lilly") has used conjoint analysis in

---

[1] *See, e.g.*, Stuart Eriksen and L. Robin Keller, *A Multiattribute-utility-function Approach to Weighing the Risks and Benefits of Pharmaceutical Agents*, Medical Decision Making 1993: 13(116-125); Mike Aristides et al., *Conjoint Analysis of a New Chemotherapy: Willingness to Pay and Preference for the Features of Raltitrexed versus Standard Therapy in Advanced Colorectal Cancer*, Pharmacoeconomics 2002; 20 (11):775-784; Michael Aristides et al., *Patient Preference and Willingness-to-Pay for Humalog Mix25 Relative to Humulin*

evaluating its pharmaceutical products. *See* Ex. 3, Michael Aristides et al., *Patient Preference and Willingness-to-Pay for Humalog Mix25 Relative to Humulin 30/70: A Multicountry Application of a Discrete Choice Experiment*, Value in Health 2004: 7(4):442-454.

6. In my previous declaration I explained how I would conduct a conjoint analysis survey and how the results of that survey would allow me to calculate damages for the purposed classes. I explained that:

> The final phase would be to untangle and evaluate the data collected through the conjoint survey. Specifically, I would need to evaluate how the "withdrawal risk" attribute played into the decision-making process of consumers and physicians. . . . [U]sing conjoint analysis I could determine how much the "withdrawal risk" was valued by consumers and physicians. This value would be determined using a pricing attribute as part of the conjoint analysis that would allow me to calculate, on average, what the "withdrawal risk" value was for each purchase, either in absolute or percentage terms. . . [T]hese metrics would independently allow me to calculate an amount of damages that were sustained by the marketplace as a result of the consumer protection violations alleged by Plaintiffs.

(Declaration of Dr. Joel W. Hay at ¶ 25, Dkt. 83.)

7. During the oral argument on September 17, 2013, the Court asked questions about whether my proposed analysis would be able to ascertain the value of a particular attribute of a drug, and whether that value could be used to calculate a damages amount. Because my previous declaration did not fully elaborate upon how the *value* of an attribute would translate into a specific *damages* calculation. I will do so here.

---

*30/70: A Multicountry Application of a Discrete Choice Experiment*, Value in Health 2004: 7(4):442-454; Gunnar Johansson et al., *Asthma Treatment Preference Study: A Conjoint Analysis of Preferred Drug Treatments*, CHEST 2004; 125:916–923; Andrew Lloyd et al., *The Importance of Drug Adverse Effects Compared with Seizure Control for People with Epilepsy A Discrete Choice Experiment*, Pharmacoeconomics 2005; 23 (11):1167-1181. Attached as Exhibits 1 – 5.

8. To begin, it is important to establish what I mean by the term "value." In economic terms, the value of a product is a *measure* of the benefit a typical consumer believes they will obtain by use or ownership of the product. Frequently, economists measure value in terms of dollars and consider the value of a product to be the market's willingness to pay ("MWTP") for an item. MWTP is an objective measurement that allows economists to confidently determine what a product is worth for a given subject population.

9. Take the Court's car hypothetical as an example. If a person is willing to pay, at most, $10,000 for a car, then one could say that the consumer values the car at $10,000. Because value is a measure, however, value can be described using non-monetary determinants. For instance, the value of a product could be determined relative to other objects or conditions. One could describe the consumer's value of the product relationally. The consumer could consider that a car is five times more valuable than a motorcycle. In that case, one could say that the consumer values the car at five motorcycles.

10. Similarly, one could describe value in the context of an attribute. To follow the Court's automobile hypothetical, a consumer could value a car with a high-end battery 3% more than a car with an aftermarket battery. Likewise, a consumer could value a car with a 7-year battery 2% more than a car with a 3-year battery. In either case, the value of the product or the attribute is described in terms of a measure of what the consumer believes it is worth to him or her. Simply stated, whether one talks about the product as a whole or a specific attribute of the product, value reflects a measure of desirability.

11. Conceptually and practically, value is different than price. Price is determined by the seller, whereas value is determined by the buyer. The consumer only purchases an item if the "value" to the consumer is equal to or greater than the transactions price. In a competitive and transparent market, the price of a product is

the intersection of the supply and demand curve and very closely approximates the MWTP. However, in the brand name pharmaecutial market, price and value often diverge because of market constraints and regulatory factors.

12. In the car battery hypothetical, it does not matter what price the consumer ultimately paid at the car dealership, whether the dealer is holding a sale, or whether the dealer has raised prices because location rent or employee health insurance premiums increased. Conjoint analysis allows the researcher to determine the value of the high-end car battery to the consumer objectively, so that regardless of the particular circumstances of each consumer's purchase, the aggregate value of the attribute—the high-end battery—is represented as MWTP.

13. In the car hypothetical, this MWTP may closely approximate market prices, because the market for cars, while not perfectly efficient, is a fairly efficient, competitive market. By contrast, the prescription drug market is subject to demand and supply regulations and constraints that substantially weaken the relationship between transaction price and value.[2] In the context of a patent-protected drug like Cymbalta, because the relevant treatments typically possess some market power, the relationship between price and value is even more complex. While typically there is some relationship between a prescription drug's value and its price, the drug's price does not perfectly reflect its value. In this context, therefore, using multi-criteria decision analysis actually is a more direct and reliable way to measure in financial terms the difference between the product with and without the attribute in question.

---

[2] As I wrote in 2005, ".., healthcare markets are heavily regulated, licensed, credentialed, and restricted. In every country, healthcare satisfies few of the Economics 101 criteria for free market competition. Under these circumstances, the "invisible hand" ensuring that scarce medical resources are being produced or consumed efficiently is severely atrophied and arthritic." Hay JW. "Application of Cost Effectiveness and Cost Benefit Analysis to Pharmaceuticals." Chapter 14 in Santoro M, Gorrie T, eds. The Grand Bargain: Ethics and the Pharmaceutical Industry in the 21st Century. Cambridge University Press, New York NY, 2005:225-248.

14. Turning to Cymbalta, Plaintiffs allege that Lilly withheld material information from everyone – consumers and their prescribers alike – about the risks of withdrawal and misrepresented that withdrawal rates occur at rate greater than or equal to 1% when studies show the risk rate was at least 44%. The injury at issue, therefore, is that every consumer purchased Cymbalta that was not the same product as Lilly represented. What Plaintiffs have asked me to do is determine on a classwide basis (or to typical consumers) what damages are associated with that injury.

15. In a perfectly competitive market, using price would be a simple way to approximate damages. In such a market, price is equal to value. Therefore, simply determining what the price of the drug would have been absent the misrepresentation and subtracting that from the price actually paid, would yield a measure of injury, i.e., overvaluation. Here, however, because of the nature of the prescription drug market and because Cymbalta is still on patent, using price as a proxy for value is not appropriate. In this instance, using statistical analysis to directly measure value in the aggregate is more suitable than using price as a proxy for value.

16. To calculate damages, therefore, I will need to determine the relative value to consumers of both high (44%) and low (1%) levels of withdrawal risk compared to other Cymbalta attributes.

17. I propose conducting a conjoint survey to determine the value of the withdrawal risk attributes. My analysis would involve the following steps.

   A. First, I will generate a list of attributes for Cymbalta based on discussion with one or more patient focus groups. This initial step will allow me to identify the attributes most important to consumers in their treatment decisions. Because of the focus of this case, one of those attributes will be the risk of withdrawal.

B. The second step is to design the conjoint analysis survey. While the precise configuration of attributes depends on the results of the initial focus group findings, it is likely that the conjoint study would contain 5-7 attributes. Each attribute will have 2-4 levels. For example, the attribute of withdrawal risk will be represented in a low, medium, and high percentage. These attributes and levels will be combined into choice combination profiles. Because 7 attributes with 4 levels would yield 16,384 choice profiles, a fractional factorial design will be used to effectively represent the various choice profiles without overwhelming survey respondents with thousands of repeated choice tasks to fully assess preferences across all attributes and levels. Fractional factorial designs can be used to efficiently generate statistically valid estimates generally using less than 100 subjects and requiring these subjects to consider only 8-12 choice profiles each.[3] This fractional factorial design will be generated by SPSS, Sawtooth or other computer conjoint survey software.

C. Next, I will conduct the conjoint survey, asking a random sample of patients to make decisions about various hypothetical drugs based upon specific attributes. This will be done using a computer-generated survey.

D. The final step after I have collected sufficient data is to use statistical modeling to assign relative percentages to the various attributes. These percentages will show how Cymbalta is valued by consumers according to each attribute, including how consumers value the risk of withdrawal.

18. Using the above conjoint analysis, the economic loss suffered by each consumer of Cymbalta can then be computed in an objective, common manner. The relative value measured by the conjoint analysis can be expressed in absolute terms or as a percentage (ratio).

---

[3] For conjoint analysis statistical power calculations, see Jordan J. Louviere, David A. Hensher, Joffre D. Swait. Stated Choice Methods Analysis and Applications, Cambridge University Press, New York, 2003; pp. 262-64.

19. In absolute terms, the conjoint analysis will determine the dollar amount that consumers are willing to pay for a particular attribute (i.e., the MWTP). Damages for each consumer would then be that amount up to the amount of their actual out-of-pocket expenses.

20. Alternatively, the relative value determined through conjoint analysis can be expressed as a percentage, yielding a refund ratio. This refund ratio would then be applied uniformly to each class member's total out-of-pocket expenses.

21. To illustrate how a refund ratio could work, I will use Plaintiff Jennifer Saavedra as an example. Assume that my conjoint survey indicates that the relative value of a 1% versus 44% withdrawal risk is 30% of the total product value. This percentage indicates that, on average, by concealing the risk of withdrawal from consumers, Lilly was able to inflate the value as perceived by typical consumers of Cymbalta by 30%. Thus, to calculate her damages, one would simply apply that refund ratio to the amount of money she paid out of pocket for Cymbalta. According to her declaration, Plaintiff Saavedra spent $455.00 of her own money on Cymbalta. Her refund, therefore, would be $136.50, i.e., 30% of the money she spent out of pocket.

22. Either of these approaches is economically valid, but it is too early in the process (i.e., conjoint analysis has not yet been performed) to determine whether one method would be superior to the other.

23. Using conjoint analysis avoids the problems of trying to isolate how Lilly's concealment of withdrawal risks affected the price each consumer paid. This approach uses valid statistical methods to create a workable damages model that addresses the injury each consumer sustained by purchasing a product that was materially different from the product as represented. Since this approach uses a conjoint survey, it also avoids the trappings of individual issues. Instead of trying to figure out what each consumer believed his or her valuation of Cymbalta's

withdrawal risk was—something that would be difficult to objectively determine due to inherent bias caused by asking an individual to value an attribute directly—conjoint analysis gives us insight into common and systematic market behavior and allows me to determine a refund ratio that captures the damage caused to all consumers by Lilly's conduct.

24. Lilly has not offered any expert testimony to rebut my testimony about conjoint analysis. Instead, Lilly has put forward the declarations of Dr. Ernst R. Berndt of the Massachusetts Institute of Technology and an employee of Lilly named Patrick Bruen. I am familiar with Dr. Berndt and his work, although I am not familiar with Mr. Bruen. Both Dr. Berndt and Mr. Bruen spend a considerable amount of time discussing their understanding of how the price that a consumer pays for a particular drug varies. Although I have not been asked to dispute or verify the contents of these declarations, I believe a general observation is warranted. Respectfully, both of these declarations do not bear upon my opinion whatsoever. Their analyses focus exclusively on whether there is a uniform price paid by consumers for Cymbalta. They discuss at length the various ways prescription drugs make their way from Lilly's factory to the consumer's hand. They do not, however, touch on the issues of value or whether the concealed risk of withdrawal would influence consumer perception of the drug.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 21st day of October, 2013, at Los Angeles, California.

_____
Dr. Joel W. Hay